UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JEFFREY BIZZACK,<br><br>Defendant | Criminal No. 19-10222-1-DPW |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this memorandum in connection with the sentencing of defendant Jeffrey Bizzack.

Bizzack, a successful entrepreneur, conspired with William "Rick" Singer and others to secure his son's admission to the University of Southern California ("USC") by falsifying his son's qualifications and bribing a USC athletics administrator, Donna Heinel, to designate him as a recruited volleyball player. Bizzack made payments totaling $250,000 to facilitate the bribery scheme, including $50,000 directed to a USC athletics account, and $200,000 to Singer's sham charitable organization, the Key Worldwide Foundation ("KWF"). Singer, in turn, passed a portion of the KWF funds to Heinel personally and to a third co-conspirator, Laura Janke, who fabricated a volleyball "profile" for Bizzack's son as part of the scheme.

Earlier this year, following the arrest of other participants in the conspiracy, Bizzack, through counsel, contacted the government and arranged to meet with government investigators. During the ensuing interview, Bizzack admitted to his criminal conduct and agreed to plead guilty to one count of conspiring to commit mail fraud and honest services mail fraud, in violation of Title 18, United States Code, Section 1349. Bizzack also resigned from his position as an executive at the World Surf League, although he continues to provide unpaid consulting

services and to retain an ownership interest in the company. Bizzack's contrition and prompt acceptance of responsibility are significant and commendable. They merit a considerable reduction in his sentence. At the same time, Bizzack plainly was aware, in real time, that his actions were wrong, and that they would cause lasting harm not just to the college admissions process broadly but to another, real individual who would be cheated out of admission to USC as a result of Bizzack's fraud. And yet Bizzack pursued the scheme anyway.

The government respectfully recommends a term of imprisonment of nine months, which is below the stipulated Sentencing Guidelines range, together with a fine of $75,000 and 12 months' supervised release.[1]

## I.     Background

Bizzack was introduced to Singer in or about April 2017.[2] By that summer, Bizzack had agreed with Singer to pursue a scheme to secure his son's admission to USC through what Singer termed the "side door" – bribing a USC official to designate Bizzack's son as a recruited athlete. In the wake of that agreement, Singer asked co-conspirator Laura Janke, a former women's soccer coach at USC, to prepare a falsified athletic profile for Bizzack's son.[3]

---

[1] Based on the Pre-Sentence Investigation Report, the government's recommended sentence is above the applicable Guidelines range, but based on the Government's calculation of the Guidelines, the government's recommended sentence is below the applicable Guidelines range. The legal issues surrounding the Guidelines calculation are addressed in Section II herein.

[2] Singer pled guilty to racketeering conspiracy and other charges for his role in the scheme and is cooperating with the government's investigation. *See United States v. Singer*, No. 19-10078-RWZ (D. Mass.), Dkt. 1 (Information), Dkt. 2 (Plea & Cooperation Agreements), Dkt. 19 (Clerk's Notes of Plea Hearing).

[3] Janke pled guilty to racketeering conspiracy for her role in the scheme and is cooperating with the government's investigation. *See United States v. Ernst*, No. 19-10081-IT (D. Mass.), Dkt. 1 (Indictment), Dkt. 160 (Plea & Cooperation Agreements), Dkt. 170 (Clerk's Notes of Plea Hearing).

Singer initially asked Janke to depict Bizzack's son as a water polo player, but later changed course and asked her to depict him as a volleyball player. Bizzack's son did not play either sport competitively. On or about July 16, 2017, Singer e-mailed Bizzack to request certain biographical details for the profile, with the subject line, "For Me to build an athletic profile for USC or Georgetown -if we are going to side door." The profile ultimately depicted Bizzack's son, falsely, as a nationally ranked volleyball player, high school team captain and starting setter, and the recipient of a number of league awards. It included the photograph of another individual playing volleyball.

On or about October 19, 2017, Heinel used the false profile to present Bizzack's son to the USC subcommittee on athletic admissions as a purported volleyball recruit.[4] Before doing so, she further doctored the profile, including by deleting a logo from the photograph indicating the name of the athlete actually pictured.

