UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cr-10222-DPW |
| | ) | |
| JEFFREY M. BIZZACK, | ) | |
| Defendant. | ) | |

## JEFFREY M. BIZZACK SENTENCING MEMORANDUM

The Defendant, Jeffery M. Bizzack ("Mr. Bizzack") hereby submits, through his counsel of record, his sentencing memorandum.

## I.        Introduction

Acceptance of responsibility, accountability and offers of assistance are the cornerstones of Mr. Bizzack's actions in this prosecution. He accepted responsibility clearly, completely and at a very early stage. He is remorseful, ashamed and accepting of the punishment this Court will impose. Mr. Bizzack has taken extraordinary, early and continuous steps to take responsibility for his conduct – actions that speak louder than words. These efforts make Mr. Bizzack very different from the other parents charged in this matter.

Mr. Bizzack takes responsibility for his offense conduct and has, from an early point in time, taken every step he could to demonstrate his willingness to be held accountable for his actions. Immediately after learning that the Government was aware of his involvement and prior to the initiation of proceedings, he retained counsel and made immediate contact with the Government. He resigned as an executive from one company and from the board roles he held at

other companies even before speaking to the Government – months before his involvement in this matter became public.

Soon after contacting the Government, Mr. Bizzack and his counsel met with the Government, including both prosecutors and agents. At this initial meeting, he engaged in a truthful, complete and candid discussion of his actions. He fully accepted responsibility for his wrongful conduct, made clear to the Government that he was willing to be held accountable for it, and offered to cooperate in their investigation in any way that he could to save the Government's investigatory resources. Shortly after meeting with the Government, Mr. Bizzack executed a plea agreement, further demonstrating his acceptance of responsibility.

During this same time frame, Mr. Bizzack offered to assist the University of Southern California ("USC"). He, along with his counsel, met with investigators for USC and talked openly and honestly about everything he knew about the scheme and his participation in it. He explained that his son did not participate in the offense conduct and had no knowledge of Mr. Bizzack's illegal actions related to the USC admissions process. Mr. Bizzack made clear that the offense was caused by his conduct, and that he knew what he had done was wrong, both legally, and as a father. He deeply regretted his actions and was overwhelmed with shame. He had betrayed USC and his son and had harmed hardworking students who might have otherwise been able to go to USC. Mr. Bizzack told USC, just as he told the Government, that he was at fault for the admissions scheme and that he took full ownership of it.

Mr. Bizzack resigned from his executive role and board positions before he even hired counsel in this matter. He took these actions to protect his colleagues and business partners from the consequences of his actions. He has spoken to his colleagues, friends and family repeatedly of his shame and remorse for his actions as well as his acceptance of responsibility and his

commitment to being held accountable for his actions. He has also demonstrated his commitment to proactively do whatever he can to mitigate the negative effects of his conduct on others.

Mr. Bizzack has also used the months since he decided to take responsibility for his actions in this matter to review and reassess his life and priorities. Mr. Bizzack has been regularly going to counseling to help him examine how he made the decisions that led to this matter. He has been volunteering at a food bank where he has handed out food packages to those in need. He has also used the time since he resigned his executive and board positions to try to repair the relationships he strained and the harms he caused through his actions in this matter.

The Government's sentencing recommendation completely ignores the eleven sentences already imposed on parent-defendants in this case, all of whom received terms of imprisonment far below what the Government is now seeking for Mr. Bizzack. This is true even though by the Government's own theory of comparative liability as expressed in its filings in the related case of *United States v. Abbott et al.,* Mr. Bizzack did not engage in the aggravating conduct that it attributes to these other parent-defendants apart from the amount of money at stake in this matter. Indeed, the Government itself admits that Mr. Bizzack's extraordinary acceptance of responsibility means that he is deserving of a shorter sentence than the other parent-defendants in this matter who payed Singer at least as much money. For this reason, the Government's recommendation for Mr. Bizzack is significantly below its recommendations for three already sentenced defendants, Huneeus, Sloane and Sempervivo.[1] But the Government's recommendation simply ignores what happened with these defendants. In fact, as detailed below, all three of these defendants, as well as every defendant already sentenced in this matter, received sentences far below what the Government now seeks for Mr. Bizzack.[2] Simply put,

---

[1] All three defendants are among the 11 parent-defendants charged in *United States v. Abbott, et al.*
[2] See *United States v. Abbott et al.*, 19-cr-10017-IT, and *United States v. Vandemoer*, 19-cr-10079-RZ.

imposing the Government's suggested sentence on Mr. Bizzack would be a miscarriage of justice and run afoul of the goals of modern sentencing, especially the need "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

After full consideration of the materials before the Court, and the sentencing factors the Court must weigh, Mr. Bizzack requests that this Court impose a sentence of probation and community service – a sentence that is sufficient but not greater than necessary to satisfy the goals of modern federal sentencing.