On or about November 30, 2017, Singer forwarded Bizzack a letter from USC indicating that his son has been conditionally accepted to the university. The letter stated, "Your records indicate that you have the potential to make a significant contribution to the intercollegiate athletic program as well as to the academic life of the university." Less than a week later, on or about December 5, 2017, Bizzack issued a $50,000 check to USC's "Galen Center" – a restricted account that operated under Heinel's oversight – pursuant to his agreement with Singer that the $50,000 installment would be due upon receipt of his son's conditional acceptance. Before sending the check, Bizzack left Singer a voicemail indicating that he was "sending this check off to Donna and I just put a note in the letter just saying, you know, it's a donation."

---

[4] Heinel has been separately charged with racketeering conspiracy and related charges. *See United States v. Ernst*, No. 19-10081-IT (D. Mass.), Dkt. 272 (Third Superseding Indictment).

Bizzack did not tell his son about the conditional acceptance, a fact he confirmed in e-mails to Singer on or about January 5 and 25, 2018. In the January 25, 2018 e-mail, Bizzack also acknowledged that Singer would be registering his son with the NCAA – a process only required of student athletes.

USC mailed Bizzack's son a formal acceptance letter in late March 2018. Within days, Bizzack exchanged text messages with Singer confirming his intention to send $200,000 to Singer's purported charity, KWF, as they had previously agreed. Bizzack mailed a check for half that amount to KWF in March 2018. The memo line read "Donation," but in a handwritten note accompanying the check, Bizzack linked the payment to his son's admission: "Rick, A big thank you for all your help with [my son]! He is thrilled about U.S.C. and is still on cloud nine!" In April 2018, Bizzack sent a second check to KWF in the amount of $50,000, and caused his company, Eco-Pivot, to wire KWF the remaining $50,000.

Beginning in or about July 2018, Singer began making $20,000 monthly payments from KWF to Heinel in exchange for her role in facilitating the admission of Bizzack's son and the children of Singer's other clients to USC.

On or about October 26, 2018, Singer – who by this time was cooperating with the government's investigation – placed a telephone call to Bizzack at the direction of federal agents. During the call, which was consensually recorded, Singer told Bizzack that the IRS was auditing KWF, and that they needed to get their stories straight on what to tell the IRS about Bizzack's $200,000 payment to KWF. Bizzack acknowledged that his son had been admitted to USC through Heinel and volleyball, and asked Singer, "What is the – like with other people that you're doing this, what are – what's happening with them?" Bizzack also inquired whether anything was "going to come back to" him. Singer suggested a story Bizzack could use if asked

about the payment: that he had donated to KWF because it is a charitable organization that helps underserved children. Bizzack responded by noting that the "worst case scenario" was a perjury charge, and later asked if "any of your money . . . go[es] to underprivileged kids for anything?" He also asked Singer whether his other clients "actually take your donation and put it on their tax returns" and whether he should do the same "or just let that ride this year." And he sought reassurance that his $50,000 payment to USC looked like a donation. The call ended with Bizzack indicating he planned "to just keep my head down."

## II.   The Applicable Sentencing Guidelines

As noted, Bizzack stands convicted of one count of conspiracy to commit mail fraud and honest services mail fraud. The Probation Department has taken the position in this and related cases that the applicable Sentencing Guidelines for this charge should be determined by reference to Section 2B1.1 of the Guidelines. In contrast to those other cases, however – in which the government erred in drafting plea agreements providing that Section 2B1.1 applies to honest services fraud – the government and the defendant in this case have stipulated that the applicable guideline is Section 2B4.1, which governs commercial bribery offenses.[5] The parties have further stipulated that the value of Bizzack's bribe payments – $250,000 – increases his offense level pursuant to U.S.S.G. §§ 2B4.1(b)(1)(B) and 2B1.1(b)(1)(F). This stipulation distinguishes Bizzack's plea agreement and Guidelines calculation from those of the defendants

---

[5] The commentary to Section 2B4.1 provides that it "covers commercial bribery offenses and kickbacks that do not involve officials of federal, state, or local government, foreign governments, or public international organizations." U.S.S.G. § 2B4.1, cmt., n.1. USC charges tuition for educational services, making it a commercial enterprise. *See, e.g.*, *United States v. Brown University*, 5 F.3d 658, 666 (3d Cir. 1993) ("The exchange of money for services, even by a nonprofit organization, is a quintessential commercial transaction. Therefore, the payment of tuition in return for educational services constitutes commerce.") (internal citation and quotation omitted).

sentenced in *United States v. Abbott, et al.*, No. 19-cr-10117-IT.[6] The Guidelines provide that, in cases involving such a stipulation, the Court should "determine the offense guideline . . . applicable to the stipulated offense." U.S.S.G. § 1B1.2(a).