## II.     Response to the Court's Procedural Order

As detailed in the section below, the plea agreement in this matter suggests one guideline range based on U.S.S.G. § 2B4.1, but Probation, after conducting its own calculation, has found that a different Guideline range based on U.S.S.G. § 2B1.1 applies.  This is the only legal question to be decided at the sentencing.  If the Court finds that the applicable guideline range is the one described in the plea agreement, Mr. Bizzack will request and the Government will recommend a variance from the advisory guideline range.  If the Court finds that Probation's calculation is correct, Mr. Bizzack will ask for a sentence within that guideline range.  There are no factual issues that require an evidentiary hearing.

## III.    Applicable Guideline Range

The plea agreement states that the applicable guideline range is U.S.S.G. § 2B4.1, with a ten-level increase in the offense level driven by the amount of money that Mr. Bizzack paid to Singer ($200,000) and the USC Galen Fund ($50,000), leading to an offense level of 15 (after a three-level reduction for acceptance of responsibility).  Probation has conducted its own analysis of the applicable guidelines and has determined that the appropriate guideline is U.S.S.G.

§ 2B1.1. Probation has further determined that there is no cognizable victim or loss as those terms are defined in the guidelines, and thus the applicable offense conduct is a 5 (after a two-level reduction for acceptance of responsibility). Probation's determination matches the decisions of other Judges in this district. Indeed, the eleven other parent-defendants charged with the same crime in this very conspiracy were sentenced pursuant to Probation's guideline calculation.[3] See, *United States v. Abbott et al.,* Dkt 443, Memorandum and Order (J. Talwani holds that the correct guideline calculation is pursuant to U.S.S.G. § 2B1.1 with no loss enhancement – not § 2B4.1 – for defendants charged with the exact same offenses in this very same conspiracy). See also, *United States v. Vandemoer*, Sentencing Hearing (J. Zobel reaches the same result for a coach-defendant charged as part of this same conspiracy).

Defendant is bound by the plea agreement, and thus will not take a position on how the Court determines this issue, but does note that even were the Court to find that U.S.S.G. § 2B4.1 applies, 18 U.S.C. § 3553 and justice necessitates a sentence well below that guideline range to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

## IV.  Discussion

### A.  History and Circumstances of Defendant

Mr. Bizzack is a 59-year-old executive and entrepreneur who has, until this incident, lived a law-abiding life. Mr. Bizzack has been married for over 30 years to his wife with whom he has two children, a daughter, age 21, and a son, age 19.

---

[3] In its objection to the PSR, the Government asserts that this matter is "factually different" from *United States v. Abbott, et al.* because in this case the plea agreement includes a provision that the applicable guideline range is U.S.S.G. § 2B4.1. While there is no question that the plea agreements contain different guideline calculations, it is worth noting that the underlying facts of this case are identical to *Abbott* – both Informations charge similarly situated individuals with the same crime for involvement in the very same scheme.

This incident is a stark aberration from Mr. Bizzack's personal history. Over the years, Mr. Bizzack has developed a reputation as an upstanding business leader known for honesty, trustworthiness, and dependability. The numerous letters of support from Mr. Bizzack's friends and colleagues provide a testament to his character:

- "I have been in business with many different individuals over the past 30 years and none has been as honest, trustworthy, fair and supporting as Jeff." *Letter of Terry Hardy.*

- **"I have known Jeff since 1994 …** During this time, I have been a witness [to] Jeff's decision making in life and in business and – with this situation clearly as an exception – I have been impressed with his integrity, calmness, clarity and focus on family and what's 'right'." *Letter of Steve Klei.*

- "Jeff has shown to me over and over, in real life situations and struggles, his dedication to honesty, unparalleled support, and integrity in all aspects of his life." *Letter of Catherine Greer.*

- "I know Jeff to be trustworthy, charitable, dependable and always having a good moral compass." *Letter of John Moody.*

- "Jeff's character can be seen in so many small ways, the respect he has for each individual, the way he talks about other people when they're not there, the importance he gives to taking the high road when there might be other easier alternatives." *Letter of Noah Grimmett.*

- "He has built a well deserved reputation of honesty and integrity in his business dealings and personal life." *Letter of Scott Greer.*

- "His success has always been based on hard work, determination and enthusiasm. He has always had a great sense of honesty and integrity in his personal and business relationships…" *Letter of Monsignor Richard Duncanson.*

- "At all times, he has shown to have a generous, kind and devoted character towards others. He is a person with a lot of integrity and really makes a great effort to make sure that he acts correctly at all times…" *Letter of Cathy Templeton.*