The parties' stipulation as to the applicable offense level is buttressed by the factual allegations in the Information – which, under the terms of Bizzack's plea agreement, he does not dispute. For example, the Information alleges that Bizzack "conspired with others known and unknown to the United States Attorney *to use bribery* and other forms of fraud to facilitate the admission of applicants to colleges and universities." Dkt. 1 (Information) ¶ 29 (emphasis added). One of the objects and purposes of the conspiracy was to "[b]rib[e] university athletic coaches and administrators to designate applicants as purported athletic recruits . . . ." *Id.* ¶ 30(b). The manner and means of conspiracy likewise included "[b]ribing university athletic coaches and administrators to designate students as purported athletic recruits . . . ." *Id.* ¶ 31(f).

Moreover, even if the Court were to determine that the parties' stipulation is not conclusive, the Guidelines require the application of Section 2B4.1 here. Section 1B1.2(a) provides that, for an offense involving conspiracy, the applicable guidelines are Section 2X1.1 "as well as the guideline referenced in the Statutory Index for the substantive offense," but that for statutory provisions not listed in the Statutory Index, "the most analogous guideline" applies.[7] Section 2X1.1, in turn, provides that the base offense level for conspiracy is the "base

---

[6] The application of Section 2B1.1 rather than Section 2B4.1 in the related cases resulted, by the government's calculation, in only a one point difference in the resulting offense level, because Section 2B4.1 has a base offense level of 8 and Section 2B1.1 has a base offense level of 7 in the context of a Section 1349 conspiracy. The Probation Department, however, has taken the position that under Section 2B1.1, the bribe amount does not factor into the calculation of the offense level.

[7] Section 1B1.2(a) further cites Section 2X5.1, which provides that "[i]f the offense is a felony for which no guideline expressly has been promulgated, apply the most analogous offense

offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." U.S.S.G. § 2X1.1(a).

The substantive offense in this case is honest services fraud, in violation of 18 U.S.C. §§ 1341 and 1346. Section 1346 does not appear in the Statutory Index. The most analogous guideline is Section 2B4.1, because Bizzack's "offense conduct more closely resembled a fraud achieved through bribery than a straight fraud." *United States v. Montani*, 204 F.3d 761, 769 (7th Cir. 2000) ("Although Montani was convicted of mail fraud, the government, Montani, the probation officer and the district court agreed that he should be sentenced under the bribery guideline because his offense conduct more closely resembled a fraud achieved through bribery than a straight fraud.").

Likewise, while the Statutory Index provides that Section 2B1.1 applies to ordinary mail fraud charged under Section 1341, the cross-reference in Section 2B1.1(c)(3) provides that, where "the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two," the other guideline applies. As set forth above, the conduct set forth in the Information establishes a commercial bribery offense.[8] *See, e.g.*,

---

guideline." The background section to Section 2X5.1 elaborates that "[m]any offenses, especially assimilative crimes, are not listed in the Statutory Index or in any of the lists of Statutory Provisions that follow each offense guideline. Nonetheless, the specific guidelines that have been promulgated cover *the type of criminal behavior that most such offenses proscribe*. The court is required to determine if there is a sufficiently analogous offense guideline, and, if so, to apply the guideline that is most analogous." (Emphasis added.)

[8] Application Note 17 of Section 2B1.1 provides examples of when other offense conduct sections are used, such as in the case of "a state employee who improperly influenced the award of a contract and used the mails to commit the offense," and who is "prosecuted under 18 U.S.C. § 1341 for fraud involving the deprivation of the intangible right of honest services." *Id*. The Guidelines note that "[s]uch a case would be more aptly sentenced pursuant to § 2C1.1." *Id*. Analogously, private sector honest services fraud falls under Section 2B4.1.