- "I have always known Jeff to be an honest, responsible, and loyal person dedicated to his family, friends and community, and this behavior was certainly inconsistent with the person I know." *Letter of Steven Snyder, M.D.*

- "His honesty, fairness and caring for others is exhibited in both his business and personal life." *Letter of James Bizzack.*

- "Jeff is a man of honor and integrity." *Letter of Emily Hofer.*

- "I believe the behavior Jeff exhibited in committing this crime is the exact opposite of the man I know and love." *Letter of John Moore.*

Mr. Bizzack has started and led several companies and embedded in each of them an employee friendly culture, a desire to promote environmental sustainability, and a commitment to improving their local communities. For example, he co-founded a clothing company that uses recycled fishing nets as the source for its fabrics, and that prides itself on making only environmentally sustainable clothing. As an executive at a sports league, he worked with others to hire the first female executive of an international sports league and to encourage women's participation in the sport. He also helped develop artificial wave technology using renewable power and made sure that the facility was set aside on certain days to use that technology for charitable purposes for the local community by hosting groups of disabled veterans, children with cancer, and people with disabilities. Throughout his business career, Mr. Bizzack has been recognized as a leader who looks out for others, and doesn't put himself first:

- "Jeff is a man that has always put everyone's needs before his own… In fact, Jeff has always shied away from spotlight, often enabling those around him to get the credit for work he has done personally…There is absolutely no ego with this man. He takes a backseat and celebrates everyone around him." *Letter of John Moore.*

- "I see Jeff as the kind of person that makes you feel optimistic about humanity, that you're not in this alone, stokes enthusiasm about the future and what the possibilities are." *Letter of Noah Grimmett.*

- "I remember telling my wife that Jeff was a 'salt of the earth' kind of guy. Someone I could trust, rely on and honestly would like to emulate as I grow as a leader and CEO." *Letter of Mark Walker.*

- "He is a great leader and has earned the trust, respect and love from both his partners and the employees he manages." *Letter of Mark Beaudoin.*

- "His biggest belief is in people and what can happen when you find the right people, take care of them, empower them and let them achieve greatness." *Letter of Mark Walker.*

- "A man who puts his whole heart into everything he does, who puts others before himself, who challenges us to be our best selves, who inspires us to do the best work of our lives, and to never forget what it's all for – our families." *Letter of Emily Hofer.*

Mr. Bizzack has long sought to harness his businesses and charitable activities to promote the greater good:

- "While it is apparent Jeff is successful professionally, that isn't what defines him. That has never been what drives Jeff.  It is making a difference – whether helping others succeed in business and life or helping the broader community…" *Letter of Steve Klei.*

- "Jeff always has been active in the community. He and I have worked to raise millions of dollars for many amazing charitable groups including MiOcean, Surfrider, Hurricane Relief, WSL PURE, AMP Surf and many others. Jeff gives more than he takes and loves paying it forward." *Letter of Terry Hardy.*

- "Jeff is active in the community helping to advance causes which he is passionate about.  He was instrumental in the development of 'miOcean,' a non-profit organization to help local governments implement solutions to prevent contaminated urban run-off from polluting our coastal waters." *Letter of Steven Snyder, M.D.*

- "His commitment to helping others, passion for honesty and integrity above all else, and genuine desire to make a positive impact, whether in business or personal life, is what Jeff's true character has exemplified throughout his life." *Letter of Catherine Greer.*

- "In all the years I have known him, he always made good decisions, worked for the betterment of others, and was an unwavering supporter of those around him." *Letter of Vickey Rinehart.*

- "He is a truly compassionate and caring person." *Letter of Scott Greer.*

Mr. Bizzack's life has also been marked by efforts to help others quietly, without seeking the limelight.  For example, while living in Hawaii shortly after dropping out of college, Mr. Bizzack met Edgar and Trudy Kolm, an elderly couple who had fled Germany during WWII and had no surviving family.  For the final twelve years of their life, Mr. Bizzack and his wife regularly visited Edgar and Trudy in San Francisco and helped them with their shopping and

household chores.  Jeff, who is not himself Jewish, even went with them to synagogue on Jewish holidays, as they had no one else with whom to share these events.[4]

Mr. Bizzack also met Vickey Rinehart while living in Hawaii.  Mr. Bizzack and Ms. Rinehart each started businesses that were located near each other in 1983, but neither of their businesses thrived – indeed, both Mr. Bizzack and Ms. Rinehart had to declare bankruptcy and each left Hawaii when their respective businesses failed.  Ms. Rinehart left the world of business and returned to being a school administrator, ultimately becoming the superintendent of a public school district in California.  As Mr. Bizzack achieved success in other business ventures, he and Ms. Rinehart remained friends.  Ms. Rinehart continued to struggle financially in the years following her bankruptcy.  Mr. Bizzack transferred his house to Ms. Rinehart, allowing her to pay only $190,000 – the amount of the outstanding mortgage for the house – even though the house was valued at well over $300,000 at the time.  In Ms. Rinehart's words,