7

*United States v. Poirer*, 321 F.3d 1024, 1035 (11th Cir. 2003) ("We get to § 2B4.1 by applying § 2F1.1, which is the guideline specifically associated with the offense conduct. Application Note 14 of § 2F1.1 is essentially a cross reference that sends us to § 2B4.1. We are not improperly 'borrowing . . . from other offense guidelines,' but instead are applying the offense guideline and its Application Note.").[9]

Consistent with this analysis, the First Circuit and at least four other circuits have concluded that Section 2B4.1 applies in cases of private sector honest services fraud, whether or not those cases were charged pursuant to Section 1346.[10] *See, e.g.*, *United States v. Josleyn*, 99 F.3d 1182, 1198 (1st Cir. 1996) (applying U.S.S.G. § 2B4.1 where defendant convicted of conspiracy and mail fraud for conspiring to defraud his former employer by accepting bribes from prospective Honda dealers in exchange for dealership rights); *United States v. Rybicki*, 38 Fed. App'x 626, 2002 WL 655214, at *8 (2d Cir. 2002) (affirming sentence under U.S.S.G. § 2B4.1 where defendant convicted of honest services fraud); *United States v. Montani*, 204 F.3d 761 (7th Cir. 2000) (same); *United States v. Winters*, 62 F.3d 1418, 1995 WL 462415 (6th Cir. 1995) (unpublished) (same); *United States v. Kelly*, 2018 WL 2411593, at *4 (S.D.N.Y. May 29,

---

[9] If the Court determines that Section 2B1.1(c)(3) does not, on the facts of this case, require the application of Section 2B4.1, the government respectfully submits that the applicable Guidelines level should nonetheless be enhanced based on the value of the bribes paid, for the reasons set forth in its Memorandum Regarding the Methodology for Calculating Gain or Loss Under the Sentencing Guidelines filed in the *Abbott* case, No. 19-CR-10117-IT (Dkt. 422), which is attached hereto as Exhibit B, and incorporated herein by reference.

[10] The conclusion that Section 2B4.1 applies to private-sector honest services fraud makes sense for at least two reasons. First, the analysis parallels the application of Section 2C1.1 for public-sector honest services fraud, which provides for a higher base offense level but the same method of enhancing that level based on the value of the bribe or the improper benefit conferred in exchange. Second, it is consistent with the purpose of the Guidelines to achieve a just result and to reflect the defendant's culpability to apply a bribery guideline in a case involving fraud committed via bribery, and to measure the harm based on the value of the bribe or the improper benefit conferred.

2018) (unpublished) (same); *United States v. Hendershot*, 150 F. Supp. 2d 965 (N.D. Ill. 2001) (applying U.S.S.G. § 2B4.1 where defendant convicted of mail fraud arising out of an illegal kickback scheme and noting that "[t]he government prosecuted this case as a bribery case"); *see also Poirer*, 321 F.3d at 1034 ("It is certainly true that accepting or providing bribes is inconsistent with the delivery of honest services, but that is not to say that the commercial bribery guideline cannot also be applied to a § 1343 money and property wire fraud case.  The defendants' conduct in giving and receiving money in exchange for the misappropriation of documents is 'more aptly' covered by the commercial bribery guideline than by the fraud guideline.").

More recently, in *United States v. Tanner*, a district court in the Southern District of New York applied Section 2B4.1 in a private sector honest services fraud case in which the defendant, a pharmaceutical executive, received a kickback of nearly $10 million in exchange for giving secret guidance to executives at a mail-order pharmacy the defendant's employer was negotiating to purchase.  *See* 17-cr-00061-LAP (Oct. 30, 2018 S.D.N.Y.) (Preska, J.) (sentencing transcript) (attached hereto as Exhibit A).  In that case, the Probation Department agreed that Section 2B4.1 was the appropriate guideline, and the court applied that guideline.  *See id.*

Likewise, in a recent case in the Southern District of Florida involving a scheme to bribe former University of Pennsylvania basketball coach Jerome Allen to recruit a co-conspirator's son to the University of Pennsylvania basketball team, the parties stipulated that the defendant's Guidelines for money laundering should be calculated based on an underlying base offense level derived using Section 2B4.1(a).  *See* Plea Agreement, *United States v. Allen*, No. 18-cr-20773-KMW (S.D. Fla. Oct. 3, 2018) (Dkt. 10).  At sentencing, the district court agreed with the parties

9

and enhanced the offense level based on the bribe amount. *See id.* at Dkt. 35 (Presentence Investigation Report).

For all these reasons, Section 2B4.1 is the appropriate guideline in this case. Accordingly, Bizzack's base offense level is 8, and is enhanced by 10 based on the value of the bribes he paid, resulting in a total offense level of 15 after acceptance of responsibility, and a Guidelines sentencing range of 18 to 24 months.