> He did this in order to help me with my large financial debt.  His actions allowed me to purchase a home I could otherwise not afford, and to use the equity in the house to pay my debts, repay my State retirement account, and become financially secure. Part of these actions, I believe were to help make up for the losses many years before in Hawaii, and also because he was a dear, kind friend who really cared about making my life better.  As a result of his actions, I have remained financially stable, and was able to care for my aging parents for several years in the home he helped me secure.  His kind, thoughtful, and generous actions made a major difference in our lives.  *Letter of Vickey Rinehart.*

Mr. Bizzack's kindness extended not only to those he knew, but also to others with whom he did not have a direct connection.  About five years ago, Mr. Bizzack heard through his children's Catholic elementary school, that another family had fallen on hard times and could not afford to send their child to a Catholic high school.  Mr. Bizzack agreed to anonymously pay the tuition for this family.  This child has since graduated from college and is attending law school.

---

[4] This story is recounted in the letter of support from the Rev. Msg. Richard Duncanson.

Mr. Bizzack also supported other lower income families by anonymously donating for their tuitions at the elementary school his children attended.

As the numerous character letters filed on Mr. Bizzack's behalf make clear, Mr. Bizzack's conduct in the matter before this Court is in sharp contrast to Mr. Bizzack's character. As explained in more detail below, Mr. Bizzack's strong moral center reasserted itself once he learned he was under investigation. From that moment until today, Mr. Bizzack has consistently sought to "own" his terrible decision by fully accepting responsibility and coming forward to plead guilty in this matter before he was charged.

### B. Extraordinary Acceptance of Responsibility

From the moment he became aware that his involvement in the scheme was under investigation, Mr. Bizzack decided to plead guilty, even though he had not yet been charged. Shortly after the Government's investigation in this matter became public in March 2019, Mr. Bizzack promptly took two steps to accept full responsibility for this crime. First, he immediately resigned from his employment and board memberships in an effort to protect his colleagues, partners, employees and companies from any additional harm caused by his grave lapse in judgment. Second, he engaged lawyers and instructed them to contact the Government and offer for Mr. Bizzack to come talk with them about his conduct as soon as possible. Mr. Bizzack ultimately proffered with the Government in May 2019, at which point he openly admitted his involvement in this scheme and offered to assist the Government in any way that he could. He did not attempt to deflect responsibility or minimize his role. Mr. Bizzack agreed to plead guilty shortly after that meeting, a plea that ultimately occurred in July 2019.

After talking with the Government, but before his plea in this matter, Mr. Bizzack also spoke with USC's investigators. To the best of our knowledge, Mr. Bizzack is the only parent

charged in this matter who agreed to speak with USC. Mr. Bizzack met with USC's investigators, in person, for several hours, and provided them with all requested documents to be totally transparent with them and to assist in USC's investigation.

Mr. Bizzack's immediate and complete acceptance of responsibility sets him apart from every other defendant who has been charged in this case. It also reflects Mr. Bizzack's longstanding character, outside of the moral lapse that allowed him to participate in this crime. Though it is hard for Mr. Bizzack's friends and colleagues to understand how a person who typically displayed a strong moral center got involved in this matter, they universally agree that Mr. Bizzack's total and complete acceptance of responsibility – his insistence that he will own up to his conduct – is completely consistent with his character:

- "When the news of the scandal first broke it didn't surprise me how Jeff reacted. His first concern from a business perspective was the potential negative impact that his mistake could have on his partners and the employees of the companies he was associated with, so he immediately resigned from all Board and officer positions. He also took full responsibility for his actions, making it clear to everyone that he was willing to bear the full consequences. In his mind it was simply the right thing to do regardless of the impact on him personally." *Letter of Mark A. Beaudoin.*

- "I know he is remorseful and wishes he could change what has happened. I know he realizes it was a bad decision and he knows he must accept the consequences. I am truly impressed how Jeff is handling this situation and stepping up and taking responsibility and ownership and accountability." *Letter of Steve Klei.*

- "As I learned what had happened I was struck by Jeff's desire to take responsibility and ownership for what he did. Knowing Jeff, I could see that he wasn't worried about himself but was more concerned with the effect on his son and the effect it would have on his wife and daughter and business associates." *Letter of Scott Greer.*