### III.     The Defendant Should Be Sentenced to Nine Months in Prison.

Bizzack's crime was serious, considered and extended. It was intended to secure a place for his son in USC's entering class through deception and fraud. It involved corrupting a college admissions process that thousands of students depend on annually. It contributed to the weakening of public confidence in the fairness of that system not just at USC, but more broadly. And it caused concrete harm: the theft of an admissions spot, and the lifelong opportunities associated with it, from a more deserving student. Such harm is difficult to measure in dollars and cents, but it is real and lasting, and it demands punishment.

Bizzack's actions were neither impulsive, nor committed out of desperation. An enormously successful businessman, Bizzack had the resources to send his son to private school and pay for unlimited private tutoring. Yet these legitimate advantages were not enough for him. Instead, Bizzack sought to employ illegal means to secure an even greater edge over those without such means, or who were unwilling to cheat to get ahead.

The defendant was not dragged across the moral line, but agreed to engage in fraud within a relatively short time after meeting Singer. And the fraud itself extended over more than nine months. That time provided Bizzack numerous opportunities to turn back: when Singer asked him for information for his son's athletic profile in July 2017; when his son received his

conditional acceptance to USC in November 2017; when his son was officially accepted to the university in March 2018; at each of the points when he made payments that he knew would be used to pay bribes; and at every point in-between. Instead, Bizzack repeatedly chose to forge ahead.

From the beginning, Bizzack understood that what he was doing was wrong. The large payments he made to facilitate the fraud speak to his knowledge of the wrongdoing and the lengths to which he was willing to go to engage in it. A sophisticated businessman, Bizzack did not haggle with Singer over the bribe amount because, to him, what he was getting was worth it: an illegal advantage over other college applicants. He knew that his son didn't play volleyball, much less at a level that would qualify him for collegiate competition. Indeed, this knowledge is precisely why Bizzack didn't tell his son about the scheme. It is same reason he later expressed concern to Singer about whether his actions were "going to come back to" him. And it is why he ultimately directed his attorneys to call the government after he learned about this investigation.

To be sure, Bizzack deserves credit for coming forward rather than waiting to be charged, and the government's recommendation – well below the low end of the stipulated Guidelines sentencing range – reflects his proactive effort to accept responsibility for his crime. At the same time, Bizzack stepped forward only after many of his co-conspirators had already been charged. His first reaction, when Singer called and suggested he was being audited, was to keep his "head down." A meaningful term of incarceration is appropriate in light of the seriousness of Bizzack's offense, the lasting harm it caused, and the need for just punishment.

Neither probation nor a criminal fine would constitute a sufficient penalty under these circumstances. Criminal defendants "with money or earning potential" should not be able to "buy their way out of jail." *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting

the desirability of minimizing "discrepancies between white- and blue-collar offenses"); *see also United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008) ("[I]t has been noted that probationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class."). Nor would home confinement be a meaningful punishment given the prosperity in which the defendant resides.

Considerations of general deterrence also weigh in favor of incarceration. Bizzack's crime was multi-faceted, involving bribery, false statements, and laundering funds through a sham charity. These are crimes that occur quietly, in conference rooms, living rooms, and over the phone. They are difficult to detect. And they are rationalized by those who commit them, just as Bizzack rationalized his conduct as in his son's interests, telling Singer that his son was "thrilled about U.S.C. and is still on cloud nine!!" All parents want the best for their children, but most have a moral compass, and the self-restraint to stop short of achieving their goals through bribery and fraud. For those, like Bizzack and his co-conspirators, who lack that restraint – for whom the prospect of breaking the law and lying to cover it up is not, by itself, sufficient to stop them from committing crimes – the certainty of incarceration is the best and surest deterrent.

Courts recognize "the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). The fact that perpetrators of fraud crimes are "rational, cool, and calculated," makes them "prime candidate[s] for general deterrence." *Id*. (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted). A sentence of incarceration here will make unambiguously clear that everyone is accountable to the

law regardless of status, and will deter others from buying illegal advantages in the college admissions process.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that Bizzack be sentenced to a term of incarceration of 9 months, a fine of $75,000, and 12 months of supervised release.

                Respectfully submitted,

                ANDREW E. LELLING
                United States Attorney

By:    */s/ Kristen A. Kearney*
       ERIC S. ROSEN
       JUSTIN D. O'CONNELL
       LESLIE A. WRIGHT
       KRISTEN A. KEARNEY
       Assistant United States Attorneys

Date: October 23, 2019

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 23, 2019.

                */s/ Kristen A. Kearney*
                *Kristen A. Kearney*
                Assistant United States Attorney