- "The actions Jeff has taken subsequently to proactively take full responsibility for what he has done and make no excuses therefor, are exactly in tune with his character as known to us as a loving and righteous parent and citizen attempting all he can to right a wrong no matter the personal consequence and provide his children and nephews and nieces an example of what the right thing to do is." *Letter of Keith Bizzack.*

- "In fact, Jeff called me the day before his guilty plea, incredibly remorseful, to inform me of his misconduct, the gravity of his situation, and to let me know he was ready to accept the responsibility for his wrongdoing." *Letter of John Moody.*

- "While we were surprised to hear about his unfortunate decision which lead to this case, it is no surprise to us that he is accepting responsibility for his actions." *Letter of Mr. and Mrs. James Bizzack.*

- "Jeff is a good person, who had a momentary lapse in judgment, of which he is so incredibly remorseful. It has been so painful to watch him go through this process. But he is. He has accepted full responsibility for his actions, and is doing everything he can to make it right." *Letter of Anna Holbrook Bizzack.*

- "When I first heard about the Jeff's involvement in the events that lead to this sentencing, I thought there had to be a mistake. After talking to Jeff, however, I understood that he had participated and immediately understood how embarrassed and remorseful Jeff was for what he had done. … I also believe Jeff truly understands the mistake he made, it's impact on others and is owning it. He isn't shirking responsibility and wants to make amends. Nobody will be harder on Jeff than he will be on himself." *Letter of Mark Walker.*

- "Jeff has owned his mistake and I know he will pour his whole heart into learning from this mistake." *Letter of Emily Hofer.*

- "He is a person with a lot of integrity and really makes a great effort to make sure that he acts correctly at all times which in the case of this situation I find this aberrant behavior not at all representative of who he really is. Being very close siblings Jeff and I have had many long long conversations and times of honest heart felt discussions of the reality of what these actions in this crime have done to his character and our family. Remorse, shame, and sadness are always at the forefront of these long talks." *Letter of Cathy Templeton.*

In the six months since Mr. Bizzack resigned from his executive role and board positions, he has committed himself to reexamining the priorities and decisions that led him to commit this crime and has been attempting to make up for the consequences of his actions through direct service to those in need. Mr. Bizzack has been volunteering at a food bank at which he sorts food products, cleans, and prepares food for distribution, and has handed out food directly to the poor. He hopes that this hands-on work to help the needy can start to address some of the consequences of his actions.

### C.        Comparison to Other Defendants in this Matter

The Government in its consolidated sentencing memorandum in *United States v. Abbott et al.*, lays out six factors that distinguish defendants' relatively culpability in this matter.  These six factors are: (1) the amount of bribes and other payments; (2) whether the defendant is a "repeat player" in the scheme; (3) whether defendant's participation in the scheme was active or passive; (4) whether the defendant involved his children; (5) whether the defendant occupied a position of trust; and (6) whether the defendant engaged in other related conduct to further the scheme.[5]  The Government also cited additional individual aggravating factors in each of its Supplemental Sentencing Memorandum for each *Abbott* defendants.  Mr. Bizzack's involvement in this crime did not include any of these aggravating factors other than the amount of money involved.

Unlike other defendants, Mr. Bizzack left the details of the scheme to Singer and kept the scheme from his son.  According to the Information, Singer arranged for others to prepare the falsified athletic credentials[6] and prepared and sent the false application.  Mr. Bizzack intercepted the initial acceptance letter informing his son that he had been tentatively accepted as a volleyball recruit.  In fact, Mr. Bizzack's son only found out about this scheme after other parents were arrested and Mr. Bizzack explained his involvement.  Unlike many of the other parents in this case, Mr. Bizzack did not take a tax deduction for the payments to Singer's charity or pay them through a charitable fund, or commit any additional acts to further the scheme other than those required to complete crime.  He also did not encourage anyone else in the scheme.[7]

---

[5] *United States v. Abbott et al.*, Dkt # 423, <u>Government's Consolidated Sentencing Memorandum</u>, p. 22-26.
[6] Mr. Bizzack knew that the application would include false claims about his son's athletic history, but unlike other parents involved in this scheme, neither Mr. Bizzack nor anyone else in the Bizzack family helped create the falsified records or photographs.
[7] The PSR's Offense Conduct states that Mr. Bizzack was introduced to Singer through a mutual acquaintance and also introduced Singer to other parents.  These facts are both accurate, though it is worth noting that neither the introduction to Mr. Bizzack nor Mr. Bizzack's introduction of Singer to other parents involved Singer's illegal

The Government's sentencing recommendation here bears no resemblance to any of the prior sentences that have been handed down in this case. As shown in the chart below, the eleven parent-defendants who have already been sentenced in this matter all received sentences far below what the Government is recommending for Mr. Bizzack. This is true even though, apart from the amount of money involved, Mr. Bizzack engaged in none of the aggravating factors the Government has cited as grounds for their recommendations for the other defendants. Indeed, the Government is now recommending a longer sentence for Mr. Bizzack than those received by the already sentenced parent-defendants who paid at least as much money as he did and for those who engaged in aggravating conduct that Mr. Bizzack did not.

| Defendant Name | Scheme | List of the Government's Asserted Aggravating Characteristics[8] | Government Sentencing Rec. | Jail Sentence Imposed |
|---|---|---|---|---|
| Peter Jan Sartorio | Test taking scheme | 1) Came up with idea for cash payment scheme to make the crime untraceable; *Government's Sartorio Suppl. Sentencing Memorandum, P. 3.* <br> 2) structured the cash withdrawals to avoid attracting attention at his bank; *Government's Sartorio Suppl. Sentencing Memorandum, P. 3.* <br> 3) amount of money involved ($15,000). | 1 month | no jail time |
| Felicity Huffman | Test taking scheme | 1) "Brazen hypocrisy" in engaging in scheme while cultivating and monetizing a public persona as a … purveyor of parenting wisdom, [including advice to] "extol the virtues of imperfection" and the "potential of failure"; *Government's Consolidated Sentencing Memorandum, P. 27*; *Government's Huffman Suppl. Sentencing Memorandum, P. 7.* <br> 2) took steps to repeat the crime for her second daughter; *Government's Huffman Suppl. Sentencing Memorandum, P. 4.* <br> 3) amount of money involved ($15,000). | 1 month | 2 weeks |

activities – both were referrals for Singer's *legal* college coaching activities and occurred before Mr. Bizzack even learned of the illegal scheme.
[8] These aggravating circumstances are taken from the Government's Consolidated Sentencing Memorandum and Supplemental Sentencing Memoranda filed in *U.S. v. Abbott et al.*

| Defendant Name | Scheme | List of the Government's Asserted Aggravating Characteristics[8] | Government Sentencing Rec. | Jail Sentence Imposed |
|---|---|---|---|---|
| Majorie Klapper | Test taking scheme | 1) Extensive involvement in multiple aspects of the fraud; *Government's Klapper Suppl. Sentencing Memorandum, P. 5.*<br>2) mislead ETS about how her older son's exam score had increased so substantially; *Government's Klapper Suppl. Sentencing Memorandum, P. 2.*<br>3) engaged Singer to cheat on her younger son's exam; *Government's Klapper Suppl. Sentencing Memorandum, P. 4.*<br>4) agreed to misrepresent her child's race on the application forms; *Government's Klapper Suppl. Sentencing Memorandum, P. 4.*<br>5) agreed to falsely claim that neither she nor her husband had attended college; *Government's Klapper Suppl. Sentencing Memorandum, P. 4.*<br>6) amount of money involved ($15,000). | 4 months | 3 weeks |
| Jane Buckingham | Test taking scheme | 1) Played a major role by suggesting how to commit the fraud; *Government's Buckingham Suppl. Sentencing Memorandum, P. 5.*<br>2) manipulated her son by giving him a fake test and telling him it was real; *Government's Buckingham Suppl. Sentencing Memorandum, P. 3.*<br>3) told Singer she intended to commit the crime again for her second child (but was interrupted by her arrest); *Government's Buckingham Suppl. Sentencing Memorandum, P. 1.*<br>4) showed "brazen hypocrisy" as an author of a book on parenting; *Government's Consolidated Sentencing Memorandum, P. 27*<br>5) amount of money involved ($60,000). | 6 months | 3 weeks |
| Gordon Caplan | Test taking scheme | 1) Displayed flagrant disregard for the law by an attorney; *Government's Consolidated Sentencing Memorandum, P. 25.*<br>2) a "rules oriented" lawyer who claimed that he was "not worried about the moral issue" of the fraud; *Government's Caplan Suppl. Sentencing Memorandum, P. 4.*<br>3) amount of money involved ($75,000). | 8 months | 1 month |
| Robert Flaxman | Test taking scheme | 1) Daughter was involved in cheating during the examination; *Government's Flaxman Suppl. Sentencing Memorandum, P. 3.*<br>2) took a tax deduction for the "donation"; *Government's Flaxman Suppl. Sentencing Memorandum, P. 4.*<br>3) agreed to mislead the IRS; *Government's Flaxman Suppl. Sentencing Memorandum, P. 4.*<br>4) amount of money involved ($75,000) | 8 months | 1 month |

| Defendant Name | Scheme | List of the Government's Asserted Aggravating Characteristics[8] | Government Sentencing Rec. | Jail Sentence Imposed |
|---|---|---|---|---|
| Gregory and Marcia Abbott | Test taking scheme | 1) Pursued the exam cheating scheme more than once; *Government's Abbott Suppl. Sentencing Memorandum, P. 6.*<br>2) threatened legal actions when the fraudulent test scores were not released; *Government's Abbott Suppl. Sentencing Memorandum, P. 6.*<br>3) actively pursued the scheme for nearly eight months; *Government's Abbott Suppl. Sentencing Memorandum, P. 6.*<br>4) did not succumb to Singer's pressure -- defendants approached Singer about the scheme; *Government's Abbott Suppl. Sentencing Memorandum, P. 6.*<br>5) amount of money involved ($125,000). | 9 months | 1 month |
| Devin Sloane | College Application Scheme | 1) Involved his son; *Government's Sloane Suppl. Sentencing Memorandum, P. 4.*<br>2) provided doctored photos for the falsified athletic credentials; *Government's Sloane Suppl. Sentencing Memorandum, P. 4.*<br>3) affirmatively lied to USC about the purpose of the donation; *Government's Sloane Suppl. Sentencing Memorandum, P. 11.*<br>4) lied to the high school guidance counsel to further the scheme; *Government's Sloane Suppl. Sentencing Memorandum, P. 15.*<br>5) amount of money involved ($250,000). | 12 months | 4 months |
| Stephen Semprevivo | College Application Scheme | 1) Involved his son; *Government's Semprevivo Suppl. Sentencing Memorandum, P. 1.*<br>2) had his son write an email to Georgetown falsely boasting of his athletic credentials; *Government's Semprevivo Suppl. Sentencing Memorandum, P. 7.*<br>3) sued Georgetown after he was arrested to try to prevent them from disciplining his son (in the Government's words: "he abused the legal process in an effort to preserve the benefits of that crime"); *Government's Semprevivo Suppl. Sentencing Memorandum, P. 1; Id. at 2.*<br>4) continued to evade responsibility and demonstrate lack of remorse; *Government's Semprevivo Suppl. Sentencing Memorandum, P. 10.*<br>5) actions were "considered and extensive" ... he pursued the fraud for months; *Government's Semprevivo Suppl. Sentencing Memorandum, P. 7.*<br>6) amount of money involved ($400,000). | 15 months | 4 months |

| Defendant Name | Scheme | List of the Government's Asserted Aggravating Characteristics[8] | Government Sentencing Rec. | Jail Sentence Imposed |
|---|---|---|---|---|
| Augstin Huneeus | College Application Scheme and Test Taking Scheme | 1) Crime was calculated and carefully planned; *Government's Huneeus Suppl. Sentencing Memorandum, P. 8.*<br>2) acted in an assertive manner, demanding more from Singer; *Government's Huneeus Suppl. Sentencing Memorandum, P. 8.*<br>3) involved in both schemes; *Government's Huneeus Suppl. Sentencing Memorandum, P. 7.*<br>4) considered pursuing the exam cheating scheme multiple additional times; *Government's Huneeus Suppl. Sentencing Memorandum, P. 3.*<br>5) suggested alternative techniques to commit the fraud; *Government's Huneeus Suppl. Sentencing Memorandum, P. 8.*<br>6) involved his child and instructed her to keep a "shut-your-trap-mentality" about the fraud; *Government's Huneeus Suppl. Sentencing Memorandum, P. 7-8.*<br>7) offered to involve a second daughter to cheat on behalf of the daughter who was the subject of the fraud; *Government's Huneeus Suppl. Sentencing Memorandum, P. 8.*<br>8) repeatedly lied to his daughter's high school counselors; *Government's Huneeus Suppl. Sentencing Memorandum, P. 8.*<br>9) agreed, without hesitation, to lie to the IRS about the scheme; *Government's Huneeus Suppl. Sentencing Memorandum, P. 8.*<br>10) amount of money involved ($300,000). | 15 months | 5 months |

Given the defendant's extraordinary acceptance of responsibility, as well as his minimal involvement in any of the aggravating conduct that the Government has identified with other defendants, justice requires that Mr. Bizzack receive a sentence at the low end of the sentences that have been given to the other parent-defendants who have plead guilty in this matter, and certainly not a sentence higher than that received by every single defendant who has already been sentenced, as has been requested by the government.

**D.      Arriving at a Reasonable Sentence 3553(a) Factors**

In arriving at a just sentence in this case, Mr. Bizzack respectfully asks the Court to consider several important factors pursuant to 18 U.S.C. § 3553(a):

First, until this incident, Mr. Bizzack has lived an exemplary life. Mr. Bizzack is a devoted father and husband – he and his wife have been married for over 30 years. He has found success as an entrepreneur, but he has not been driven by a single-minded desire to make money. Instead, he has always combined his efforts to build productive businesses with a vision intended to improve the wider world – a vision and culture that he has embedded into his businesses, and that he has lived through his charitable works and efforts to help those in need.

Second, the nature and circumstances of Mr. Bizzack's offense do not warrant incarceration. Mr. Bizzack was a limited participant in Rick Singer's overarching scheme. Though he fully takes responsibility for his involvement in this crime, unlike other parent-defendants, he did not engage in any related conduct to further the crime, did not involve his son, did not lie about his involvement, did not take advantage of tax deductions, was not a repeat player, and has never attempted to minimize his role in the offense.

Third, Mr. Bizzack has gone to extraordinary lengths to accept responsibility for this crime. To date, a total of 52 defendants have been named in the series of cases stemming from

Rick Singer's fraud scheme, 35 of whom are parents who, like Mr. Bizzack, agreed to participate in the scheme to further their children's college application.  Of those parent-defendants, only one – Mr. Bizzack – comes before the Court without having been arrested prior to his offer to plead guilty.  Mr. Bizzack has been completely open and willing to assist in the Government's investigation, as well as in USC's own investigation into this matter.  Unlike other defendants, he has made no effort to defend, justify or minimize his conduct.  Mr. Bizzack's sentence should recognize his extraordinary actions in coming forward as an example for the as-yet-uncharged parents in this case.[9]

Fourth, the Government's recommended sentence in this case is far higher than that of any of the defendants *in this same matter* who have already been sentenced, even though by the Government's own theory of culpability, Mr. Bizzack is *less* culpable than these other defendants.   Indeed, even without comparing Mr. Bizzack to the other defendants in this case, a sentence of probation would be an appropriate sentence for a first-time offender who like Mr. Bizzack has made the extraordinary efforts to accept responsibility and atone for his actions.

Fifth, under the factors in 3553(a), a sentence of probation combined with community service is sufficient but not greater than necessary to accomplish the goals of sentencing.  Mr. Bizzack has never been arrested before and presents no risk of recidivism for this or any other crime.  He has been absolutely forthcoming about his involvement and has been working hard to make amends in any way that he can.  Indeed, he has already started doing hands-on community service by volunteering to sort food products, clean, prepare food for distribution, and distribute food packages to those in need.  Given the tremendous publicity that this case has engendered,

---

[9] According to the Indictment filed against some of the parents in this case, Rick Singer made $23 million dollars from this scheme, but the total value of payments in the various charging documents in this matter amounts to about half of that, suggesting that many of the parents who engaged in this scheme have not yet been charged.  The Government has also made statements that there are numerous uncharged parents still under investigation.

and the range of sentences imposed on different defendants depending on the details of their conduct in this case, a message of general deterrence has been clearly sent.  A sentence of probation would fairly reflect Mr. Bizzack's extraordinary efforts to accept responsibility in this matter and encourage other uncharged defendants to follow his example.

Finally, in light of the framework of aggravating factors described by the Government in *US v. Abbott et al.*, as well as the factors considered by other judges involved in sentencing the other defendants in this case, a sentence of probation for Mr. Bizzack would ensure that the sentence avoids unwanted disparities among defendants with similar records that have been found guilty of the same conduct.

## V.  Conclusion

For all the reasons detailed above, Mr. Bizzack respectful submits that a sentence of one year of probation with a special condition that Mr. Bizzack perform 250 hours of community service and a fine of $75,000 is sufficient but not greater than necessary to achieve the goals of sentencing.

JEFFREY M. BIZZACK,

By his attorney,


  /s/ Seth P. Berman
Kate Corrigan (Pro Hac Vice)
kate@cwsdefense.com
Corrigan, Welbourn Stokke APLC
4100 Newport Place, Suite 550
Newport Beach, CA 92660
(949) 251-0330

Jeremy Goldman (Pro Hac Vice)
jeremy@goldmandefense.com
Law Offices of Jeremy N. Goldman
19200 Von Karman Avenue
Suite 300
Irvine, CA 92612
(949) 387-6670

Seth P. Berman (BBO# 629332)
sberman@nutter.com
NUTTER, McCLENNEN & FISH, LLP
155 Seaport Boulevard
Boston, MA  02210
(617) 439-2338

Dated:  October 23, 2019

## CERTIFICATE OF SERVICE

       I certify that a true copy of the above document was served upon all counsel of record through the ECF system on October 23, 2019 and was sent electronically on that date to the parties' counsel of record and to United States Probation Officer Martha Victoria by email.


                                          /s/Seth P. Berman
                                            Seth P. Berman

Dated: October 23, 2019