# Exhibit A

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   UNITED STATES OF AMERICA,                    New York, N.Y.
4              v.                                 17 Cr. 61(LAP)
5   GARY TANNER
6   ANDREW DAVENPORT,
7              Defendants.
8   ------------------------------x              Sentence
9
                                                 October 30, 2018
10                                               10:05 a.m.
11
12  Before:
13                  HON. LORETTA A. PRESKA,
14                                               District Judge
15
16                          APPEARANCES
17
18  GEOFFREY S. BERMAN
         United States Attorney for the
19       Southern District of New York
    BY:  RICHARD A. COOPER
20       AMANDA K. KRAMER
         Assistant United States Attorneys
21
22  WILMER CUTLER PICKERING HALE & DORR, LLP
         Attorneys for Defendant Tanner
23  BY:  BRENDAN R. McGUIRE
         HOWARD M. SHAPIRO
24       MATTHEW R. GALEOTTI
         CLAIRE GUEHENNO
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

iau2tanS kjc

                                        APPEARANCES
                                        (continued)


KOSTELANETZ & FINK, LLP
        Attorney for Defendant Davenport
BY:   SHARON L. McCARTHY


                        – and –


POLSINELLI PC
        Attorneys for Defendant Davenport
BY:   MARY CLARE BONACCORSI




ALSO PRESENT:

SHAPIRO ARATO, LLP
        Appellate Counsel for Defendant Davenport
BY:   ALEXANDRA  A. E. SHAPIRO


COVINGTON & BURLING LLP
        Attorneys for Valeant
BY:   NANCY L. KESTENBAUM


SPECIAL AGENT MICHAEL PREIS, F.B.I.

iau2tanS kjc

1          (Case called)

2          THE COURT:  United States v. Gary Tanner and Andrew

3    Davenport.

4          Is the government ready?

5          MR. COOPER:  Yes.  Good morning, your Honor.  Richard

6    Cooper and Amanda Kramer for the government.  With us at

7    counsel table, F.B.I. Special Agent Michael Preis.

8          THE COURT:  Good morning.

9          MS. KRAMER:  Good morning, your Honor.

10          THE COURT:  Counsel for defendant Tanner.

11          MR. McGUIRE:  Good morning, your Honor.  Brendan

12    McGuire, Howard Shapiro, Matthew Galeotti, and Claire Guehenno

13    on behalf of Mr. Tanner.  Mr. Tanner is here with us, as well.

14          THE COURT:  Yes, sir.  Good morning.

15          Counsel for Mr. Davenport.

16          MS. McCARTHY:  Good morning, your Honor.  Sharon

17    McCarthy.  I am here with Mary Clare Bonaccorsi and also

18    Mr. Davenport.

19          THE COURT:  Yes, ma'am.  Thank you.

20          Mr. McGuire, have you and your client had adequate

21    time to review the presentence report?

22          MR. McGUIRE:  We have, your Honor.

23          THE COURT:  Is there any reason it should not be made

24    a part of the record?

25          MR. McGUIRE:  No, your Honor.

1          THE COURT:  Are there any objections to the report?

2          MR. McGUIRE:  None other than were previously included

3   in our prior written submissions to the court, your Honor.

4          THE COURT:  Do you folks want to discuss loss amount

5   at this point?  Obviously you have all put in materials on it,

6   and I think the question is whether or not, under 2B4.1, we are

7   taken back to the 2B1.1 guidelines and thus the 20 points.

8   That's the question.

9          Ms. McCarthy.

10         MS. McCARTHY:  Your Honor, we certainly put in our

11  submissions that we don't believe that there is a loss here;

12  that we have proven in fact that Valeant earned quite a lot of

13  money off of the work that Philidor did; that in fact the

14  purchase price for Philidor was below its purchase price value

15  and was bought at a bargain by Valeant.

16         So we are not contesting that there was a verdict here

17  against our clients --

18         THE COURT:  But here is the question.  I am focusing

19  on the bribery, commercial bribery guideline, which

20  specifically talks about the value of the bribe --

21         MS. McCARTHY:  Yes, we understand.

22         THE COURT:  -- and doesn't that take us to the 9.7,

23  which then takes us to the 2B1.1 guideline, which gives us the

24  20 points?

25         MS. McCARTHY:  That is correct, your Honor.

1          THE COURT:  Okay.  There is no way around that

2    point --

3          MS. McCARTHY:  Right.

4          THE COURT:  -- regardless of what we think about the

5    other counts of conviction.

6          MS. McCARTHY:  We were not aware that the government

7    was going to be referring to 2B4.1 when we made our sentencing

8    submissions, your Honor.  I believe that that's an accurate

9    reading of 2B4.1 and that is the value of the payment, 9.7.

10         Loss is relevant for other issues that we will be

11   discussing, including towards restitution, which your Honor has

12   given us time to brief.

13         THE COURT:  Yes, ma'am.  I was looking at page 10,

14   footnote 3 of the government's submission.  I guess one of the

15   reasons that I ask this question is if we agree as to that, I

16   think there doesn't need to be further findings on loss or

17   restitution at this point in time and you people can be heard

18   on all of that in due course.

19         MR. McGUIRE:  Your Honor, I think that may be true.  I

20   would just want to add for the record, though, the government

21   on page 6 of its submission, in footnote 2, cites to the *Kelly*

22   case, which is a Judge Sweet opinion, which does, as the

23   government indicates, apply to 2B4.1.  However, I would say in

24   that opinion Judge Sweet's point of reference is loss.  He

25   talks explicitly about loss because 2B4.1 references us back,

iau2tanS kjc

1    as your Honor stated, to 2B1.1.  As your Honor stated, the

2    language in 2B1.1 speaks in terms of the amount of the bribe,

3    but I would just note that in that opinion the focus then

4    became loss to the victim.

5            THE COURT:  Okay.  I understand that you people might

6    not necessary and probably don't agree that that is a loss

7    amount, particularly in connection with the honest services

8    count of conviction, but I think that 3D1.2(b) and 3D1.3

9    instructs us to take the highest guideline of the grouped

10   counts of conviction and, thus, under the commercial bribery

11   guideline, we are stuck with the 20 points.  Isn't that right?

12           MS. McCARTHY:  We are of that view except for the 9.7

13   million.  Valeant presented in its victim impact statement, and

14   I'm sure the court hasn't had a chance to focus on that,

15   because we are not dealing with that right now, $8 million as

16   an alternative theory which the government puts forward in

17   footnote 3 as well.  So we would ask the court, instead of 9.7,

18   to use the 8 million, which results in an 18-point, rather than

19   a 20-point, enhancement.

20           THE COURT:  All right.  What is the government's

21   position on all of this, please?

22           MS. KRAMER:  Good morning, your Honor.

23           THE COURT:  Yes, ma'am.

24           MS. KRAMER:  Mr. Cooper will be handling the bulk of

25   the sentencing proceeding today, but I will address this issue.

iau2tanS kjc

1          2B4.1 is unequivocal that the question for the number

2     of levels to be increased using the table in 2B1.1 is to be

3     based on the greater of the value of the bribe or the improper

4     benefit to be conferred, so what is paid as a bribe or a

5     kickback or what is received in exchange.

6          We are taking a fairly conservative view that the

7     bribe is the greater amount in this case.  I think all of the

8     litigation -- a lot of the litigation that has taken place in

9     cases applying 2B4.1 is where the bribe or kickback is less

10    than the amount received, which we are avoiding that litigation

11    by taking the conservative view, but there is no world in which

12    the value of the bribe in this case is less than 9.7, and the

13    improper benefit conferred is either larger than that or you

14    use the bribe amount.

15         The use of 2B4.1 was in the government's response to

16    defense counsel's objections to the PSR and was in the final

17    PSR.  And the case law is very plain.  There are a couple of

18    cases, including *Kelly*, where the court uses loss as a

19    shorthand but is still applying the principle of 2B4.1 and

20    looking at the value of the bribe or the improper benefit

21    conferred.

22         There is no authority to the contrary that loss,

23    pecuniary harm to a victim is what should be applied under

24    2B4.1.  The government has not seen any and defense counsel

25    have not cited any.  So there seems to be not a substantive

iau2tanS kjc

1   objection to this.

2          THE COURT:  Anything else on that point, please?

3          MR. McGUIRE:  Not from us, your Honor.

4          MS. McCARTHY:  No, your Honor.

5          THE COURT:  All right.  Thank you, then.

6          Relying, then, on Section 2B4.1, I adopt, and I am

7   looking at --

8          MS. McCARTHY:  Your Honor, we have some objections to

9   the PSR.  I don't know if you want to do our objections before

10  going into the findings.

11         THE COURT:  All right.  I am doing Mr. Tanner now.

12         MS. McCARTHY:  Sure.

13         THE COURT:  I thought I would do Mr. Tanner first --

14         MS. McCARTHY:  Absolutely.  I wasn't sure how you were

15  doing it.

16         THE COURT:  -- and then move to you.

17         MS. McCARTHY:  Perfect.  Thank you.

18         THE COURT:  Okay.

19         Anything else, Mr. McGuire, that you wanted to object

20  to?

21         MR. McGUIRE:  No, your Honor.  Thank you.

22         THE COURT:  With respect to the offense level

23  computation, I accept the finding of the presentence report set

24  forth at paragraphs 37, and as I say, through and including

25  paragraph 40, which refers to 2B4.1, so I accept the findings

iau2tanS   kjc

1    of the presentence report set forth at paragraphs 37 through 48

2    which conclude that a total offense level of 32 is appropriate.

3              With respect to the defendant's criminal history, I

4    accept the findings of the presentence report set forth at

5    paragraphs 49 through 55, which conclude that a criminal

6    history category of I is appropriate.

7              Mr. McGuire, I have an avalanche of paper.  I hope

8    that you will not ask me to recite every one of the letters and

9    the follow-up letters that you people have sent me, but suffice

10   it to say that I have a great package of material.

11             MR. McGUIRE:  Thank you, Judge.  We added to that in a

12   minimal fashion this morning by giving your Honor a one-page

13   late arrival --

14             THE COURT:  Yes, sir.

15             MR. McGUIRE:  -- by Ms. Mary Ramsey.

16             THE COURT:  Yes, sir.

17             Would you like to now speak on behalf of Mr. Tanner?

18             MR. McGUIRE:  Sure, your Honor.  Thank you.

19             Your Honor, to begin today, I would like to thank you,

20   Judge, for the care and consideration that I know you bring to

21   this process and for the courtesies that you have extended to

22   counsel over the past two years.  We have done all that we

23   could to defend Gary, and it was a hard-fought trial.  But as

24   is well known, your Honor ensured that everyone in this

25   courtroom treat each other properly and all parties were

1      treated with respect by your Honor and by everyone in chambers,

2      so thank you.

3            I would also like to note at the outset my respect for

4      the AUSAs on the case.  While I continue to disagree with

5      certain views that Ms. Kramer and Mr. Cooper had of the case

6      and of Gary, as I believe they know, it is their positions that

7      I take issue with, not them personally.

8            My experience over the years before your Honor has

9      taught me many lessons, none more important than it is the

10     quality of the argument, not the quantity that moves the needle

11     in this courtroom.  I have taken that lesson to heart today, as

12     I am sure the court is fully familiar with our submissions, so

13     I do not intend to be repetitive.

14           In preparation for today, I have conferred with others

15     with more experience than I and reviewed more sentencing

16     transcripts than I care to admit.  In addition to reinforcing

17     the gravity of today's proceeding, this preparation has also

18     left me unsettled -- unsettled in the knowledge that no matter

19     how many hours we spent preparing for today, on some level we

20     are bound to fail.  We will fail to adequately convey to you

21     the meaning and the impact of Gary's life.  Our submission and

22     presentation to the court about his history, no matter how

23     lengthy or eloquent, cannot compete with a three-week trial of

24     more than a dozen witnesses and hundreds of exhibits focused

25     entirely on his offense conduct.  It may only be natural, then,

iau2tanS kjc

1   for the offense conduct which spanned a narrow slice of this

2   44-year-old-man's life to assume disproportionate prominence as

3   we all think about the appropriate sentence in this case.

4            But as we all know, each of these factors -- the

5   defendant's history and characteristics, as well as the offense

6   conduct -- must be accorded equal consideration under the

7   statute.  And one could argue that on judgment day, to the

8   extent any factor should receive special consideration, it

9   should be the entirety of the one's life, not one chapter in

10  it.  But that's the way it is, we understand that, and will not

11  spend more than a few minutes today on Gary's history and

12  characteristics.  We know this court appreciates that

13  limitation, but it is certainly clear to me that whatever I say

14  here today will not do this good man justice.

15           I will do my best to provide balance to the relatively

16  dark picture that the government has painted in its submission

17  to convey the humanity inherent in this tragic part of Gary's

18  life and the lives of his wife and sons and to ask this court

19  to consider the fullness and the decency of the life he has led

20  and the potential good he can do in the future.

21           Before I begin, I would like to just make three

22  preliminary points clear for the court.

23           First, neither our submission nor our presentation

24  today is intended to retry this case or to pick a fight with

25  the government about the evidence.  The jury has rendered its

1    verdict and Gary respects the verdict.  By asking the court to

2    consider all of the good that Gary did for Valeant and

3    suggesting that Valeant was not financially harmed by his

4    conduct, Gary is not refusing to accept responsibility.  Gary

5    wholeheartedly accepts responsibility, and you will hear that

6    from him, Judge.  Rather, we, as Gary's lawyers, are trying to

7    highlight the unusual aspects of this case as mitigating

8    factors for sentencing.  By asking the court to also consider

9    the ways in which Gary's performance benefited Valeant, we are

10   not attempting to minimize his intent or his failure to

11   disclose the payments.

12        The government repeatedly notes that the jury rejected

13   certain of the arguments we made in our submission to the

14   court.  Of course some of these arguments were not squarely put

15   to the jury but, more importantly, we are no longer in front of

16   the jury, and we submit that the court can and should seriously

17   consider all of the facts that distinguish this case from every

18   other reported honest services fraud case, including the fact

19   that the efforts of these two men benefited Valeant by hundreds

20   of millions of dollars, which is of course why Valeant directed

21   them to build Philidor in the first place.

22        The second point that we feel compelled to make clear

23   is that, sitting before you today, Gary Tanner more than

24   accepts responsibility for his conduct.  He is genuinely

25   remorseful for his conduct.  He is broken.  Not just sorry that

iau2tanS kjc

1    he got caught, but sorry and contrite for his choices and for

2    his lack of transparency with his employer, an employer that

3    provided him with an opportunity to do what he loved doing --

4    building and fixing companies.  Please understand that Gary

5    appreciates the seriousness of his conduct and that he knows he

6    is here today as a result of his own actions.  That is

7    overwhelming to him and will remain with him for the rest of

8    his life.

9              The third and final point, Judge, relates to the

10   sentencing guidelines.  While we recognize that the court, as

11   you just did, as a legal matter must determine the applicable

12   guidelines range, we submit that, as a practical matter, the

13   guidelines are irrelevant to this case.  They fail completely

14   to capture the nature and the nuance of the conduct here, and

15   they are so far out of the realm of the reasonable that they

16   render themselves useless.

17             As we noted in our submission, several respected

18   judges in this district have expressed similar criticism in

19   prior cases that are far less unusual than this one.  As their

20   sentencing recommendations demonstrate, both the government and

21   probation recognize this, so I won't belabor the point.  But we

22   ask the court to ascribe no weight to the applicable guideline

23   range.

24             Instead, when considering the guideline range along

25   with all the other Section 3553(a) factors, we ask the court to

1   do what the government suggests on page 8 of its submission,

2   "to take into consideration your own sense of what is a fair

3   and just sentence under all the circumstances," as the Second

4   Circuit instructed in the *Jones* case.

5          Because the guidelines, Judge, do nothing to guide us

6   in this case, the question of what is a fair and just sentence

7   under all the circumstances here is a more challenging one and

8   is made all the more challenging because there are no analogous

9   cases upon which to rely.  After two years with this fact

10  pattern, like all of us involved in the case know it is an

11  unusual one.  That is one reason why the court had serious

12  questions about the government's theory at the start of the

13  case and when the government's superseded the indictment.  And

14  that is why the government does not cite to a single analogous

15  case in support of its requested sentence, because no such case

16  exists.

17         And that brings me to the key point I would like to

18  focus on today:  The law requires the court to impose a

19  sentence that is sufficient but not greater than necessary to

20  serve the goals of sentencing.  That is the principle with

21  which today's sentence of Gary must be consistent.  The

22  sentence we all know cannot be arbitrary.  Indeed, that is why

23  all of us -- probation, the government and both defendants --

24  have requested sentences of varying degrees well below the

25  guideline range.  The guidelines produce an arbitrary sentence

iau2tanS kjc

1   here and an arbitrary sentence is an unjust sentence.  Today's

2   sentence must be principled to be fair and just.

3          So then it begs the question, what is a sufficient

4   sentence in this case?  And if one believes, as the government

5   does, that Gary's sentence can only be sufficient if it is

6   substantially more than two and a half years in prison, what is

7   the principle that renders a shorter term of imprisonment or

8   home confinement insufficient?  Suppose probation had

9   recommended one year.  What then would have been the

10  government's recommendation?

11         There is an ambiguity and an arbitrariness to these

12  numbers, Judge, and I submit that it stems from the challenge

13  of quantifying the real harm here within the context of the

14  many ways in which Gary benefited Valeant as an employee.

15         In the process of engaging in the charged conduct

16  here, Gary and Andy built a company of more than a thousand

17  employees that exceeded Valeant's expectations in terms of

18  performance.  Unlike the typical fraud case, Philidor was not

19  an accounting fiction or an empty storefront.  It was a

20  successful and sustainable business that had a positive impact

21  on the lives of its employees and patients.  And the manner in

22  which it ended had nothing to do with Gary or Andy.  That is

23  why the magnitude of the deprivation of honest services cannot

24  be measured by the amount of money that Andy paid to Gary.

25  That is why this case is so unusual, and that is why a

iau2tanS kjc

1    significant sentence here would not be fair or just.

2              To be clear, Judge, we understand and do not seek to

3    minimize the seriousness of the conduct, and there are, of

4    course, real interests that need to be considered in connection

5    with this sentencing, including Valeant's interest and the

6    public's interest.  But can those interests only be vindicated

7    in this case by way of a significant prison term?

8              No matter what the court does today, Gary will

9    experience a life sentence as a result of this case.  He is now

10   a felon whose reputation has been ruined.  He has been living

11   under the weight of this case for more than two years.  And in

12   this day and age, Google will keep him attached to this case

13   for the rest of his life.  He will also spend the balance of

14   his life digging out from millions of dollars of forfeiture and

15   restitution orders.  And as we noted in our submission, even

16   though he has paid $4.7 million in taxes to the government on

17   the $9.7 million he received from Andy, he receives no credit

18   for that under the law.  This will force Gary to earn an

19   additional $4.7 million over the course of his life to satisfy

20   the forfeiture obligation over and above what he received and

21   it permits the government to receive a total of approximately

22   $15 million, even though the payment at issue in this case was

23   for $10, or 9.7 to be precise.  Of course this may be the law,

24   but that doesn't make it fair, and we ask the court to consider

25   that reality as a significant mitigating factor.

iau2tanS kjc

1          That brings me to Gary.  We began our written

2     submission to the court with a simple statement:  "Gary Tanner

3     is a good man."  In a sense, nothing more needs to be said

4     about him.  He has handled this tragic chapter in his life with

5     the grace and the dignity of a good man, a man who you would

6     assume was raised in a loving family that instilled within him

7     the values of selflessness, gratitude, and commitment.  But of

8     course that assumption would be wrong.

9          Gary was not raised in a loving family.  Gary suffered

10     as a child.  Gary has asked me not to discuss his upbringing

11     further here today, but the presentence report provides the

12     court with some of what he had to experience as a young boy.  I

13     am sure the court has reviewed that portion of the PSR

14     carefully.  But, Judge, I say it only captures some of his

15     experience because Gary was too overwhelmed during this portion

16     of his interview with the probation officer to provide him with

17     a full account.  But suffice it to say, it is extraordinary

18     that Gary has become the husband, the father, and person he is

19     today after all he had to overcome.

20          I trust that the court has reviewed every letter

21     submitted on Gary's behalf.  They are consistent in the traits

22     they highlight.  They paint a picture of someone who is modest,

23     kind, generous, and for whom family is everything.

24          While it would be my preference to highlight every

25     single one of them, I will direct the court's attention to a

1    portion of just one of them, to a quote that captures the

2    essence of today and the future for Gary more eloquently than I

3    will.  The quote is from the letter written by Chris Hufford,

4    Gary's close friend, who met while the two of them were working

5    at Sears more than 20 years ago.  Judge, it is the first of the

6    four letters we submitted this past Saturday as a supplement to

7    our original filing, and it reads in part, "If his life were a

8    book, this situation would represent only a short and

9    incongruent chapter among an otherwise stellar underdog story.

10   On that note, a trait that I believe relevant to Gary's

11   sentencing is his penchant and skill to analyze past actions

12   and take those lessons forward.  In other words, I have never

13   known Gary to repeat mistakes."

14          Now, in the position I am in today, some lawyers have

15   to compliment their client even though they don't really know

16   their client.  They have to rely heavily on the letters of

17   support because they haven't had the opportunity to spend

18   meaningful time with their client.  That's not the case here.

19          Having spent the better part of the past two years

20   with him, I know this man, Judge.  We are around the same age,

21   and a similar stage of life.  He has trusted all of us for the

22   past two years.  And over that time period every member of our

23   team has done everything we could for him, not because he is

24   our client, but because he is such a good man and because we

25   believe in his fundamental decency.

1          When you have a trial, during the trial and the months

2    of preparation beforehand, you go through the personal

3    experiences of daily life with one another.  You have the

4    opportunity to observe the little things that provide a window

5    into someone's character, sometimes when he doesn't even know

6    you are looking.  You get to meet his wife and witness

7    firsthand the loving partnership they have built.  You overhear

8    him on the phone with his boys trying to avoid talking about

9    why he is in New York again.  You experience the awkwardness

10   when he asks you about your childhood, but then doesn't want to

11   talk about his own.  And perhaps most profoundly, you see and

12   feel another human being experiencing a fear so crippling that

13   he is frequently rendered speechless -- fear of what today will

14   bring; fear that your Honor will see him as nothing more than a

15   liar and a fraud, not for the full person he is; fear that he

16   will have to say goodbye to Jack and Rhett.

17         Certainly it is common for defendants on the day of

18   sentencing to say that family comes first.  For Gary it does

19   not just come first.  There is nothing but family.  He knows

20   life on his own, and he never wants to be alone again.  And,

21   yes, as the government generally points out, it has been his

22   choices that have put him and his family in this position.

23         But unlike so many convicted of honest services fraud

24   who were clearly thinking only of themselves, Gary is

25   different.  His life has been spent building financial security

1    for his family.  He was born with nothing, he was given

2    nothing, and he never had the safety net that so many of us are

3    blessed to have.

4            Just consider how he spent the money that he received

5    from Andy.  He put it into education accounts for his sons and

6    long-term retirement accounts for him and his wife.  Again, no

7    excuses here about the fact that he received the money in the

8    first place, but the manner in which he put the money to use is

9    revealing and relevant.

10           Judge, Jack Tanner is 12 years old and Rhett Tanner is

11   nine years old.  The court will not hear from them today, but

12   today's outcome may impact them more than anyone else.  Unlike

13   their father, they know the love of two caring and attentive

14   parents.  The effect of the removal of their father from their

15   lives, particularly at these ages, will be immeasurable.  Their

16   father is their hero, and he will remain so, irrespective of

17   today, but we ask the court to consider them in fashioning

18   appropriate sentence.

19            I hope, Judge, that my words today have been helpful.

20   As I know this court appreciates, good people can make bad

21   decisions, and this good person screwed up in a serious way.

22   He knows that.  But this is such an aberration, the only

23   deviation from an otherwise law-abiding and inspiring life that

24   will never be the same.  Without spending a day in prison, Gary

25   will be penalized for life as a result of this case.  A

iau2tanS kjc

 1    percentage of every paycheck for the rest of his life will go

 2    to Valeant.

 3             In light of all of this, do the circumstances of this

 4    case and his life require that he also spend time in prison?

 5    Is there no alternative but to separate him from his wife and

 6    sons?  Judge, we submit that there is.

 7             Thank you for your time and your patience, your Honor.

 8    We ask you to temper justice with mercy and impose the lowest

 9    possible sentence on Gary.

10             Thank you.

11             THE COURT:  Thank you.

12             Mr. McGuire, did Mrs. Tanner wish to go next?

13             MR. McGUIRE:  Yes.  Thank you, your Honor.

14             THE COURT:  Good morning, ma'am.

15             MS. TANNER:  Good morning, Judge.

16             THE COURT:  Would you just say your name for the

17    reporter, please.

18             MS. TANNER:  Abbey Tanner.

19             Most people in here know Gary as coworker, client, a

20    defendant, so I wanted to speak of him as a father and a

21    husband.

22             I'm sorry.

23             THE COURT:  Take your time, ma'am.  Mr. McGuire, would

24    you adjust that microphone, please.

25             MS. TANNER:  I sincerely wish that every child could

1    have a father like this man.  The emotional support, the

2    guidance, the nurturing and the discipline that he offers as a

3    father cannot be overstated.  His constant involvement lets our

4    boys know that they matter, that they are loved, that they are

5    cherished.  It brings them a sense of safety and comfort that

6    every child should be afforded.  Perhaps given his own

7    childhood, or what I would consider lack of, he doesn't take

8    fatherhood for granted.  He knows it's an absolutely privilege

9    and an honor.

10          Gary and I assume equal roles in many facets of our

11   life together, but there are some life lessons he is teaching

12   them that I just can't do by myself.  And what comes to mind is

13   Gary's love and respect for me.  He has never viewed myself, or

14   any other woman for that matter, as anything other than an

15   equal.  He leads by example, and he is teaching our boys how

16   women should be treated.  This might sound odd, but that's

17   everything when you are trying to raise two young boys into

18   respectful young men.

19          And I was fortunate growing up to have a loving,

20   supporting father who was always present in my life, and I

21   would give anything for Jack and Rhett to have the same

22   constant, consistent presence.  I want them to continue to be

23   excited for Sunday mornings, because it's Gary who makes the

24   best breakfast, and I want them to continue to be enthusiastic

25   when they come home from their jiu-jitsu classes because it is

dad that they run to when they want to show him everything that

they have learned.  I want them to continue laughing and

experiencing the joy when dad does crazy things that mom just

doesn't do, like jump in the pool with his clothes on or take

them camping.  And most of all, I want them to continue hearing

"I love you" every night when Gary tucks them into bed.  Some

of these things may sound trivial and insignificant, but they

are not, especially to our boys, because it is those innocent,

little moments every day that matter.

Jack, as I mentioned in my letter, is our logical

pre-teen.  He is sometimes too logical for his own good,

because he tends to rely on himself and look inward when he has

problems to solve.  Normally Gary and I have placed value on

this because we have taught him to persevere when things

aren't easy.  However, the hurt I know he will experience if

Gary is incarcerated is a problem I know he won't be able to

solve no matter how many times he goes over the situation in

his head.

And Rhett is at that age, at nine, where he is old

enough that he wants his independence, but he is still young

enough that mom and dad are his world.  Gary is his hero, his

confidant and, above all else, Gary is his best buddy.  Where

Jack is ruled by his head, our younger son is ruled by his

heart, and I know Rhett's heart will undoubtedly break without

Gary by his side.  I lay awake at night and wonder what the

iau2tanS kjc

1    long-term effects will be on our boys if Gary is gone.  How

2    will their sadness, their anger, their confusion manifest?  And

3    as a mother, it is hard to imagine your children in so much

4    pain and not have the ability to fix it.  And I do understand

5    that Valeant is the victim in this case, but it can't be

6    overlooked that Jack and Rhett will be the other casualties if

7    Gary is absent.

8            And as adults, we are very clear and have an

9    understanding of finite time.  Gary and I know that good

10   seasons as well as bad seasons will not last forever, but

11   unfortunately children don't perceive time the same way.  So

12   right or wrong, sending Gary away will make Jack and Rhett feel

13   like they're the ones being punished.  And so I humbly stand

14   before you to ask -- beg -- that if you feel additional

15   punishment is necessary after all that our family has lost,

16   that Gary's debt to society be paid without separating him from

17   our boys.

18           Thank you for your time and your consideration, and

19   your patience.

20           Thank you.

21           THE COURT:  Yes, ma'am.  Thank you.

22           Mr. Tanner, would you like to speak on your own

23   behalf?

24           DEFENDANT TANNER:  Yes.

25           THE COURT:  Yes, sir.

iau2tanS kjc

1          THE DEFENDANT:  Thank you, Judge Preska.

2          I wanted to start off just by thanking you for your

3    time, your consideration, and your respect during the trial.  I

4    would I also want to thank Ms. Kramer and Mr. Cooper for their

5    professionalism and courtesy during the trial.  This is

6    certainly not a situation that I ever thought I would ever

7    encounter and personally it has undoubtedly been the most

8    difficult period of my life.

9          My entire life has been defined by working hard and

10   caring for my family.  Based on the experiences I had growing

11   up, I ended up being on my own at a relatively young age and

12   putting myself through school and working as hard as possible

13   to build a better life for myself and for my family.  This

14   included sacrificing a significant amount of time with my

15   family, which was dedicated to work, in an effort to achieve

16   financial independence.

17         Prior to this experience, I have never had any

18   interaction with the criminal justice system, and I never had

19   any reason to believe I would.  This has been an incredibly

20   difficult experience for myself and for my family, and I think

21   about why I didn't disclose these payments every day, multiple

22   times a day.  Overall, I regret so much not disclosing a

23   financial interest, and I will regret it for the rest of my

24   life.

25         At this point, my life as I knew it has been greatly

iau2tanS kjc

1   changed, but I have taken a lot from this process.  My primary

2   concern is for my family.  My wife and my two boys mean

3   everything to me, and the thought of being away from them for

4   any period of time is very difficult for me to accept.  I have

5   no choice but to accept the outcome of the trial, but I am

6   begging you to let me stay with my family.  I will do anything

7   the court requires for punishment, but I feel there are far

8   better options for society generally than separating me from my

9   family.

10          I am truly sorry for not disclosing my financial

11  interest, but I ask that you give me a chance to stay with my

12  family during this difficult time and demonstrate how much I

13  can contribute back to society.

14          Thank you.

15          THE COURT:  Yes, sir.  Thank you.

16          Counsel, does it make sense now to move on to consider

17  Mr. Davenport's situation?

18          MS. McCARTHY:  Sure, your Honor.

19          THE COURT:  Ms. McCarthy, have you and your client had

20  adequate time to review the presentence report?

21          MS. McCARTHY:  Yes, your Honor.

22          THE COURT:  Is there any reason it should not be made

23  part of the record?

24          MS. McCARTHY:  No, but we have a couple of provisos.

25          THE COURT:  Yes, ma'am.

| 1 | MS. McCARTHY:  So, your Honor, on page 2 of the |

1          MS. McCARTHY:  So, your Honor, on page 2 of the

2    probation report, it indicates that Mr. Davenport was arrested

3    and released on the same day, November 17, 2016.  I have

4    provided documents to the government that indicate that that is

5    not accurate.  He was released the next day, November 18, 2016.

6    So we would ask that that be changed on page 2, "release

7    status," indicating that he was released the next day, on

8    November 18.

9          THE COURT:  Any objection?

10          MR. COOPER:  No objection.

11          THE COURT:  Thank you.

12          MS. McCARTHY:  Your Honor, paragraph 86 of the report,

13    I would just ask that it be supplemented.  It talks about

14    Mr. Davenport's tax filings and indicates that there was no

15    record of return filed for years 2014 through 2017.  We

16    submitted yesterday, your Honor, a letter from Alan Gubernick,

17    Mr. Davenport's accountant, indicating that those returns were

18    filed yesterday and that there is no tax due.  The tax had

19    previously been paid.  There was one return showing some tax

20    due, but because of the overpayments in later years, those

21    payments will cover the tax due.  So the net is no tax due.  So

22    that would be our request for paragraph 86, that it be

23    supplemented to indicate that the returns were filed and there

24    is no tax due.

25          THE COURT:  Thank you.

iau2tanS kjc

1           Any objection?

2           MR. COOPER:  No objection to that additional sentence,

3    your Honor.

4           THE COURT:  Thank you.

5           MS. McCARTHY:  And, your Honor, the next is paragraph

6    77, which actually ties into the forfeiture argument that we

7    made about the inclusion of the Andrew J. Davenport 2014

8    irrevocable trust in the items to be forfeited or listed --

9           THE COURT:  Did you say 77?

10          MS. McCARTHY:  Paragraph 77 indicates that

11   Mr. Davenport personally obtained over $50 million in cash from

12   the sale of Valeant.

13          THE COURT:  Yes, ma'am.

14          MS. McCARTHY:  Mr. Davenport personally received $44

15   million, not over 50.  That number over 50 includes the funds

16   that were paid to the trust; and, as we have set forth in our

17   letter, the chronology does not support that those funds that

18   were provided to the trust as a result of the sale belong in

19   any way to Mr. Davenport.  So we would ask that that be

20   corrected to say 44 million.

21          THE COURT:  Any objection?

22          MR. COOPER:  No, your Honor.  That's accurate.  It

23   would also be accurate to say that Mr. Davenport personally and

24   the trust that he settled obtained over $50 million from the

25   sale.  I think there could be no dispute about that.

```
 1              THE COURT:  Ms. McCarthy.
 2              MS. McCARTHY:  Well, I think a separate sentence,
 3    perhaps, that the Andrew J. Davenport Irrevocable Trust
 4    received over $7 million is fine with us as long as the 50 is
 5    changed to 44, your Honor.
 6              MR. COOPER:  That's fine, your Honor.  Thank you.
 7              THE COURT:  Thank you.
 8              Yes, ma'am.
 9              MS. McCARTHY:  Did the court want to here us now on
10    forfeiture, or did you --
11              THE COURT:  I don't think so.  Counsel, I understood
12    that, except for the special assessments, we are deferring all
13    discussions of other financial penalties for another day.
14              MR. COOPER:  Your Honor, I thought that we were
15    deferring the restitution discussion for a different day.  I
16    think that the court needs to pronounce forfeiture at the time
17    of sentencing.
18              THE COURT:  Counsel.
19              MS. McCARTHY:  So I will be heard on that?
20              THE COURT:  Yes, ma'am.
21              MS. McCARTHY:  So, your Honor, the primary issue that
22    we have with the proposed preliminary order of forfeiture is
23    its inclusion of this trust that we are discussing.  It is an
24    irrevocable trust.
25              I put forward in our letter of October 29 the
```

iau2tanS kjc

1   chronology that establishes that a gift was completed by

2   Mr. Davenport in January of 2013 of a 6.0 percent interest in

3   Philidor to the 2008 trust, which is the precursor to the 2014

4   trust.  The only difference in these trusts, your Honor, is

5   that in 2014, before the funds were received from Valeant,

6   Mr. Davenport received tax advice that the way that the 2008

7   trust was created, he was personally responsible for its tax

8   obligations, and so his accountant suggested that they change

9   the trust to remove that tax obligation from Mr. Davenport

10  personally and put the tax obligation on the trust.  That's the

11  only change that that resulted in.

12          The fact is that as of January 2013, the irrevocable

13  trust held an interest, 6.0 percent interest, in Philidor.  So

14  I don't know what to say to the government's argument that they

15  just disagree.

16          I have been talking to the government about this now

17  for weeks, Judge.  Last night, after I had gone to bed, they

18  sent a letter, which finally tells us why they don't think that

19  this is correct, that they think that he has an interest in the

20  trust.  They claim that money was paid to him out of the trust,

21  *ipso facto* he owns the assets of the trust.

22          Well, Judge, if the government had looked at

23  Mr. Davenport's UBS account for End Game, which was Government

24  Exhibit 231, they would see there were two payments made in

25  exactly the amount that they are talking about, 1.7 million, to

iau2tanS kjc

1   both the Treasury and to the Pennsylvania Department of

2   Revenue.  Those payments were made 1.5 million to the Treasury

3   on April 23, and 200,000 on April 30.  It is my understanding,

4   Judge -- and I have had to cobble this together because, again,

5   when I woke up this morning I saw the letter -- that

6   Mr. Davenport's accountant requires checks to be written for

7   taxes.  He doesn't like to do the electronic payments, like

8   many of us do.  The trust at that point did not have checks for

9   its account.  I don't know why.  So Mr. Davenport paid, with

10  his checks, the trust taxes.  The 1.7 paid to Mr. Davenport

11  from the trust was to reimburse him for those taxes.  And,

12  Judge, I will be happy to give the court the documents that

13  support this, but if the government will look at Government

14  Exhibit 231, which they kindly brought this morning, they will

15  see those two payments that I am talking about in that amount.

16          The other thing that the government argues is that

17  somehow this ties into Mr. Davenport secreting money away that

18  they cannot trace.  After he got $4 million in his End Game

19  account, that they can't trace 3.4 million of it.  Well, that

20  went to purchase the home he lives in now.  He is living in the

21  $3.4 million.  So there is no playing going on here with money.

22  So I don't even know what to say to that.  The government has

23  the documents that would show that those funds were paid for

24  the purchase of his home.

25          Bottom line here, Judge, is that, in 2013, the 2008

1    trust was given, as a completed gift, an interest in Philidor.

2              THE COURT:  Say it again.  Say it again.  Just say it

3    again.

4              MS. McCARTHY:  When Philidor was formed in January

5    2013, which is before the alleged conspiracy began -- the

6    government alleges the conspiracy began in the summer of

7    2013 -- there were people who were given an interest in

8    Philidor.  I have here, Judge, as an exhibit to the Philidor

9    operating agreement -- I am happy to hand it up -- which shows

10   all of the folks who --

11             THE COURT:  I have it memorized from trial.  I just

12   wanted you to tell me what the amount of the trust --

13             MS. McCARTHY:  6 percent.

14             THE COURT:  Thank you.

15             MS. McCARTHY:  And the government has some allegation

16   in its letter of this morning that, unlike the other people who

17   had ownership interest in the trust, the trust didn't put any

18   cash in, so really it is Mr. Davenport's.  I don't know what

19   that means, Judge.  Also, it is not accurate.  There are other

20   owners, at least three other owners, who didn't put any cash

21   in, and the cash was minimal that was put in by any other

22   owner, like $100.  This company was valueless when it was

23   formed in January 2013.

24             So the government can rail against this, but the fact

25   of the matter is that the assets in the trust and the money

iau2tanS kjc

1    that the trust received after the sale to Valeant in 2014

2    belonged to the trust.  Mr. Davenport is not a beneficiary of

3    the trust.  It is an irrevocable trust, meaning once a gift is

4    made to the trust, it cannot be taken back.

5           So, Judge, it is basic trust law.  It is based upon

6    the trust documents.  I have the trust documents here, if the

7    court would like to see them.  But I provided those to the

8    government many weeks ago, and it wasn't until late last week

9    that they called to tell me -- it was Friday -- they had talked

10   about it at the highest level of their offices, and the only

11   answer they have is they don't agree with my position.  And

12   again, last night is the first time they set forth their

13   reasons, and we have rebutted them.

14          THE COURT:  All right.  Who would like to speak to

15   that?

16          MR. COOPER:  I will.  Thank you, your Honor.

17          Just, first, on the timing point, the defendant has

18   had notice since the time of indictment, when the trust was

19   listed as specific property that we would seek to forfeit, that

20   that was our intention, and the letter filed last night was in

21   response to Ms. McCarthy's letter of yesterday.

22          But setting that aside, your Honor, our position is

23   set forth in the letter.

24          I just want to make a few points in response to

25   Ms. McCarthy's arguments.

1          First, the money flow that is laid out in our letters

2     whereby the trust transferred $1.7 million to the End Game

3     account which then sent money to Mr. Davenport's personal

4     account -- by the way, both of those accounts, the End Game

5     account and Mr. Davenport's personal account, Mr. Davenport had

6     sole control.  He was the sole signer on those accounts.  The

7     point there is that money that was in the trust was not beyond

8     Mr. Davenport's control.  It was not solely moved around and

9     paid by the executors of the trust who were Mr. Davenport's

10    wife and his brother, but he had an active role and obviously

11    had access to trust funds at the time, so that the contention

12    that the trust assets were beyond or are beyond his personal

13    control is belied by the bank records.

14          THE COURT:  What do you say to counsel's suggestion

15    that that money was reimbursement for his having paid the trust

16    taxes?

17          MR. COOPER:  Your Honor, I will credit Ms. McCarthy's

18    representation along those lines.  Our point is not that the

19    disposition of the funds was ultimately not for the benefit of

20    the beneficiaries of the trust, it is that the trust assets

21    were not beyond Mr. Davenport's ability to access and to move

22    around.  It wasn't his brother --

23          THE COURT:  How do we know he told them to do it?  Is

24    there any reason to think it wasn't the executor of the trust

25    who said to reimburse him for paying the trust taxes?

iau2tanS kjc

1        MR. COOPER:  We have seen no evidence of that, so I

2   can't speak to that fact other than the absence of evidence

3   along those lines.

4        One moment, please, your Honor.

5        THE COURT:  Yes, sir.

6        (Counsel confer)

7        MR. COOPER:  The other point along those lines, your

8   Honor, is that it is true that the trust was listed on the

9   ownership tables as a 6 percent owner of Philidor.  Based on

10  our investigation, every other ownership interest of Philidor

11  was either in response to an investment in Philidor or somebody

12  who had done some work for either Philidor or BQ6, one of

13  Mr. Davenport's earlier --

14       THE COURT:  My recollection is, maybe I didn't

15  memorize it properly, but my recollection was there were some

16  relatives in there someplace.

17       MR. COOPER:  I believe that those relatives had done

18  work for some of Mr. Davenport's prior companies, like BQ6

19  Media.  So it was in response to an investment or essentially

20  sweat equity that was put up by people like Mr. Davenport's --

21       THE COURT:  But not in Philidor.

22       MR. COOPER:  Some of them I believe did early work on

23  Philidor, but everybody did work in some capacity for

24  Mr. Davenport.  The trust falls into neither of those buckets.

25  So both of those facts suggest that this was in fact a tax

1   planning strategy, where Mr. Davenport allocated his assets,

2   his interest between his personal End Game shell and the trust

3   account.  What the proposed order of forfeiture seeks to do is

4   forfeit Mr. Davenport's interest in the trust.  As we note in

5   our letter last night, in a footnote, if the trust can come

6   forward and show that it was a *bona fide* purchaser for value or

7   that it has a valid means to contest the forfeiture, it can do

8   so after the entry of the notice of forfeiture, of the proposed

9   order of forfeiture.  The proposed order includes a mechanism

10  that the trust can follow along those lines.  But that doesn't

11  mean that Mr. Davenport should not be required to forfeit

12  whatever interest he has in the trust, and that's what we are

13  seeking to do here today.

14          THE COURT:  What do you say to counsel's argument that

15  he has no interest in the trust because it was an irrevocable

16  trust?

17          MR. COOPER:  Your Honor, I think his -- I think the

18  facts that we set out in our letter show that it wasn't

19  entirely out of his reach and that he had at least some control

20  over the disposition of the assets here.  So I don't know that

21  it is as easy as Mr. Davenport putting an interest in a trust,

22  in an irrevocable trust, and then being hands-off from that

23  time forward.  That just doesn't appear to be the case.  The

24  money that we traced flows through two of Mr. Davenport's

25  accounts on his way out the door, two of his personal accounts

1   that he had sole control over.

2            THE COURT:  Are those the reimbursements we are

3   talking about?

4            MR. COOPER:  Yes, your Honor.

5            THE COURT:  Thank you.

6            MR. COOPER:  Thank you.

7            MS. McCARTHY:  Your Honor, I can answer the question

8   of how the funds were transferred to Mr. Davenport.  They were

9   transferred at the direction of the trustee of the trust,

10  Matthew Davenport.  And if the court requires, I can get you

11  the documentation that will show that.  Bob Catelli, the banker

12  who handled this matter, is in court today.  I can also get an

13  affidavit from Mr. Gubernick, the CPA, saying that it was at

14  his request that this was done.

15           Look, I have a trust, a lot of people set up trusts,

16  and the idea of a trust is that you set aside assets for your

17  children, for your spouse, for your descendants and that you

18  are hands-off, that you don't control those.  And this trust

19  was set up properly, Judge.  My partner who handles our trusts

20  and estates practice has reviewed these trusts and has gone

21  over them with a fine-tooth comb.  They are proper trusts.  And

22  the result of the way these trusts were set up is -- and the

23  government can't argue against this, because it is literally

24  like explaining why the sun is shining every day, it just is,

25  Judge -- that an irrevocable trust is no longer the grantor's

iau2tanS kjc

1    property.  It is no longer Mr. Davenport's interest once it is

2    gifted.  And, Judge, this is gifted to the trust well before

3    the government claims that this conspiracy began.  So the trust

4    should not be in the picture, Judge.  The trust should not have

5    to litigate this and sit with a frozen account.  It should be

6    able to be used for the benefit of Mr. Davenport's children,

7    who are the beneficiaries of the trust.

8              THE COURT:  Anything else?  Yes, sir.

9              MR. COOPER:  One more point, your Honor.

10             Regardless of whether or not the initial interest in

11   January 2013, the initial 6 percent, was gifted to this 2008

12   trust that, defense counsel's papers point out, in November

13   2014, which was in the middle of the charged offense and just a

14   month before the transfer of the money, during the course of

15   all of these conspiratorial communications, in November 2014,

16   that is when Mr. Davenport created the new trust and the

17   interest was transferred to that new trust, and that's the

18   trust where the money sits today.  So it is just not the case

19   that everything, all of the granting and all of the transfers

20   occurred before the charged conduct.

21             THE COURT:  But they were both irrevocable trusts, no?

22             MR. COOPER:  Correct, your Honor.

23             THE COURT:  Thank you.

24             MR. COOPER:  Thank you.

25             THE COURT:  I find that the contents of the trusts are

1    not Mr. Davenport's property and, accordingly, are not the

2    subject of the forfeiture order.

3              What else?

4              MS. McCARTHY:  That's all, your Honor.

5              Would you like to hear from me?

6              THE COURT:  Yes, please.

7              MS. McCARTHY:  You are probably already tired of

8    hearing from me but --

9              THE COURT:  No, ma'am.

10             MS. McCARTHY:  Thank you, your Honor.

11             I know that the court has read our sentencing brief,

12   so I am going to try not to retread.  It is also an unusual

13   situation for me to have another defendant being sentenced at

14   the same time, so I'm afraid that some of the things that

15   Mr. McGuire said I may go over again, so please forgive me for

16   that.

17             Your Honor, we understand the government's theory of

18   honest services fraud, but we agree with what Mr. McGuire said

19   and do believe that this case is different from other honest

20   services fraud cases, and for that reason, we submit that the

21   court should sentence Mr. Davenport differently from other

22   honest services fraud cases and that an appropriate sentence

23   here would be a period of time served with supervised release

24   as we request in our papers.

25             In every other private honest services fraud case that

1    we have seen, money is paid by a vendor to a company employee

2    in order to entice the employee to give business to the vendor,

3    and that's not what happened here.

4         Here, it was Valeant that had an interest in seeing

5    Philidor succeed, so it entered into that alliance with

6    Philidor in January -- it was formed in January 2013, well

7    before the government claims that a conspiracy between

8    Mr. Tanner and Mr. Davenport was formed.  So Valeant and

9    Philidor had a relationship, the purpose of which was for

10   Philidor to distribute as much of Valeant's product to its

11   customers as it could through its mail order services.

12        So Philidor did exactly what Valeant wanted it to do,

13   and Mr. Tanner assisted in making that happen.  Mr. Davenport

14   was not making secret payments to Mr. Tanner along the way, as

15   we see often private honest services fraud cases; rather, he

16   gave Mr. Tanner a portion of the money that he personally

17   earned from the purchase of the option for Philidor.  And we

18   submit that that fact is very different from the typical honest

19   services fraud case.  And I know the government is going to

20   vehemently object to my comments, but I feel strongly about

21   that, your Honor, and I wanted to reiterate that.

22        We appreciate that there was certain evidence

23   submitted at trial about planning that Mr. Tanner did with his

24   financial planner.  There is no evidence that Mr. Davenport

25   partook in that or understood that that was happening.  We ask

1   that that not be imputed to him.

2           We are not rearguing the trial nor are we asking the

3   court to disregard the jury's verdict or trying to minimize

4   Mr. Davenport's conduct.  He will tell you, as we have said in

5   our brief, that he regrets every day not telling Michael

6   Pearson that he was going to make this payment to Gary Tanner.

7   He is going to have to live with that for the rest of his life.

8   We are asking the court to take the factual distinction here

9   into account in fashioning Mr. Davenport's sentence and it is a

10  distinction, your Honor, that we submit calls for leniency.

11          Your Honor, as you know, we submitted 60 letters of

12  support for Mr. Davenport.  Many of the people who wrote those

13  letters are sitting here in this courtroom, and I thank them

14  for being here to support Mr. Davenport.  I know the court has

15  read everything we have submitted, and there were far too many

16  letters for us to reference in our sentencing brief.

17          Each one of those letters, Judge, tells a little bit

18  about Andy Davenport.  And I have to say I have been doing this

19  for a while, at both sides of the table, and frankly have never

20  been so moved by the stories of a person's many acts of

21  kindness, compassion, and generosity as I have been in this

22  case, and the reflection that those letters have on the life

23  that Mr. Davenport has led.  And I am not overstating it,

24  Judge, when I say that Mr. Davenport's conduct that leads him

25  to stand before the court today is an aberration in the way he

1    has conducted himself throughout his 50 years on this earth.

2         There are so many stories about how he taught and

3    mentored people, people who may not otherwise have gone very

4    far in their personal lives, because of a lack of education,

5    training, or skills.  Andy encouraged those people.  He helped

6    them to take ownership of the work they were doing so that they

7    weren't just employees.  As a result, these people felt pride

8    in what they were doing; and the fact that Andy believed in

9    them, empowered them to meet the challenges of the work he was

10   asking them to do.

11        I know the court read the letter of Valerie Stiltner,

12   who had worked at Philidor's dispensing operations as its

13   supervisor.  After she suffered a stroke that came after a

14   period of disability due to emergency surgery, Andy welcomed

15   her back to Philidor and found a place for her even after she

16   partially lost her vision and movement and her cognitive

17   functions were impaired.  That's extraordinary, Judge.  He told

18   her to and I am quoting from her letter, "have confidence in

19   the abilities she still had instead of focusing on the ones she

20   lost."  I really, frankly, never heard of such encouragement

21   from an employer.

22        These stories go on and on.  Andy contracted out some

23   of Philidor's packaging work to a company that employs adults

24   with special needs, again finding a way to give people who

25   might otherwise have felt worthless a feeling of pride in their

iau2tanS kjc

work, lifting them up.  There are many letters from Philidor

employees who, despite Andy's conviction and the charges in

this case, would gladly work for him again.  Judge, that's

extraordinary.  That's an extraordinary comment on him as a

boss and as a person.  Most people run away from a felon.  I

know.  I have tried to bring people in to court or get letters

written for many other people.  This is extraordinary.

We submitted as Exhibits FF and GG the sentiments

written both on a white board at Philidor and in a spiral

notebook given to Andy on the day, the last day the employees

were going to be at Philidor right after Valeant pulled out of

the option deal.  Those sentiments speak volumes, Judge.  They

make it abundantly clear that Philidor felt like a family, and

the employees were supported by Andy and the other executives.

They were supported to work hard, feel pride, and yet attend to

their own families the way that Andy attended to his when he

needed to, knowing that Philidor would be there for them when

their crises passed.

Some of the letters are from people Andy lifted up

with his support and encouragement who went on to do things

they never imagined they were capable of, people like Nick

Spuhler, who is here today.  He is the caddy who came to see

Andy as a father figure after his own father fell into the

spiral of opioid addiction.  From day one, Andy empowered

Mr. Spuhler that day on the golf course by asking him:  What do

1    you think?  Making him feel like his views and input mattered.

2    Mr. Spuhler carries that empowerment with him to this day,

3    working at a major healthcare advertising agency, and he

4    credits Andy with preparing him for that challenge.

5          There is Andy's sister-in-law Lauren Brimhall, also

6    here today, who was a failing high school student when Andy met

7    her.  She credits her success both as a writer and an

8    award-winning photographer to Andy's constant support and

9    encouragement, and she poignantly wrote "Andy had faith in me

10   when no one else did and, quite frankly, I will be proving him

11   right until the day I die."

12         That's where I am going to stop on this part of my

13   remarks, Judge.  The stories go on and on, and they are moving

14   and they are important, because they give the court insight

15   into the heart and soul of this man.  He is a good man, he has

16   done a lot of good for other people, and we ask that the court

17   recognize that goodness and show him mercy today.

18         Now, another aspect I would like to touch on, Judge,

19   is Mr. Davenport's health.  We have submitted a number of

20   medical reports that provide the court with the background of

21   Mr. Davenport's health issues as well as current reports about

22   recent tests that show, among other things, that he recently

23   suffered two minor heart attacks and that he has a coronary

24   calcium score that puts him at the highest possible risk for

25   complications, including stroke, heart attack, and sudden

iau2tanS kjc

1  cardiac death.

2          As I am sure the court can appreciate, anyone who goes

3  through this process, including a trial and now sentencing, is

4  under tremendous stress.  Mr. Davenport's heart issues under

5  this sort of stress put him at a higher risk than most other

6  people in his situation.  We have real, significant concerns

7  that if he is sentenced to jail time, he may not survive.  And

8  I don't say that lightly, Judge.

9          But what's remarkable to me, and I'm saddened by it,

10  frankly, is the government's reaction to this information, and

11  I don't understand it.  In the face of the medical evidence

12  that we have submitted, the government's reaction is that our

13  argument is specious and that Mr. Davenport's health issues are

14  a result of his "own poor choices with seemingly no present

15  effort to correct."  It is just a breathtaking position for

16  them to take, Judge.

17          I appreciate, I am a former prosecutor, a trial

18  conviction is terrific.  You are very proud of it, and you are

19  very jealous of that.  You want to protect it and you want to

20  be an aggressive advocate, and I don't challenge their being

21  aggressive advocates.  That is terrific.  But their job is to

22  do justice, Judge, not to crush a man.  And to not take into

23  account real evidence of his health issues, I don't understand.

24  It seems to lack compassion for what are real lifelong health

25  issues.

iau2tanS kjc

1          To the extent that the government believes that

2    Mr. Davenport has in some way caused his own health issues,

3    despite the fact that every man in his family has died from

4    sudden heart attacks -- his brother Matt just this past March

5    at the age of 52, his brother Tony at the age of 48 -- I would

6    like to tell the court a few things.

7          First, since September of 2017, Mr. Davenport has had

8    a trainer come to his home three times a week to work with him.

9    They do cardio exercises and strength training.

10         In addition, when he is able to, he plays golf, and he

11   tries to walk as much of the course as he can, despite a very

12   bad back and bad knees, problems that arose starting with his

13   playing football, and later on in life he suffered chronic back

14   problems that weren't solved until very recently, for which he

15   had to take very strong opioid medication.

16         Second, Mr. Davenport is under the care of his

17   personal physician, Dr. Ronald Luber, who works regularly with

18   him on his complex regimen of oral medications and insulin

19   injections which need to be adjusted based on intraday blood

20   glucose readings, and Mr. Davenport measures those himself.  It

21   is fair to say that the daily monitoring that must be done is

22   daunting, and the medical regimen as well.  But Mr. Davenport

23   is committed to this regimen because he wants to stay alive for

24   his wife and his two children and his extended family, many of

25   whom depend upon him for financial and emotional support.

1          Like anyone who works themselves to the bone, as

2     Mr. Davenport has done in his working life, particularly in

3     building Philidor starting in 2013, I think we all know this,

4     kind of hard to stay in good physical shape.

5          In the midst of all of that, Mr. Davenport lost his

6     brother, he lost his father, and he carried the burden of

7     providing for all of his employees and caring for his older

8     brother's children.  He then lost his brother Matt in March,

9     and that added stressor has impacted his health.

10          He is obese, according to Dr. Fisher, but I have

11     talked to his family and his friends.  He has the same body

12     type as his brothers and his father.  So to the extent that's

13     what the government thinks is a result of his poor choices,

14     unfortunately it is a genetic issue.

15          Your Honor, the evidence of Mr. Davenport's health

16     issues speak for themselves and the court, we respectfully

17     submit, should put significant weight on these issues in

18     fashioning an appropriate sentence for Mr. Davenport, which we

19     submit should not include any time in prison.

20          Now, I do want to say this, and this will be

21     embarrassing for Mr. Davenport for me to talk about this here,

22     but I have to do it.  Another aspect of his health that is of

23     concern is his drinking.  His doctor, Edward Fisher, his

24     cardiologist, writes in his report, which is Exhibit D to our

25     submission, Mr. Davenport is clinically an alcoholic.  Perhaps

1    this is the aspect that the government also thinks is a poor

2    choice.  If so, I don't know what to say to that.  Anyone who

3    has dealt with alcoholism in their family or in their life

4    knows that it is not a choice, it is a disease.  Quickly Google

5    alcoholism and you will find that right away you see the word

6    "disease."  Until the alcoholic is able to grapple with it, it

7    cannot be solved or controlled.  In fact, it is never solved.

8    Once an alcoholic is always an alcoholic.  Due to the stress of

9    this case, Mr. Davenport has not had the strength to deal with

10   this issue, and until he has that strength and can face his

11   drinking head on, he will remain dependent on alcohol, and for

12   that reason we ask the court, in fashioning Mr. Davenport's

13   sentence, to require that he participate in alcohol treatment.

14        Finally, your Honor, as is evident, as I said, from

15   the many people here today in support of Andy, he has a very

16   strong community that supports him.  He has lost some friends

17   as a result of his conviction, but his family, many, many

18   former employees, and his longtime friends remain steadfast

19   supporters for him.  On a daily basis, Andy has to deal with

20   the shame of his conduct that led to his conviction.  He had to

21   explain to his young children -- Drew who is fourteen and Jade

22   who is twelve -- what he did that has caused such upheaval in

23   their lives and has caused him tremendous shame and pain.

24        He has been punished by the loss of his stature in the

25   business community.  He has been punished by the possibility

iau2tanS kjc

1   that his family may lose its home, his children may have to

2   leave their school, and his wife, who has not worked for 17

3   years, will need to find a job.  He lost his brother Matt while

4   preparing for this case.  As I have said, all of these things,

5   your Honor, constitute punishment.

6          Andy Davenport has led an admirable life.  He has much

7   to give and many people left to lift up.  We ask that the court

8   give him the opportunity to do so and sentence him to time

9   served with supervised release requiring community service and

10  alcohol treatment.

11         Thank you, your Honor.

12         THE COURT:  Yes, ma'am.

13         Ms. McCarthy, did Ms. Milner want to go next?

14         MS. McCARTHY:  Yes.

15         THE COURT:  Yes, ma'am.  Would you say your name for

16  the reporter, please.

17         MS. MILNER:  Gina Milner.

18         THE COURT:  Yes, ma'am.

19         MS. MILNER:  Thank you for this opportunity, Judge.

20         My name is Gina Milner and I am Andy Davenport

21  sister-in-law and friend.  I am here to speak in support of

22  Andy on behalf of his family and friends.  My sister Andy's

23  wife would be standing here if she could but is far too

24  emotional for words.  The pieces of her heart are hanging on by

25  the thread of hope that your Honor will show mercy on her

husband for the sake of their children and those that rely on
him.

Our family is devastated.  I have known Andy for more
than 20 years, and I know that he is devastated beyond measure
to be sitting before you today awaiting sentencing for what he
knows is a terrible error in judgment.  And we are scared,
scared of the possibility that the stress of this case and the
possibility of a jail sentence may be too much for him to
endure.  Andy has serious medical issues, including a
congenital heart problem that has plagued his family.  We are
scared of losing someone who many of us don't know how to live
without.

Andy makes the lives of the people around him better.
I am sure you have heard it over and over again in the letters
submitted to this court in support.  But Andy is kind,
brilliant, and generous.  He is a family man and always makes
time to prioritize everyone else's needs above his own.  He is
hard-working, determined, self-made, and comes from very humble
beginnings.

THE COURT:  Ms. Milner, maybe slow down just a little
bit.

MS. MILNER:  Sure.  Sorry.

I hadn't known Andy long when I worked with him at
Dover Communications along with his father and his two brothers
almost 20 years ago.  During that time, I watched them build a

iau2tanS kjc

successful medical education business, only to bury their

father when he was just 63.  The three brothers then sold the

business for millions of dollars to Cardinal Health.

        Not long after, they started yet another successful

endeavor in the pharmaceutical industry only to have their

eldest brother Tony, a pharmacist and critical to the business,

pass away suddenly of a heart attack just 48.  Tony's kids were

left without a father, and Andy's mom was devastated.

        Still grieving himself, Andy had to deal with the

reality of so much uncertainty.  His business was in jeopardy.

The weight of his employees' livelihoods rested on his great

big shoulders, and now he had not only his own family to take

care of, but his brother's as well.

        The only thing bigger than his shoulders is his heart.

So Andy did the only thing he knew how:  He took care of

everyone.  He, with the help of his only remaining brother,

Matt, took care of their mother and their nephews and started a

new pharmaceutical marketing firm, BQ6 Media Group, to create a

financial vehicle to support all the people who depended on

him.

        Andy went to work, hiring employees, including several

people in this room, like Nick Spuhler -- a young man who

caddied for him -- me, his two nephews, nobody of whom had any

experience in pharmaceuticals.  Andy believed in people he

thought had intelligence and determination and took a chance on

them regardless of experience and he was willing to teach.  In
that moment, he created opportunity.  At the time his nephews
were sad and rudderless kids who I watched charting an unsteady
course.  Andy helped steer them in the right direction, devoted
time to mentoring them, and while he continued to help them
financially, he empowered them by giving them purpose.

Over the years, Andy has created opportunity for
countless people and not just family, perfect strangers that
many might easily overlook, like waitresses, caddies, and
disabled veterans.  He ceases the best in people, believes in
them, and knows how to motivate, encourage, and inspire them to
see the best in themselves.

Judge Preska, I hope I am starting to paint the
picture of a man who you know as a convicted felon who many in
society would simply choose to write off, but who I and so many
others know as selfless and determined.

Over the years, I have also witnessed Andy's
extraordinary generosity, whether it be giving hundreds of
dollars to complete strangers, helping out a friend or family
member or employee who fell on hard times, or even giving an
ownership stake of his company to a young man he mentored,
despite the fact they no longer worked together, with nothing
expected in return.  I have no doubt the court has read many
letters of support submitted on Andy's behalf recounting much
the same.

1          Thus far I have told you about Andy as it relates to

2    my working relationship.  But my true admiration comes from my

3    personal one.  I can't even begin to tell you how much our

4    personal relationship means, let alone what family means to

5    him, especially his children, my niece and nephew.

6          His children are brilliant -- absolutely,

7    mind-blowingly, beautifully brilliant.  I love my sister, but

8    they didn't get that from us.  You don't have to take my word

9    for it either.  You can look at their IQ tests or ask their

10   schools.  Brilliance like that needs guidance and direction.

11   Those kids are capable of anything.  And if I'm convinced of

12   one thing, it's that there isn't a person in this room capable

13   of tapping into that potential and drawing it out other than

14   Andy.  I pray to God and beg you, Judge Preska, to allow Andy

15   to be here for his kids now, in the most formative years of

16   their lives, to mentor and inspire them the way he has for so

17   many others.  To deny his children the opportunity to have

18   their father teach and guide them is to risk having them not

19   realize their full potential, to take that knowledge and

20   channel it with purpose, to do good and amazing things that can

21   make society better.

22         Over the course of the past year since Andy was

23   indicted, he has had to bear witness as the people he loves

24   struggle -- struggle with his conviction; struggle to find work

25   after losing their jobs, jobs that he created -- and he is

1    devastated not for himself, he is devastated because he feels

2    regret and despair that he has caused this pain.  For a person

3    whose life revolves around taking care of others, around making

4    people's lives better, by carrying their burdens, to go on

5    living, knowing that he has caused their pain, is a punishment

6    all its own.

7              But we are suffering differently.

8              I suffer selfishly for the potential loss of my

9    brother-in-law, mentor, boss, and friend.  Throughout my life,

10   I have had nothing to give.  All I have are the words I share

11   with you today.  This is my honest and heartfelt recollection

12   of the years I have spent with one of the greatest human beings

13   I have ever known.

14             We are all suffering.  And as if Andy hasn't suffered

15   enough loss in his lifetime, this year, he lost his last

16   remaining sibling, his best friend, and the only person in the

17   world who could finish his sentences, his brother Matt, at just

18   52.  Another Davenport loss to another sudden heart attack.  He

19   now finds himself with even greater responsibility, playing

20   father to his niece, caretaker to his mother, and facing

21   sentencing for actions I know he wholeheartedly regrets with

22   every fiber of his being.

23             There is one last story I would like to share.

24             I worked with Andy's brother Matt for ten years.  In

25   that time, I had never known Matt to read a book yet somehow,

1   in his own way, he, too, was brilliant like Andy.  Many didn't

2   see his genius, but Andy did.  He drew out the best in Matt.

3   My own son, Cole, who is nine years old, has learning

4   disabilities.  When I see Andy look at my son, I see him look

5   at him the same way he looked at his brother, with a hopeful

6   determination that this kid has something special, and we are

7   going to find it.

8          Education has always been important to Andy, and over

9   the years he has generously contributed to my children's

10  education, but now is no longer in a position to do so.  This

11  year my husband Andy, who worked at Philidor, and I had to take

12  our son out of private school, a school he loved, because we

13  can't afford it after losing our jobs when Philidor collapsed

14  after Valeant pulled out of the deal and BQ6 deteriorated.

15         My son recently wrote a letter to a friend in his old

16  school saying, "Don't worry.  We will always stay friends, and

17  one day I will be back."

18         When I look at Andy and I see the way he looks at my

19  son, he now looks at him with sadness.  He is dying looking

20  into my son's eyes feeling like he let us down, feeling

21  helpless that he can't fix this.  He isn't thinking about

22  himself other than he wishes he could take back the error in

23  judgment he made while working tireless hours to make this

24  world a better place for everyone he loved -- family or

25  otherwise.

iau2tanS kjc

1          Just like it is killing him thinking about what that

2    error in judgment did to the reputation of a company he built

3    that provided exceptional service to physicians and patients,

4    to all the people he employed who lament the loss of a company

5    they loved, stress it has caused his family, those that depend

6    on him for financial support and guidance, especially his

7    children who have suffered being ridiculed in school, who saw

8    their dad plastered on the front page of the *Enquirer* as a

9    convicted criminal.

10          When I tell you Andy is brilliant, hard-working, and

11   selfless, it is because I witnessed firsthand a man with so

12   much grit and intellect put his head down and work like an ox

13   to pay people's salaries even when it meant money out of his

14   own pocket before we ever turned a profit.  I watched him turn

15   a situation that would have devastated most and create

16   something better than before.  I watched him carry the sadness

17   of loss, the burden of faltering business, and the weight of

18   all of these people and heave it up on his six-foot shoulders

19   and plow ahead, never echoing a word of self-doubt or

20   self-pity.

21          Andy is suffering.  He is devastated.  But his only

22   concern is for his family -- his wife, his kids, his mother,

23   two nephews, and his niece -- who depend on him.  How will they

24   survive without him?

25          Given his family history, I have been asking myself:

1   What is the likelihood of him surviving jail?  He just suffered

2   two mild heart attacks and is at risk every day of a fatal

3   heart attack.  He is, without question, paying the price each

4   and every day for his choices and has for the last three years.

5   Any time in jail for Andy could literally mean a life sentence.

6          Your Honor, Andy's life is literally in your hands.

7   You are the only person in this room that gets to decide just

8   punishment.  As my last plea to you, on behalf of myself, all

9   of his family and friends that support him here today, they are

10  all here despite his conviction, I beg you not to incarcerate

11  him.  Please show leniency.  My hope is that one day in the not

12  so far off future you will hear about his children, about his

13  nieces and nephews, including my own two kids and say to

14  yourself, I gave one man a second chance, and because of that,

15  these children who depend on them left the world a better

16  place.

17         The man I know may be a convicted felon in the eyes of

18  the law, but the man I know, if given the opportunity, will

19  never quit in his pursuit to turn his God-given abilities to

20  into possibilities for others.

21         Thank you.

22         THE COURT:  Yes, ma'am.  Thank you.  Ms. Milner, would

23  you be kind enough to give the reporter your notes?  She will

24  return them to Ms. McCarthy.

25         MS. MILNER:  Would you like me to approach?

iau2tanS kjc

1              THE COURT:  Yes, ma'am.  You were a little speedy.

2              Mr. Davenport, would you like to speak on your own

3    behalf?

4              DEFENDANT DAVENPORT:  Yes, your Honor.

5              THE COURT:  Yes, sir.

6              DEFENDANT DAVENPORT:  Thank you, your Honor, for the

7    opportunity to speak here today.

8              I deeply regret giving money to Gary Tanner, and I

9    take full responsibility for the consequences of my poor

10   judgments and actions.  I had many opportunities to discuss my

11   intention to pay Gary with Mike Pearson, Valeant's CEO, and

12   seek formal approval for doing so.  I did not, and I will

13   forever regret that poor decision.

14             I apologize to this court.  I apologize to Valeant,

15   and the many good employees who I encountered over the years.

16   I apologize to the good people who worked with me at Philidor

17   and who took such pride in the work we did.  I know that their

18   association with Philidor is now tarnished because of my

19   actions.

20             Family has always been the most important thing in my

21   life.  I have let down those who I care for and who depend upon

22   me the most.  I will spend the rest of my life attempting to

23   atone for the damage that I have done to them.

24             Thank you, your Honor.

25             THE COURT:  Yes, sir.  Thank you.

iau2tanS kjc

1          Off the record.

2          (Discussion off the record)

3          THE COURT:  May we hear from the government now,

4     please.

5          MR. COOPER:  Thank you, your Honor.

6          At the outset, I would just like to address the

7     comments from both defendants, from Mrs. Tanner, Mrs. Milner,

8     and defense counsel.

9          It is quite clear from the letters submitted to the

10    court and from all of the comments today that these two men had

11    an impact on their families and communities.  That much is

12    absolutely evident.

13         And it is clear that any sentence will have collateral

14    consequences beyond just these two men.

15         It is also clear that Mr. Davenport has serious health

16    issues.  We understand that.

17         We thought carefully about our sentencing

18    recommendation in light of all of the letters and the documents

19    that were submitted to the court, which is how we came to our

20    ultimate sentencing recommendation.

21         To be clear, your Honor, there are collateral

22    consequences in any sentence, in any case, any sentence that

23    the court hands down.  They are of course regrettable.  But as

24    the court is well aware, they are the consequences not of the

25    court's actions, but of the defendants' actions, of their

iau2tanS kjc

1    conduct.

2            Here today, your Honor, I want to speak to a few

3    issues.  I want to first address a couple of specific arguments

4    that defense counsel made.  I want to talk to the seriousness

5    of this offense and the need, the particular need here for

6    general deterrence.

7            So first I want to address the guidelines argument

8    that Mr. McGuire made.  He urged the court to reject the

9    guidelines and to give them no consideration.  Your Honor, the

10   guidelines here are narrowly tailored to the precise offense,

11   to the payment of the bribe, to the size of the bribe.  This

12   was not an insignificant payment for Mr. Davenport to

13   Mr. Tanner.  This was nearly $10 million.  The guidelines

14   recognize that, and that's what they are based on.  So this is

15   not a case where the potential magnitude of loss is perhaps

16   difficult to see at the outset and that drives the numbers.

17   Here, it is the actual offense conduct that both defendants

18   were well aware of at the time.

19           Both defense counsel suggest also, your Honor, that

20   this is a very unusual case.  That was a theme running through

21   both counsel's remarks.  This is not an unusual case.  This is

22   in the heartland of honest services fraud cases.  Money was

23   paid for improper benefit.  This was not merely an undisclosed

24   payment, but it is clear from the evidence at trial that

25   Mr. Davenport purchased significant assistance with that $9.7

iau2tanS kjc

1    million, secret assistance.

2             The starkest example that the court may remember from

3    trial was during the negotiations of the option agreement.

4    This was a situation where Mr. Davenport sat on the opposite

5    side of the table from Valeant, where a dollar more here is a

6    dollar less there, and Mr. Tanner provided back-channel

7    information to Mr. Davenport about Valeant's position and then

8    commented to Mr. Davenport and helped Davenport craft his

9    response to Valeant's negotiating position.  That is an

10   improper benefit bought and paid for that is similar to many

11   other honest services fraud cases.

12            This is also in the heartland of honest services fraud

13   cases because of the steps that the defendants took to conceal

14   their activity, which shows their understanding of its

15   wrongfulness at the time, in the use of shell companies, the

16   use of multiple layers, the use of secret alias e-mail

17   accounts, and fake business cards.  Those are steps that took

18   place over many, many months.  This wasn't one single

19   undisclosed payment, but it was a course of conduct over a

20   period of time.

21            Your Honor, this is a serious case.  Companies like

22   Valeant cannot monitor everything that their employees do and

23   everything that their vendors do.  They try.  In this case

24   there were codes of conduct, there were certifications, and

25   even when Laizer Kornwasser who, as the court may remember, had

1    suspicions that Mr. Tanner was close to Philidor, Kornwasser

2    raised them up the ladder, and Mr. Tanner was given specific

3    instructions on maintaining independence from Philidor.

4         But in light of all that, your Honor, in the face of

5    all that, the defendants chose to lie and deceive again and

6    again and violate the trust that Valeant placed in them.

7         Honest services fraud is serious, your Honor, in light

8    of all that, because the whole system depends on the level of

9    trust between companies and their employees.  And here, when

10   you have a publicly traded company, where there are

11   shareholders who are at risk, they can't monitor everything

12   that happens.

13        Now, both defendants -- both defense counsel have

14   suggested in their submissions and also in their oral advocacy

15   today that the defendants accept responsibility and shouldn't

16   have made the payment, the undisclosed payment.  But that, your

17   Honor, is not acceptance of responsibility or demonstration of

18   remorse here because the crux of the crime is not merely the

19   undisclosed payment.  The crux of the crime is all the

20   deception that had happened for months, if not a year and a

21   half, before that undisclosed payment.

22        They also suggest in different ways that this was a

23   victimless crime, that Valeant benefited, that Philidor

24   benefited, that everybody benefited.  Well that's not the case,

25   as the court is aware, in two respects.

iau2tanS kjc

1          First, there was pecuniary harm here.  We lay out the

2     facts in our submission.  I know the court has the submission

3     from counsel for Valeant who I understand is in the courtroom

4     today and, on behalf of the victim, would like to address the

5     court prior to sentencing.

6          But there was actual pecuniary harm in a number of

7     different ways, all because of the promise of the payment and

8     all because of this back-channel communications.  I'm not going

9     to address the pecuniary harm in more detail here, but I also

10    want to talk about the intangible harm, because that's, as

11    well, the crux of an honest services fraud case such as this.

12         Companies like Valeant as I said earlier have the

13    right to depend on the honest services of their employees, and

14    violations like this one go to the very heart of that trust.

15    There is an intangible nonpecuniary harm that crimes like this

16    one wreak.

17         I want to say just a few more words here, your Honor,

18    on the topic of general deterrence.

19         Crimes like this are difficult to detect, particularly

20    when defendants use layers of companies and transfers between

21    bank accounts, between multiple bank accounts, and use

22    different e-mail accounts and fake names.  Crimes like this are

23    necessarily conducted in secrecy, and these two defendants

24    conducted their crime in secrecy.  Crimes like this take

25    significant investigative resources to detect, to charge, and

1     to bring to justice.  And so the need for general deterrence is

2     important in part because the cost of these crimes can't be too

3     low.

4            At bottom, this was a crime where there were two men

5     who already had a lot of money and who were earning a lot of

6     money and who engineered a scheme to get even more.  It was a

7     calculation: commit a crime, engage in all the subterfuge in

8     order to make a big payday, and it is clear that the defendants

9     thought at the time that their chances of getting caught were

10    low.  The court will remember an e-mail introduced into

11    evidence where they compared themselves to Butch and Sundance

12    and talked about riding off into the sunset and continuing to

13    play the game.  It is quite clear they didn't think that they

14    would get caught.  They conducted a cost-benefit analysis, and

15    they obviously thought that the potential risks, the potential

16    costs were not significant enough to deter them from acting.

17           People at companies, your Honor, are watching what

18    happens here today because there are people who are invested

19    with trust and discretion at those companies and engage in the

20    same sort of cost-benefit analysis as these defendants engaged

21    in at the time, and those, those are the people who need to be

22    deterred.  Today's sentence, we respectfully suggest, can serve

23    as a general deterrent message to all those people who might be

24    thinking of engaging in conduct like this, of violating the

25    trust that was placed in them, that they cannot and they must

1    not corrupt their positions.

2              With that, your Honor, we will rest on our submission.

3    Thank you.

4              THE COURT:  Yes, sir.  Thank you.

5              Mr. McGuire.

6              MR. McGUIRE:  Your Honor, I realize before we move

7    forward we have not addressed the forfeiture order with respect

8    to Mr. Tanner.

9              THE COURT:  Yes, sir.

10              MR. McGUIRE:  So I just wanted to do that for the

11    record.

12              With respect to the government's proposed forfeiture

13    order, on page 3 of that, and I will give your Honor an

14    opportunity to get there, page 3 is where the bank account --

15              THE COURT:  Paragraph what?

16              MR. McGUIRE:  It is -- it is basically paragraphs (a)

17    through -- it carries on to (h) which list the assets that are

18    the subject of the order.

19              THE COURT:  Yes.

20              MR. McGUIRE:  Mr. Tanner has no objection to the

21    account listed in paragraph (a).  That contains proceeds from

22    the payment and it is in Mr. Tanner's name.  We would, for the

23    record, object to the remaining listed accounts because those

24    either have proceeds -- or funds in them that are independent

25    of the payment that was made by Mr. Davenport to Mr. Tanner

iau2tanS kjc

1    and/or they are jointly held by Mrs. Tanner, and so Mrs. Tanner

2    intends to make a claim with respect to some of those funds.

3    So we would just note that objection to, again, it is (b)

4    through following on to page 4(b) through (h).

5            THE COURT:  And I take it that she will do so in the

6    procedure that's set out here?

7            MR. McGUIRE:  That's correct, Judge.

8            THE COURT:  Yes, sir.  Thank you.

9            Are there victims present who wish to be heard?

10           MS. KESTENBAUM:  Yes, your Honor.

11           THE COURT:  Ms. Kestenbaum.

12           MS. KESTENBAUM:  If I may.  May I use the podium?

13           THE COURT:  Yes, ma'am.

14           MS. KESTENBAUM:  Thank you.

15           MR. COOPER:  Your Honor, I'm sorry.  I believe, in

16   going through the PSR, the court had adopted the PSR with

17   respect to Mr. Tanner but not explicitly with respect to

18   Mr. Davenport.  We just ask that that be done prior to imposing

19   sentence.

20           THE COURT:  It is.  You are correct.

21           Forgive me for a minute, Ms. Kestenbaum.

22           With respect to Mr. Davenport's offense level

23   computation, I accept the findings of the presentence report

24   set forth at paragraphs 37 through 48, which conclude that a

25   total offense level of 30 is appropriate.  And in so doing, I

iau2tanS kjc

1   rely on my earlier remarks with respect to paragraph 40, citing

2   Section 2B4.1(b)(1)(B).

3          With respect to the defendant's criminal history, I

4   accept the findings of the presentence report set forth at

5   paragraphs 49 through 55, which conclude that a criminal

6   history category of I is appropriate.

7          Thank you, Mr. Cooper.

8          MR. COOPER:  Thank you, Judge.

9          THE COURT:  Ms. Kestenbaum.

10          MS. KESTENBAUM:  Thank you, your Honor.  Nancy

11   Kestenbaum, of Covington & Burling, on behalf of the company

12   formerly known as Valeant Pharmaceuticals, now known as Bausch

13   Health Systems.

14          Your Honor, thank you for the courtesy and opportunity

15   to be heard today and throughout these proceedings.  I will be

16   brief.

17          To be clear, other than restitution, which we

18   understand the court is not addressing today, the company takes

19   no position on any specific sentence or sentences that the

20   court should impose.

21          But I want to be clear here.  The defendants have

22   argued before trial, at the trial, and today that because they

23   were good at their jobs and because Valeant's relationship with

24   Philidor was successful for a time, that Valeant wasn't harmed

25   by their crimes.  As Mr. Cooper just said, what they are saying

iau2tanS kjc

1  is that essentially this was a victimless crime.  But that is

2  not true.

3          Valeant was harmed by the defendants' conduct.

4  Valeant was harmed financially, which is why the company is

5  seeking restitution, but not just financially.  The defendants'

6  betrayed Valeant's trust, which means that the defendants

7  betrayed the trust of the company, the trust of its management,

8  of its shareholders and, perhaps most importantly, betrayed the

9  trust of the company's other employees, employees who also work

10  hard for the company but who don't steal from it just because

11  they think they deserve it.

12          As Mr. Cooper just said, in this way, this case is

13  just like every other honest services case, and we ask that the

14  court take this into account in fashioning an appropriate

15  sentences here.

16          Thank you.

17          THE COURT:  Yes, ma'am.  Thank you.

18          Are there any other victims who wish to be heard?

19          Does anyone wish to add anything?

20          Thank you, counsel.  Thank you, counsel, particularly

21  for your excellent submissions and for your oral presentations

22  today.

23          Counsel, some things I am going to say will apply to

24  both defendants and I think it will be clear which do and which

25  are specific to one defendant.

1           In general, with respect to the nature and

2    circumstances of the offense, certainly you have heard that I

3    have calculated the guidelines and take them into account.

4    Here, however, I agree with Judge Sullivan, where he said in

5    *United States v. Newman*, No. 12 Cr. 121 (RJS) (S.D.N.Y. May 2,

6    2013), "There is a lot of talk about the sentencing guidelines

7    these days, particularly in fraud cases, a lot of suggestion

8    that the guidelines are overly mechanical, and that they are

9    out of whack in many cases, and I think that's probably true.

10   I think in many cases, if left to themselves, if that were the

11   only thing, then the guidelines can lead to sometimes absurd

12   and certainly unjust results."

13          They certainly would have in *United States v. Joseph

14   Collins*, 07 Cr. 1170, where the proposed guidelines sentence

15   was four levels below life.  The guidelines are an especially

16   imperfect proxy in a case of private sector honest services

17   fraud like this one.  The crime here, as counsel have

18   discussed, is the employee's deprivation from his employer of

19   its intangible right to the employee's honest services.  That

20   crime is untethered to any financial loss or harm to the

21   employer.  The amount of money that changes hands is not

22   necessarily an accurate measure of the deprivation of the

23   intangible right to honest services.

24          While financial loss played no role at trial in the

25   determination of culpability, under the sentencing guidelines,

1    it becomes the single most important consideration in

2    sentencing.  Such approach is patently unfair.  As we know,

3    both the probation department and the government have

4    recognized that, and I note that the probation department, as

5    to each defendant, has noted that, without minimizing the

6    seriousness of the offense, given the defendants' familial ties

7    and responsibility and their compliance with the bail

8    conditions, probation believes that a seriously

9    below-guidelines sentence is appropriate.  I agree.

10        With respect to the history and characteristics of the

11   defendants, I note that, unlike so many defendants we see in

12   this courthouse, neither of these defendants became a hard

13   worker after his arrest or became a devoted family man after

14   his arrest.  They both did so throughout their lives.

15        I guess following on Mr. McGuire, I will not discuss

16   Mr. Tanner's childhood in detail, only to agree with his wife

17   that he did not have one and, indeed, had a less than

18   childhood.  Mr. Tanner nevertheless, having had no example of

19   education, went out and educated himself, despite the turmoil

20   in his own life.  He put himself through school, did very well

21   in school, and went forward.

22        We know that Mr. Tanner met Mrs. Tanner while they were

23   both working at Sears, and I note her position that "I get

24   emotional thinking about Gary as a father, especially knowing

25   what he endured during his childhood years.  I often wonder to

myself why Gary turned out as great as he did, when so many

others in a similar situation go down a different path."

I note the letter of Alison Pritchett, who worked first

with Mr. Tanner at Valeant before transferring to Philidor, and

who says, "I have always known Gary to be an incredibly hard

worker and someone whose main priority was to provide for his

family.  His wife, Abbey, and boys, Jack and Rhett, are Gary's

whole world, and he is devoted to them."

Ms. Pritchett adds that "I have worked for many people

during my career, and while most of them claimed to be

supportive of family priorities, Gary stands out as a person

who actually demonstrated by his actions that he embraced this

principle."

I note the numerous letters with respect to Mr. Tanner's

dedication at his son's school and in his community.  The

principal of the school writes that, "During my 15 years in

education, I have never seen a more dedicated, helpful father,

who consistently and selflessly gives up his time and energy

for his children's school."

An administrative assistant writes, "I have worked at

schools for over 30 years and, without a doubt, I have never

seen a dad more involved than Gary is with his children.

Mr. Tanner's community work was publicly recognized when he

received the school's volunteer award."

We have heard a great deal today about how hard

iau2tanS kjc

Mr. Tanner has worked, and I think there is no one who will
take away from that.  Particularly, in growing Philidor, we
know that Mr. Tanner traveled back and forth from Arizona to
the east coast every weekend for two years.  One of
Mr. Tanner's supervisors at Medicis and then at Valeant said,
"It is hard to overstate the work ethic I have observed in
Gary."

     Mr. McGuire made mention of the letter received from
Chris Hufford, and I note his remark that "I consider Gary to
be a wonderful example of how a man should carry himself as a
friend, as a citizen, and as a father and husband."

     Accordingly, I take Mr. Tanner's self-improvement, his
hard work, his devotion to family, his devotion to his
community, and his charity into account as part of his history
and characteristics.

     With respect to Mr. Davenport, again, Mr. Davenport did
not become a hard worker, a family man, and a charitable
individual postarrest.  He did that through his entire life.

     We recall that Mr. Davenport's parents did not attend
college, and his brother Tony was the first member of the
family to go to college.

     We also recall that, although Mr. Davenport was
accepted at Princeton, Georgetown, and Penn, he chose to attend
the University of Richmond so that he could go with his close
friend.  He paid for his own education out of student loans and

1   worked 20 hours a week bartending during school.

2          When Mr. Davenport met his wife Kristin, she could

3   hardly believe how hard he worked.  She said, "I quickly

4   appreciated that Andy is the smartest and most hard-working

5   person I have ever met.  He was working so hard, he hardly left

6   the house."

7          Mr. and Mrs. Davenport now have a 14-year-old boy and

8   a 12-year-old girl.  The young man writes, "My dad was with me

9   every step of my childhood, balancing work and parenting, so it

10  never felt like he was away for too long a time.  There were

11  some days he would drive home just to see us for an hour or two

12  before driving all the way back to work until late at night."

13         He continues, "He has always been there to pick me up

14  when I am down, and I feel like I can talk to my dad about any

15  problems I have."

16         Mr. Davenport's daughter notes that "my dad is always

17  there when I need him.  No matter how crazy the idea or how

18  large the task, he will give me help in any way he can."

19         After Mr. Davenport's brother Tony died suddenly at 48

20  years old, Tony's son wrote, "In one day, I lost my protector,

21  my confident, my compass, and my hero.  My Uncle Andy, bearing

22  the loss of his oldest brother, stepped in and saved not only

23  my life, but the life of my young brother, too.  Far beyond

24  providing a roof over both our heads and college educations,

25  Andy is an irreplaceable part of not only my life, but an

irreplaceable part of the lives of his wife, Kristin, and his

young children."

I note the letter filed as Document 207-1 where a

young woman who is referred to here as "AM" says, "I understand

you may not care about what an 11-year-old girl has to say, but

it is really important to me that you take the time to read

this letter.  I have known Uncle Andy for my entire life, and I

wanted to tell you how much of an impact he has made on me and

so many other people.  Whenever I see my Uncle Andy, he always

has a big smile on his face, no matter what is happening.  He

is always strong for everyone . . . when we first moved to

Haverford, along with the Davenports, we had to change schools.

I was really excited to be going to a fancy private school,

Baldwin.  What I didn't know was that my parents could not

afford to pay for that school.  Uncle Andy was kind enough to

pay for my Baldwin education and my brother's education, while

still paying for his own two kids.  This scenario is one

example as to how much of a generous person he is."

Michelle Davenport, Andy's brother Matt's widow,

writes that when Matt died suddenly in March of 2018, it was

Andy who, despite facing an imminent criminal trial, provided

emotional support that she so desperately needed.  "The

emotional availability that Andrew has afforded my daughter and

myself is truly priceless."

Andy's mother writes that, after the passing of his

father and his brothers, "Andrew has continued to be a steady,

supporting influence on his family, not only being a terrific

parent to his two young children ages 14 and 12, but also

stepping in to a father figure role over the past decade with

his two nephews and recently for his niece.  In addition to

supporting his brother's children, Andrew has assumed a

patriarchal role, caring for his mother and ensuring the wider

family has the emotional and financial support it requires."

        One of Kristin's younger sisters, Beth Ann Olesen,

notes that "Andy isn't just generous with his money, he is

generous with his time, his energy, and his attention."

        We have heard at length today about the energy that

Mr. Davenport expended in the various entrepreneurial ventures

he engaged in with his family and friends and employees.  I

note in particular Lynn Langan, an accountant in the finance

department at Philidor, explains "I was Andy's toughest critic.

At the point of hire, I had lost all faith in those that ran

companies, how out of touch they all seemed to be from the

average employee.  But then I started noticing Andy in the

pharmacy building boxes or sitting in a cubicle taking calls.

He continued in the trenches even as the company grew as if a

reminder to stay connected.  He talked to his employees, and

mostly not about work, but rather their lives outside the

walls.  He was interested and wanted them to be successful and

happy.  It was the last part that struck me most, that even

1    though he could sit behind his desk and revel in all the

2    success, he cared more about making sure his employees felt the

3    same way."

4    　　　　Peggy Neily, who worked as director of human resources

5    for Philidor for a time, noted that Mr. Davenport was an

6    extraordinary leader, and she listed some of the things that

7    Mr. Davenport did to protect his employees and to help the less

8    fortunate.  Those things included, as counsel have mentioned,

9    extending work to adults with cognitive or developmental

10   disabilities, focusing hiring directives to U.S. veterans and

11   women joining the workforce after raising children, personally

12   matching all charitable donations made by the employees dollar

13   for dollar with no limit, and going well above all requirements

14   to see that the employees who were affected by the closure of

15   Philidor were aided.  More personally, she notes that

16   Mr. Davenport paid for hotel rooms for employees willing to

17   work during snow storms and paid the travel expenses for a

18   young employee to travel to her mother's funeral on the west

19   coast.

20   　　　　Counsel has mentioned Ms. Karen Reo, who suffered a

21   stroke, and within 24 hours of Ms. Reo's daughter's notifying

22   Philidor of the situation, she heard back from the HR

23   department that "as per Mr. Davenport, Ms. Reo would be paid

24   her full salary while she is out recuperating."  As counsel

25   have already mentioned, when Ms. Reo returned to the company

1    with various disabilities resulting from the stroke, "Andy was

2    able to carve out a role for me within the company where I

3    could still be effective despite my limitations."

4              I also note the letter from Brett Winters, who was

5    vice president of operations, who explains that the company

6    learned on a Friday that, due to a payroll company error,

7    employee paychecks would not be delivered on time, requiring

8    the employees to wait until the following week.  He sets out in

9    his letter that the banks were closed, there was no way to deal

10   with this, and when he informed Mr. Davenport of the situation,

11   Mr. Davenport gave him the entire contents of his wallet, all

12   of the cash in his safe, and proceeded to borrow cash from

13   close friends so that the employees were paid.

14             We have heard already today about Nick Spuhler, whose

15   father suggested that he start caddying for Mr. Davenport when

16   Mr. Spuhler was 13 years old.  He did that and, as we have

17   heard, Mr. Davenport made him feel as an equal, encouraged him

18   to be somebody some day, gave him a job offer, stuck with him

19   through the financial downturn, and Mr. Spuhler concludes

20   that -- we have heard this sad situation with his father.  He

21   concludes, "In the absence of a father worth emulating, I used

22   my proximity to successful men at the golf club as a ready

23   collection of role models after which to fashion myself.

24   None's influence was more alluring or more enduring than

25   Andy's.  Lucky me that I got to benefit so directly from his

1   years of guidance, generosity, and good will."

2           I also note that from 2001 to 2008 Mr. Davenport

3   served on the board of directors of St. Mary's Villa for

4   Children, filling the board seat made available by his father's

5   untimely death in 2001.  That charity provides residential

6   treatment to boys and girls who manifest mental health problems

7   that cannot be addressed in less structured settings.

8           So in considering the history and characteristics of

9   these defendants, I take into account all of these facts.

10          With respect to the paragraph 2 factors, there is a

11  need for a serious sentence here to reflect the seriousness of

12  the offense and to provide respect for the law.  As we have

13  heard at length from the government, there is a need here to

14  protect companies' right to the honest services of their

15  employees.

16          With respect to paragraph B, I am convinced that there

17  is no need for extensive incarceration to deter either of these

18  individuals.

19          With respect to general deterrence, I agree with

20  Judge Rakoff, who says there is "considerable evidence that

21  even relatively short sentences can have a strong deterrent

22  effect on prospective 'white-collar' offenders."  *United States*

23  *v. Adelson*, 441 F.Supp.2d 506, 514 (S.D.N.Y. 2006) (citing

24  Richard Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80

25  (2005) and Elizabeth Szockyj, *Imprisoning White Collar*

*Criminals?*, 23 S. Ill. U. L. J. 485, 492 (1998)); *see also*
*United States v. Tomko,* 562 F.3d 558, 573 (3d Cir. 2009)
(rejecting government's argument that district court's
probation-only sentence in complex securities fraud case would
harm general deterrence).

In this instance, as we have heard at great length,
particularly from the individuals speaking on behalf of these
defendants, even a relatively short sentence has a very
devastating effect on defendants and certainly has a strong
deterrent effect in general.

In considering the paragraph D factors, I have taken
into account Mr. Davenport's medical situation, which is indeed
a difficult situation which requires monitoring.

I have in mind the paragraph 3, 4, and 5 factors.

With respect to paragraph 6, the need to avoid
unwarranted sentencing disparities, of course I am aware that
it is my job to take into account nationwide sentences,
nationwide cases, not just these cases; however, as I noted
with respect to the fraud guidelines, they are truly out of
whack at the higher ends, and that is where we find ourselves
today.  So to the extent that there is any perceived disparity,
it is because of the unworkability of the fraud guidelines at
the far end.

With respect to paragraph 7, the need to provide
restitution, I note that both defendants of course are looking

iau2tanS kjc

1  at enormous financial penalties, and thus a very lengthy

2  sentence will deter from their ability to make restitution and

3  thus that argues against requiring a lengthy prison term.

4        Mr. Tanner, counsel, taking all of those factors into

5  account, it is my intention to impose a sentence of a year and

6  a day on Mr. Tanner, followed by a period of two years of

7  supervised release on each count to run concurrently.

8        It is not my intention to impose a fine, in light of

9  the other financial penalties that Mr. Tanner is facing.

10        It is my intention to impose the restitution amount

11  set out in the proposed order of restitution, which is

12  $9,703,995.33.

13        Forfeiture, as we have discussed, will be determined

14  later.

15        MR. COOPER:  Your Honor, I'm sorry to interrupt.

16        THE COURT:  Forgive me.  You are right.  Forfeiture is

17  in the amount I noted.  Restitution is to be determined later.

18        It is my intention to impose the special assessment of

19  $400.

20        It is my intention to provide the payment schedule

21  that is set forth at pages 31 to 32, which talks about period

22  of incarceration and monthly installments at 20 percent of

23  Mr. Tanner's gross monthly income.

24        It is my intention to impose the recommended special

25  conditions of access to financial information and no lines of

iau2tanS kjc

1    credit unless he is in compliance with the installment payment

2    schedule.

3          Is there any reason, counsel, why such a sentence

4    should not be imposed?

5          MR. COOPER:  No, your Honor.

6          MR. McGUIRE:  No, your Honor.

7          THE COURT:  Very well, then.  Mr. Tanner, you are

8    sentenced, sir, to a period of incarceration of a year and a

9    day.  Following that time, you will spend a period of two years

10   on supervised release.

11         During that period, you will comply with all of the

12   standard terms and conditions of supervised release.  Among

13   them are that you not commit another federal, state, or local

14   crime, you not illegally possess a controlled substance, and

15   you not possess a firearm or other destructive device.

16         In addition to those and all of the other standard

17   terms and conditions of supervised release, during that period

18   you will provide the probation officer with access to any

19   requested financial information.

20         In addition, you will not incur any new credit charges

21   or open any additional lines of credit without the approval of

22   the probation officer unless you are in compliance with the

23   installment payment schedule.

24         As I mentioned, I do not impose a fine, but impose the

25   forfeiture amount of $9,703,995.33 jointly and severally.

iau2tanS kjc

1        During the period of incarceration, if you are engaged

2    in a BOP non-UNICOR work program, you will pay $25 per quarter

3    toward the criminal financial penalties.  If you participate in

4    the Bureau of Prisons UNICOR program at a grade 1 through 4,

5    you will pay 50 percent of your monthly UNICOR earnings toward

6    the criminal financial penalties consistent with BOP

7    regulations at 28 C.F.R. § 545.11.

8        Any payment made that is not payment in full shall be

9    divided proportionally among the persons named.

10        The restitution, upon release, shall be paid in

11    monthly installments beginning 30 days after release.  The

12    installments will be in no less than 20 percent of your gross

13    monthly income.

14        And finally, sir, I must impose and do impose the $400

15    special assessment, and that should be paid promptly.

16        It is my duty to inform you, sir, that, unless you

17    waived it, you have the right to appeal this sentence, and you

18    might have the right to appeal *in forma pauperis*, which means

19    as a poor person, with the waiver of certain fees and

20    expenses.

21        Mr. McGuire, did you wish a recommendation for a

22    designation, or Mr. Cooper did you have something to add?

23        MR. COOPER:  I do briefly, your Honor.

24        I believe the court ordered forfeiture jointly and

25    severally.

iau2tanS kjc

1          THE COURT:  You are right.  Not.  I take it back.

2          MR. COOPER:  Thank you.

3          THE COURT:  Forfeiture is not joint and several.

4    Thank you.

5          Mr. McGuire.

6          MR. McGUIRE:  Yes, Judge.  We have explained to

7    Mr. Tanner that the court cannot order a particular facility,

8    but we would ask that your Honor make a recommendation to the

9    Bureau of Prisons that Mr. Tanner be designated to a facility

10   where his family resides in Arizona, where we believe there is

11   FCI Tucson and FCI Arizona.  The preference would be FCI

12   Arizona, but the overall goal here is I think to ensure that he

13   goes to a minimum security camp, and we believe those two

14   institutions in Arizona --

15         THE COURT:  It is the court's recommendation that

16   Mr. Tanner be designated to a facility as close as possible to

17   his home in Arizona, particularly in the light of his having

18   two young children.  It is the court's recommendation that he

19   be designated to FCI Arizona or FCI Tucson.

20         MR. McGUIRE:  Your Honor, we would request a surrender

21   date in late January to allow Mr. Tanner to spend the holidays

22   with his family and get his affairs in order.

23         THE COURT:  Yes, sir.

24         (Pause)

25         THE COURT:  January 31, 2019.

1          MR. McGUIRE:  And your Honor, one other issue, which

2     is a request.  We have raised this with the government.  There

3     is a minor issue with respect to the record and a request that

4     we have with the government that -- the trial record, that is,

5     that we would ask to keep open the judgment for a period of a

6     couple of days this week to see if we can resolve it with the

7     government, and we may come to your Honor with that.  So we

8     just ask for that time.  By the end of the week, we will submit

9     a letter.  We will contact chambers otherwise to update the

10    court.

11         THE COURT:  Thank you.

12         MR. McGUIRE:  Thank you.

13         Then I believe there will be a request for bail

14    pending appeal, but we can handle that after the Davenport

15    sentence is imposed.

16         THE COURT:  Okay.  Was there any reason not to

17    continue it?

18         MR. COOPER:  No, your Honor.

19         THE COURT:  So ordered.

20         Ms. McCarthy, would you remind me, in light of the

21    holding with respect to the irrevocable trust, what the number

22    is.

23         MS. McCARTHY:  The number of what, Judge?

24         THE COURT:  The forfeiture.

25         MS. McCARTHY:  In the forfeiture order?

iau2tanS kjc

1          THE COURT:  Yes.

2          MR. COOPER:  Your Honor, sorry.  I believe the number

3     remains the same.  The court can just strike out the specific

4     property of the trust, which is --

5          THE COURT:  What about paragraph 1?

6          MR. COOPER:  The money judgment amount will remain the

7     same in paragraph 1.  On the third page, paragraphs E and F,

8     which are the paragraphs that relate to the specific property

9     and trust, maybe your Honor can just cross those out and the

10    order should otherwise be fine.

11         THE COURT:  Is that okay with you, Ms. McCarthy?  E

12    and F.

13         MS. McCARTHY:  Yes, it is E and F, your Honor.

14         THE COURT:  Yes, ma'am.  Thank you.  Thank you,

15    counsel.

16         You have heard the considerations that I have gone

17    through in thinking about a sentence.  As I said, I am

18    cognizant of Mr. Davenport's health situation, but it is

19    nevertheless my intention to impose a period of a year and a

20    day incarceration with the recommendation that Mr. Davenport

21    spend his time at the highest level medical facility that is

22    available at BOP.

23         It is also my intention to impose a period of two

24    years of supervised release on each count to run concurrently.

25         It is my intention to impose the special conditions

iau2tanS kjc

1   set forth, starting on page 31, which is a substance abuse

2   program, mental health program, providing requested financial

3   information and not incurring new credit charges or additional

4   lines of credit without approval unless in compliance with the

5   installment payment schedule.

6           It is not my intention to impose a fine.

7           It is my intention to impose the forfeiture amount of

8   $9,703,995.33.

9           It is my intention to impose the payment schedule

10  which is set out at page 33 of the presentence report.

11          And it is my intention to impose the $400 special

12  assessment.

13          Is there any reason, counsel, why such a sentence

14  should not be imposed?

15          MS. McCARTHY:  No, your Honor.

16          THE COURT:  Very well, then.  Mr. Davenport, you are

17  sentenced, sir, to a period of incarceration of a year and a

18  day.

19          It is the court's very strong recommendation to the

20  Bureau of Prisons that you be designated to the highest level

21  medical facility that is available.

22          Following that time, sir, you will spend a period of

23  two years on supervised release.  During that period, you will

24  comply with all of the standard terms and conditions of

25  supervised release.  Among them are that you not commit another

iau2tanS kjc

1    federal, state, or local crime, you not illegally possess a

2    controlled substance, and you not possess a firearm or other

3    destructive device.

4         In addition to those and all of the other standard

5    terms and conditions of supervised release, during that period,

6    you participate in an outpatient treatment program approved by

7    the probation officer for substance abuse, and that program may

8    include testing to determine whether you have returned to the

9    use of alcohol.

10        In addition, sir, during that period, you will

11   participate in an outpatient mental health treatment program

12   approved by the probation officer.

13        During that time, you will continue to take any

14   prescribed medications unless otherwise instructed by the

15   healthcare provider.

16        Sir, you might be required to pay some or all of those

17   two programs, depending on your ability to pay and the

18   availability of third-party payment.

19        The court authorizes the release of available drug

20   treatment evaluations and reports and available psychological

21   and psychiatric evaluations and reports, including the

22   presentence investigation report, to the respective healthcare

23   providers.

24        In addition, sir, during that period, you will provide

25   the probation officer with any requested financial information.

iau2tanS kjc

1    You will also not incur any new credit charges or open any

2    additional lines of credit without the approval of the

3    probation officer unless you are in compliance with the

4    installment payment schedule.

5            During the period of incarceration, if you are engaged

6    in a Bureau of Prisons non-UNICOR work program, you will pay

7    $25 per quarter toward the criminal financial penalties;

8    however, if you participate in the BOP's UNICOR program, at a

9    grade 1 through 4, you will pay 50 percent of your monthly

10   UNICOR earnings towards the criminal financial penalties

11   consistent with Bureau of Prisons regulations at 28 C.F.R. §

12   545.11.  Any payment made that is not payment in full shall be

13   divided proportionally among the persons named.

14           Following release, sir, restitution will be paid in

15   monthly installments of 20 percent of your gross monthly income

16   commencing 30 days after release.

17           As I mentioned, I do not impose a fine, but must

18   impose and do impose the $400 special assessment, and that

19   should be paid promptly.

20           It is my duty to inform you, sir, that, unless you

21   have waived it, you have the right to appeal this sentence, and

22   you might have the right to appeal *in forma pauperis*, which

23   means as a poor person, with the waiver of certain fees and

24   expenses.

25           Ms. McCarthy, did you want a specific recommendation

iau2tanS kjc

1    or what?

2              MS. McCARTHY:  Your Honor, he lives in the

3    Philadelphia area.  The two medical facilities that are in any

4    way close are both over six hours away.  One is in Devens, the

5    other is in Lexington, Kentucky.

6              (Defense counsel and defendant confer)

7              MS. McCARTHY:  He doesn't have a preference, your

8    Honor.

9              Secondly, your Honor, we would ask that if the Bureau

10   of Prisons determines, based upon an analysis of his medical

11   needs, that he does not require federal medical facility, that

12   the court then alternatively recommend FCI Schuylkill, which is

13   very close to his home.

14             THE COURT:  It is so recommended.

15             MS. McCARTHY:  Thank you.

16             THE COURT:  Did you want the January 31 surrender

17   date?

18             MS. McCARTHY:  Yes, your Honor, and also we would ask

19   that bail be continued pending appeal.

20             THE COURT:  Yes, ma'am.  Any objection?

21             MS. KRAMER:  Yes, your Honor.  We have no objection to

22   bail continuing pending the sentencing -- the surrender date of

23   January 2019, but bail pending appeal is disfavored and only

24   warranted in exceptional circumstances where the court finds,

25   by clear and convincing evidence, that an appeal raises a

1    substantial question of law or fact likely to result in

2    reversal, an order for a new trial, a sentence that does not

3    include a term of imprisonment, or a sentence that is reduced

4    from what the court has imposed.  There is absolutely no basis

5    to reach that conclusion in this case, certainly not by clear

6    and convincing evidence.

7           THE COURT:  Ms. McCarthy.

8           MS. McCARTHY:  Your Honor, if the court would permit,

9    Alexandra Shapiro will be handling the appeal on behalf of

10   Mr. Davenport, and I would ask the court permit her to address

11   this issue.

12          THE COURT:  All right.  Well, the motion is denied

13   now.  As of now, bail is continued through the surrender date.

14   If Ms. Shapiro wants to make a presentation, that's fine.

15          MS. KRAMER:  I understand that Mr. McGuire is making

16   the same motion for bail pending appeal on behalf of

17   Mr. Tanner.

18          THE COURT:  Forgive me.  I thought Mr. McGuire said

19   pending surrender.

20          MR. McGUIRE:  I said both, your Honor.  I asked for

21   the surrender date, then I also said, after the Davenport

22   sentence is imposed, that there would be a request for bail

23   pending appeal on behalf of Mr. Tanner.

24          We are going to yield the floor to Ms. Shapiro, as the

25   arguments that she is going to make we will join in.

iau2tanS kjc

1              THE COURT:  All right.

2         Ms. Shapiro.  Yes, ma'am.

3              MS. SHAPIRO:  I will try to be brief, your Honor.  I

4    know it's been a long morning.

5              With respect to the -- I think the government concedes

6    there is no risk of flight or danger, and the sole question

7    before the court is whether we can establish that there is a

8    substantial question that, if resolved in the defendants'

9    favor, would result in reversal or a new trial.

10             The leading Second Circuit case on the matter makes

11   clear that this is not a high hurdle, that "substantial" means

12   a question that is not frivolous, but rather a close question

13   or one that could well be decided the other way or one that is

14   novel and which has not been decided by controlling precedent,

15   and that is *United States v. Randell*, 761 F.2d 122, a Second

16   Circuit decision from 1985.

17             We clearly don't have to prove that the defendants are

18   likely to succeed and this court need not find that it has

19   erred, but merely whether, if we do succeed, a new trial or

20   reversal will be granted.

21             THE COURT:  What about the clear and convincing part?

22   What about the clear and convincing part?

23             MS. SHAPIRO:  Your Honor, I am about to address what

24   the issues are and why they are substantial.

25             So in the first -- we think that there are several

iau2tanS kjc

1    substantial issues which arise in part from the fact that I

2    think everyone has acknowledged, even accepting the verdict,

3    the theory of honest services fraud in this case is highly

4    unusual and that we are unaware of any other case in which a

5    private sector honest services fraud case was not based on the

6    situation described by other counsel, and I won't go on at

7    length about it, in which business is essentially steered to a

8    vendor who makes a bribe or kickback.  I think your Honor

9    acknowledged that even at the oral argument on the motion to

10   dismiss.

11            So we think that, under these unique facts, as well as

12   the Supreme Court's narrowing of the honest services fraud

13   statute most recently in the *McDonnell* case from 2016, give

14   rise to several substantial questions about both fair notice

15   and jury instructions in this case.

16            First, we think there is a substantial question

17   whether the honest services fraud statute is unconstitutionally

18   vague as applied to this conduct.  And I won't go on at length,

19   I know your Honor has ruled on this, but I think, at a minimum,

20   it is clear that that presents a novel question.  The circuit

21   has never addressed it.

22            And I have one that satisfies the substantial question

23   standard.  I think in particular I just would note that in the

24   *Skilling* case the Supreme Court was clear that the statute does

25   not criminalize mere undisclosed self-dealing by a private

iau2tanS kjc

1   employee and that something more is required, and that the type

2   of paradigmatic cases of bribes and kickbacks that the court

3   was describing in *Skilling* in context of private services are

4   the types of cases that we all have been talking about, which

5   is not what happened here.  This was very unusual, given that

6   this started because Valeant nurtured a relationship with

7   Mr. Davenport and Philidor, and I won't go through all of the

8   other facts.  The court is extremely familiar with them, more

9   than I am.

10          And I recognize that the court thought very carefully

11  about all of its rulings in the case, but I just respectfully

12  submit that this is, at a minimum, a novel question and

13  therefore satisfies the bail standard.

14          In addition, we think that there are a couple of

15  issues with respect to the jury instruction, particularly with

16  regard to the *quid pro quo*, that are similar to issues raised

17  recently by Sheldon Silver in his argument to the Second

18  Circuit, which was accepted, that he should be entitled to

19  bail, and both of those apply to this case, and there is one

20  other issue I want to mention.

21          So the first question that he raised in his successful

22  bail argument to the circuit was a question about whether the

23  jury charge was deficient because it failed to instruct the

24  jury that there needs to be a *quid pro quo* agreement before the

25  employee took the acts in question, and we think in this case,

1    as well, that the jury instruction, in particular with respect

2    to Mr. Davenport, failed to convey that the jury had to find

3    that Andy Davenport paid Mr. Tanner a kickback with the

4    understanding that the payment was made in exchange for

5    specific actions by Mr. Tanner.

6              This requirement of an agreement which, as I said, the

7    Second Circuit found was at least substantial in the *Silver*

8    case, is dictated by a long line of cases from the Supreme

9    Court and this circuit.  I won't go through all of them, but

10   the *Evans* case from 1992 in the Supreme Court makes clear that

11   there has to be a showing of an agreement in exchange for

12   performing specific acts.

13             Similarly, in the more recent case of *McDonnell*, the

14   court held that the jury had to determine that in that case the

15   official agreed to perform a specific act at the time of the

16   alleged *quid pro quo*.

17             There is a similar holding in the Supreme Court's

18   *McCormick* decision from 1991.

19             Then there are several Second Circuit cases which

20   reinforce that, including you the original *Silver* decision from

21   2017, the *Rosen* case from 2013, and *United States v. Ganim* from

22   2007.

23             In this case, the defendants requested an instruction

24   that the government had to prove "that the defendant

25   specifically intended there to be a *quid pro quo*" and they also

1  requested an instruction that, to establish the necessary *quid*

2  *pro quo*, it is not enough for the government to prove that a

3  payment was made for some future act that the employee had

4  already decided to take or for a past act that he has already

5  taken, and the court did decline to give both of those

6  instructions.  And as I mentioned earlier, it also did not

7  instruct the jury that the government had to prove that there

8  was a *quid pro quo* between the two defendants before Mr. Tanner

9  took the acts in question.

10       In addition, the jury instructions stated that all

11  that is required is that Tanner performed or promised to

12  perform the act in question at least in part because of a

13  potential bribe or kickback which was focused exclusively on

14  Mr. Tanner and failed, in our judgment, to communicate to the

15  jury that there had to have been a meeting of the minds between

16  the two defendants, and we did object to that sentence.

17       So at a minimum, again, understanding that the court

18  obviously takes a different view of this, we submit that this

19  is a substantial question, as the Second Circuit apparently

20  recognized in the *Silver* case.

21       In addition, there was a second issue that Mr. Silver

22  raised in his bail application to the circuit which had to do

23  with an instruction that your Honor also gave which permitted

24  the jury to convict on a theory that involved a so-called

25  "stream of benefits" or "as opportunities arise" theory, rather

1     than one that was focused on a particular act in this case by

2     Mr. Tanner, and this issue was not only briefed, but also

3     discussed as well at the oral argument in the *Silver* case, and

4     Judge Cabranes commented during the argument that this was an

5     important question that the circuit had yet to decide as to

6     whether the *McDonnell* case forecloses that theory which

7     previously had been permitted in the Second Circuit.

8          And we think that that statement is supported by

9     *McDonnell* which was focused on the government identifying a

10    particular matter on which a person receiving the bribe has

11    agreed to act and stated that it had to be focused and

12    concrete, among other things.

13         THE COURT:  That's the public service, the public

14    honest services fraud case.

15         MS. SHAPIRO:  That's correct, your Honor.  But I think

16    that the circuit has ruled, including in *DeMizio*, that the case

17    law from the public official cases applies to private sector

18    cases in large part, and also I would just point out --

19         THE COURT:  Certainly not the official act part of it.

20    It can't.

21         MS. SHAPIRO:  Well, there has to be an act.  In this

22    case, it is a corporate act or it is a different kind of act,

23    but it has to be specific.  And I think the court in *McDonnell*

24    reached the conclusion that it did based on three

25    constitutional concerns that it identified which caused the

iau2tanS kjc

court to construe the honest services fraud statute narrowly in
the context of the finding of what in that case the official
act, but I would submit the act in a private case, as well; and
two of those three concerns clearly apply in private cases.
One of them is fair notice, vagueness concerns about both
defendants knowing what the line is between criminal conduct
and noncriminal conduct in this context, as well as the concern
about deterring the government from abusing the broadness, the
breadth of the statute.

The second constitutional concern which applies
equally in private cases and, indeed, perhaps more so, one
might add, is the federal concern, because these are obviously
things that are governed by state law as well.

And at a bare minimum, your Honor, I would submit that
the Second Circuit has never addressed the question of to what
extent does the *McDonnell* case apply in private honest services
fraud cases, and that in and of itself is a novel question of
first impression and therefore satisfies the bail standard
under the *Randell* case.

Just one last point, your Honor. We also think that
there is a substantial question, we respectfully submit that
there is a substantial question as to whether the jury
instructions were also deficient because they failed to charge
that it is not enough for the government to prove that a
payment was made to curry favor or build good will. And, as

iau2tanS kjc

1    the court will recall, the defendants requested this specific

2    instruction, and the court declined to give it.  It is directly

3    supported by Second Circuit law, including the *United States v.*

4    *Ganim*, a 2007 case, which I mentioned earlier.

5            And so, in summary, I think the critical point here is

6    that the defendants don't have to show by clear and convincing

7    evidence or otherwise that they are likely to prevail on any of

8    these issues.  The point is, under the Second Circuit

9    precedent, is it a substantial question, is it more than

10   frivolous, is it something courts could disagree on, or is it a

11   novel question.  And I submit at least one of these issues, if

12   not all of them, certainly satisfy that standard.

13           And I would also just note that, given the length of

14   the sentences that have been imposed here today, it is

15   virtually certain that, if bail pending appeal is not granted,

16   defendants will have served most, if not all, of the sentences

17   by the time the appeal is decided, and we ask the court to

18   consider that as well.

19           Thank you.

20           THE COURT:  Thank you.

21           Yes, ma'am.

22           MS. KRAMER:  Your Honor, we must be reading different

23   *Randell* cases, because I understand the Second Circuit to have

24   said that "a substantial question is one that is close or that

25   very well could be decided the other way," and your Honor

1    passed on all of these issues through the various forms of

2    litigation that we have had in this case, from the motion to

3    dismiss through the jury charge, and made decisions that were

4    unequivocal, not that were close or that your Honor viewed

5    could be decided the other way.

6            The Third Circuit in *United States v. Miller*

7    articulated the view expressed by the Congress in enacting

8    Section 3143(b), concerning bail pending appeal, that "once a

9    person has been convicted and sentenced to jail, there is

10   absolutely no reason for the law to favor release pending

11   appeal or even to permit it in the absence of exceptional

12   circumstances."

13           These are all certainly arguments that the defendants

14   will no doubt raise on appeal, but they don't fall into the

15   limited bucket of exceptional circumstances that warrant bail

16   pending appeal.

17           THE COURT:  Thank you.

18           Anything else, Ms. Shapiro.

19           MS. SHAPIRO:  Your Honor, I would just briefly note

20   that the statement about exceptional circumstances is not

21   accurate to the extent the government is suggesting that the

22   substantial issue standard isn't the one that I read from

23   *Randell*, which says, "'Substantial' means one that is not

24   frivolous but, rather, a close question."  The government read

25   that part correctly.  And I would respectfully submit, again,

1   respecting the court's decisions and its careful attention to

2   the various issues, that -- I understand the court disagrees

3   with defendants' position, but clearly that is not the end of

4   the matter, and that's the whole point.  And, indeed, the

5   *Randell* decision also specifically states that the district

6   court does not need to decide that it erred in order to grant

7   bail pending appeal.

8           And the last thing I will mention is that, in another

9   recent case out of the Eastern District of New York, the *Mark*

10  *Johnson* case, in that case the district court denied bail

11  pending appeal and said there was a presumption against bail,

12  and that was the basis for it.  The Second Circuit took a

13  different view and granted bail in that case, notwithstanding

14  the fact that the defendant was a foreign citizen.

15          And we respectfully submit here, at a minimum, these

16  issues are certainly novel issues the circuit has never

17  considered before, and that is sufficient, under *Randell*, to

18  grant bail.

19          THE COURT:  Anything else?

20          MS. KRAMER:  No, your Honor.

21          THE COURT:  Thank you.

22          I find the defendants have not made out the

23  requirements for bail pending appeal; and, accordingly, it is

24  denied.

25          Is there anything else today, counsel?

1           MR. COOPER:  Yes, your Honor.  Two ministerial issues.

2           One is, I know that the briefing and the argument on

3   restitution are being deferred, but to the extent it is unclear

4   on the record, I believe the court needs to order restitution

5   today and defer determination of losses to that later date, so

6   we would ask that the court do that.

7           THE COURT:  No objection, right?

8           MR. McGUIRE:  No, your Honor.

9           THE COURT:  Restitution is ordered.  The amount will

10  be determined following your briefing, and I assume you will

11  let me know what your schedule is.

12          Thank you.

13          MR. COOPER:  Yes, your Honor.

14          Finally, the government moves to dismiss the

15  underlying indictment in this case as against both defendants.

16          THE COURT:  So ordered.

17          MR. COOPER:  Thank you, your Honor.

18          MS. McCARTHY:  Your Honor, just one minor fact.  We

19  removed from the forfeiture order the trust assets, but I would

20  ask that the government affirmatively lift the restraint on

21  those assets.

22          MR. COOPER:  We will, your Honor.

23          THE COURT:  Yes, sir.

24          Anything else?

25          MR. COOPER:  Not from the government.  Thank you, your

iau2tanS kjc

1    Honor.

2            MS. McCARTHY:  No.

3            MR. McGUIRE:  No, thank you, Judge.

4            THE COURT:  Thank you, counsel.  Thank you again for

5    your presentations, which were exceedingly helpful.

6            Good morning.

7                              oOo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| (1)   GREGORY ABBOTT, | ) | |
| (2)   MARCIA ABBOTT, | ) | |
| (3)   JANE BUCKINGHAM, | ) | |
| (4)   GORDON CAPLAN, | ) | Criminal No. 19-CR-10117-IT |
| (5)   ROBERT FLAXMAN, | ) | |
| (6)   FELICITY HUFFMAN, | ) | |
| (7)   AGUSTIN FRANCISCO HUNEEUS, | ) | |
| (8)   MARJORIE KLAPPER, | ) | |
| (9)   PETER JAN "P.J." SARTORIO, | ) | |
| (10)  STEPHEN SEMPREVIVO, and | ) | |
| (11)  DEVIN SLOANE, | ) | |
| | ) | |
| Defendants | ) | |

## GOVERNMENT'S MEMORANDUM REGARDING THE METHODOLOGY FOR CALCULATING GAIN OR LOSS UNDER THE SENTENCING GUIDELINES

ANDREW E. LELLING
United States Attorney

ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Assistant United States Attorneys

Date: September 5, 2019

The government respectfully submits this memorandum in advance of the September 10, 2019 hearing regarding the methodology for calculating the enhancement for gain or loss under the applicable Sentencing Guidelines.[1]

## **INTRODUCTION**

As part of their plea agreements, all of the defendants have stipulated that, pursuant to Section 2B1.1(b) of the Sentencing Guidelines, their offense levels should be enhanced based on the amount of money each parent paid to facilitate the fraud scheme. Such stipulations "will generally govern the resolution of that issue," *see United States v. Granik*, 386 F.3d 404, 411 (2d Cir. 2004), and courts are permitted to rely on the parties' stipulations in finding facts relevant to sentencing. *See id.* at 412; *United States v. Berndt*, 127 F.3d 251, 253-55, 258 (2d Cir. 1997) (affirming sentencing enhancement based on factual stipulations contained in state court plea agreement); *United States v. Bilal*, 941 F. Supp. 2d 397, 404 (S.D.N.Y. 2013) (denying motion to vacate restitution order where defendant "stipulated that the loss amount attributable to his conduct was greater than $1 million but less than $2.5 million"); *Kapelioujnyi v. United States*, 779 F. Supp. 2d 250, 255 (E.D.N.Y. 2009) (denying petition under 28 U.S.C. § 2255 and finding sentencing court was "within its discretion" in relying on stipulations regarding defendant's role in RICO conspiracy and loss amount).

Notwithstanding these stipulations, the final and draft Presentence Investigation Reports ("PSRs") prepared to date conclude that the immediate victims of the defendants' conduct—the affected universities and standardized testing agencies—suffered no cognizable pecuniary harm for Guidelines purposes. In the absence of pecuniary harm, the PSRs conclude that gain may not

---

[1] The government is also submitting to the Court an Appendix containing documents cited herein, with the exception of victim-impact statements, which have been provided to the Court by the Probation office.

be used as a substitute for loss.  As a result, the PSRs calculate the *same* Guidelines offense level

for every defendant (with no enhancement for gain or loss under Section 2B1.1(b)(1) regardless

whether the defendants paid bribes of $15,000 or $400,000).

The government respectfully submits that the PSRs' conclusion is mistaken.  The

Sentencing Guidelines consistently include enhancements based on monies paid, received, lost, or

gained in the course of the criminal conduct.  *See, e.g.*, U.S.S.G. §§ 2B1.1, 2B4.1 and 2C1.1.

Indeed, as set forth below, numerous circuits, including the First Circuit, have in similar

circumstances applied Section 2B4.1, the commercial bribery guideline, to private sector honest

services fraud cases, resulting both in a higher base offense level *and* the enhancement of that

level, based on the bribe amount, pursuant to the loss table in Section 2B1.1.  And in a pending

case in the Southern District of Florida that closely parallels this one, the PSR recommends the

application of Section 2C1.1 to likewise enhance the base offense level based on the value of the

bribe pursuant to Section 2B1.1.

There can be little dispute that the universities and testing agencies have suffered, and will

continue to suffer, pecuniary harm, and that this harm was a reasonably foreseeable consequence

of the defendants' conduct.  Although the victims' financial losses are difficult to quantify with

precision, the Guidelines instruct that where a precise loss amount cannot be "reasonably

determined," the Court should substitute the gain from the offense—in this case, the amounts the

defendants intended to pay their co-conspirators to facilitate the bribery and fraud scheme—which

are the amounts to which the parties stipulated in the plea agreements.  Such an approach is

consistent with the way the Guidelines treat bribe payments generally, would align the Guidelines

ranges in this case with those of similarly situated defendants nationwide, appropriately reflect

relative culpability and thus help to achieve a just result.

2

# I.    <u>USC AND GEORGETOWN SUFFERED PECUNIARY HARM</u>

Both USC and Georgetown, the principal university victims of the charged scheme, suffered demonstrable pecuniary harm from the defendants' conduct.[2]

<u>First</u>, as the defendants have acknowledged by pleading guilty to conspiracy to commit honest services fraud, the universities lost the value of their corrupt employees' honest services. While it is difficult to calculate that value precisely, the loss can be approximated by looking to the salaries the universities paid to the employees the defendants and their co-conspirators conspired to bribe—monies the universities would not have paid had they known their employees were corrupt, and that they stopped paying as soon as they found out.

<u>Second</u>, the defendants' scheme caused both USC and Georgetown to undertake costly internal investigations separate and apart from the government's investigation. These costs were a direct and foreseeable consequence of the defendants' fraud.

<u>Third</u>, although the Sentencing Guidelines do not recognize reputational harm as a compensable loss, where such reputational harm results in pecuniary harm, such losses are cognizable. *See, e.g.*, U.S.S.G. § 2B1.1 cmt. n.3(C)(v) (loss includes any reduction in the value of

---

[2] Section 2B1.1 of the Sentencing Guidelines defines "pecuniary harm" as "harm that is monetary or that otherwise is readily measurable in money," and provides that, in determining "loss" for purposes of the enhancement in Section 2B1.1(b), "loss is the greater of actual loss or intended loss." *See* U.S.S.G. § 2B1.1 cmt. n.3(A). Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* n.3(A)(i). Intended loss is "the pecuniary harm that the defendant purposely sought to inflict" and "includes intended pecuniary harm that would have been impossible or unlikely to occur," such as where the scheme was interrupted before it could succeed. *Id.* n.3(A)(ii). The Guidelines set forth several factors to consider in estimating loss, including (1) the fair market value or replacement cost of the property unlawfully taken; (2) the cost of developing proprietary information; (3) the cost of repairs; and (4) more general factors, such as the scope and duration of the offense and revenues generated by similar operations. *Id.* n.3(C)(i)-(iii) & (vi). The Guidelines provide that the Court "need only make a reasonable estimate of loss," *id.* n.3(C), and that where "there is a loss but it reasonably cannot be determined," the Court "shall use gain that resulted from the offense as an alternative measure of loss," *id.* n.3(B).

"corporate assets" that resulted from the offense). Here, the evidence indicates that the universities will foreseeably experience a decline in applications for admission as a result of the scheme, which will translate into a direct pecuniary loss in the form of lost application fees.

### A. Defendants Paid Bribes to USC and Georgetown Employees, Costing the Universities the Full Value of Their Employees' Honest Services

Ample precedent in honest services fraud cases supports the proposition that the salaries paid by victim organizations to bribe recipients constitute pecuniary losses to those victims.[3] This makes sense. An employer pays an employee a salary to retain that employee's loyal services. Here, USC and Georgetown paid salaries to employees who were also receiving bribes as part of the charged conspiracy. These employees feigned loyalty to their employers, while secretly acting to their employers' detriment by selling admission to athletically unqualified students in exchange for bribes. In so doing, the fraud scheme deprived the victim universities of the full value of the salaries they paid the corrupt employees. The table below sets forth the approximate salaries that the corrupt employees of Georgetown and USC received during the period in which they were also accepting bribes:

---

[3] *See, e.g., United States v. Crawley*, 533 F.3d 349, 357 (5th Cir. 2008) (affirming loss to be the full value of the salary and benefits defendant received from his union while accepting kickbacks and noting that "[b]y intentionally depriving Local 988 of honest services, Crawley *obviously* inflicted some level of pecuniary harm on the organization") (emphasis added); *United States v. Bahel*, 662 F.3d 610, 648-49 (2d Cir. 2011) (in determining restitution, court found that salary paid to employee convicted of honest services fraud was "plainly 'property' that belonged to" employer and subject to forfeiture); *United States v. Sapoznik*, 161 F.3d 1117, 1121 (7th Cir. 1998) ("We may assume that [the employer] would not have hired [defendant] had it known of his intentions, and in that event it would not have paid him four years' salary . . . [W]hat [the employer] lost . . . [was] the difference in the value of the services that [defendant] rendered . . . and the value of the services that an honest [employee] would have rendered.").

| Employee | Period in which Employee Received Bribes | Approximate Total Salary Received During Period in which Employee Received Bribes[4] |
|---|---|---|
| Donna Heinel (USC) | February 2014 to March 2019 | $1,164,116 |
| Jovan Vavic (USC) | January 2014 to March 2019 | $1,232,945 |
| Ali Khosroshahin (USC) | October 2012 to November 2013 | $331,542[5] |
| Laura Janke (USC) | October 2012 to January 2014[6] | $74,322 |
| Gordon Ernst (Georgetown) | January 2012 to June 2018[7] | $361,653[8] |

Whether the pecuniary harm for Guidelines purposes is the full value of the salary or some portion of it—in recognition of the fact that the employees also provided some legitimate services—is less relevant than the *fact* that the universities suffered a pecuniary loss.  In *United States v. Crawley*, for example, the district court determined that the entire amount of the defendant's salary should be deemed "loss" because it was not possible to "apportion what part of [the salary] he really earned and what part he didn't earn."  533 F.3d at 357 (further citation and internal quotation marks omitted).  Other courts have concluded that the better measure of loss is "'the difference in the value of the services that [the defendant] rendered . . . and the value of the services that an honest [employee] would have rendered.'"  *Bahel*, 662 F.2d at 650 (brackets and

---

[4] These figures do not include car allowances or other fringe benefits.

[5] This figure includes a salary payout of approximately $122,282 Khosroshahin received following his termination by USC in November 2013, which reflects a payment for which USC received no services from Khosroshahin.

[6] USC terminated Janke in January 2014.

[7] While Ernst's acceptance of bribes pre-dates January 2012, the government is in possession of salary information going back only to January 2012.  The figures for Vavic, Khosroshahin and Janke reflect only those periods as currently charged, but understate the loss to USC insofar as they do not include earlier periods for which there is evidence that the defendants also accepted bribes while receiving salaries.

[8] This figure includes salary payments totaling approximately $65,732.43 that Ernst received between January 1, 2018 and June 30, 2018, a time when Georgetown had placed him on leave but not yet fired him.  Georgetown received no services for this payment.

ellipsis in original) (quoting *Sapoznik*, 161 F.3d at 1121). Because that difference can be difficult to calculate, courts have concluded that a percentage of the total salary—ranging between 10 percent and 25 percent—is reasonable under the Guidelines. *See, e.g.*, *Bahel*, 662 F.2d at 648-50 (noting that "it would be unduly complex to try to delineate which part of the $876,000 [salary] was paid for honest services and which part was paid for the dishonest services," and using 10 percent as a "conservative estimate of the cost of the fraud") (internal citations and quotations omitted); *Sapoznik*, 161 F.3d at 1121-22 (finding that 25 percent of salary paid to corrupt police chief was loss for purposes of calculating restitution). Applying those same ranges to this case would result in estimated losses to USC of between $280,292 and $700,731, and to Georgetown of between $36,165 and $90,413.[9] Yet it is precisely because the losses are difficult to calculate that it is appropriate, as an alternative, to substitute the value of the bribe and related payments the defendants made in calculating the relevant offense level, as the parties have stipulated.

**B.    Georgetown and USC Have Been Forced, at Great Expense, To Conduct Internal Investigations and To Revise Policies and Programs as a Result of The Defendants' Fraud**

The victim universities have also incurred costs in investigating the defendants' fraud. Although the Guidelines exclude from the calculation of loss the costs of assisting the government in its investigation, *see* U.S.S.G. § 2B1.1 cmt. n.3(D)(ii) (loss shall not include "costs incurred by victims primarily to aid the government in[] the prosecution and criminal investigation of an offense"), investigative costs are properly included where, as here, a victim engages counsel for reasons independent of the government's inquiry. *See United States v. DeRosier*, 501 F.3d 888, 895 (8th Cir. 2007) (recognizing that investigative costs incurred to aid the government are not

---

[9] Given the sheer volume of students alleged to have been the beneficiaries of the bribery scheme involving Heinel (nearly three dozen) and Ernst (more than 10), a range closer to 50-75 percent of salary might be more appropriate.

counted in the loss calculation, but that attorneys' fees and related costs are properly included where "the investigation was prompted for the bank's own benefit"); *United States v. Piggie*, 303 F.3d 923 (8th Cir. 2002) (victim's investigative fees into coach's scheme to deprive university of the honest services of college basketball players were properly included in calculating loss for Guidelines purposes).[10]

Here, Georgetown launched an investigation into tennis coach Gordon Ernst in late 2017, nearly one year before the government contacted the university about Ernst's scheme.[11] Georgetown engaged a law firm to conduct the investigation, which determined that Ernst violated University rules concerning admissions by misrepresenting certain applicants as competitive tennis players. As a result, Georgetown placed Ernst on leave and ultimately forced him to resign. All this occurred *before* federal investigators contacted Georgetown about Ernst's fraud. The internal investigation also continued after the government's investigation was made public in March 2019.[12] As a result of the scheme, Georgetown undertook an extensive review of students recruited by Ernst, spending hundreds of hours "individually reviewing each student's case and . .

---

[10] *But cf. Lagos v. United States*, 138 S.Ct. 1684 (2018) (holding, with respect to claims for restitution, as opposed to loss, that the words "investigation" and "proceedings" in the Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A(b)(4), refer to government investigations and criminal proceedings, and that section does not permit an award of restitution for private investigations and civil proceedings). *But see United States v. Gammell*, 932 F.3d 1175 (8th Cir. 2019) (distinguishing *Lagos* and finding that private investigative costs may be compensable restitution under 18 U.S.C. § 3663A(b)(1) with respect to damage, loss, or destruction of property).

[11] *See, e.g.*, Winton, Richard, *Long before college admissions scandal, universities saw signs of fraud on campus*, L.A. TIMES (May 20, 2019), *available at* https://www.latimes.com/local/lanow/la-me-college-admissions-scandal-universities-what-know-explainer-20190520-story.html; Georgetown University, Update on the U.S. Department of Justice Investigation (March 12, 2019), *available at* https://www.georgetown.edu/media-advisories/03122019b.

[12] Letter from Georgetown University (Aug. 2, 2019).

. taking serious disciplinary action" as appropriate, and ultimately adopted a new policy for student-athlete recruitment and admissions, in an effort to protect itself against similar frauds.[13]

Likewise, although USC began assisting the government in approximately November 2018, the university subsequently launched its own internal investigation of 33 students to determine whether they had lied on their USC applications.[14]  That investigation continues.[15]  USC has also hired consultants to review its admissions policies in light of the defendants' scheme.[16]

The need for the victim universities to investigate their corrupt employees upon learning of the fraud scheme was reasonably foreseeable to the defendants.  Indeed, the reputational harm the universities suffered from the scheme, and the critical importance of academic integrity to research universities generally, *required* that the universities review their practices to determine who was involved in perpetrating the fraud, who benefited from it and how to prevent it from recurring.

Finally, as a result of the defendants' conduct, USC and Georgetown have been named in multiple putative class actions alleging that they were negligent and violated consumer protection

---

[13] *Id.*

[14] Rubin, Joel and Matthew Ormseth, *How many students cheated to get into USC? A look inside the admissions investigation*, L.A. TIMES (July 16, 2019), *available at* https://www.latimes.com/local/lanow/la-me-college-admissions-usc-20190716-story.html; *see also* Letter from University of Southern California (Aug. 7, 2019); University of Southern California, Updates regarding college admissions investigation, *available at* https://news.usc.edu/155195/statement-regarding-college-admissions-investigation/ (last updated Aug. 12, 2019); University of Southern California, USC information on college admissions issue (Aug. 11, 2019), *available at* https://news.usc.edu/155225/usc-information-on-college-admissions-issue/.

[15] *Id.*

[16] *Id.*

and unfair competition laws.[17]  The universities have incurred legal fees defending against these lawsuits,[18] which would not have been filed but for the defendants' fraud.

### C. USC and Georgetown Will Predictably Suffer Lost Revenues as a Result Of the Fraud Scheme

Georgetown and USC derive significant revenues from application fees.  One predictable consequence of the reputational harm both universities have suffered as a result of defendants' fraud is a decline in the number of applicants and a resulting loss of application fees.

For example, a recent market research poll concluded that "[t]here has been a significant negative impact to the USC brand," as a result of the fraud scheme, and that, of the schools measured, USC's name was most associated with the terms "scandal" and "cheating."[19]  Although the arrests in this case occurred too late in the admissions cycle to have an impact on the number of applications to USC's class of 2023, a recent academic study suggests that the university can expect a decline in applications on the order of 10 percent for each of the next two years.[20]

---

[17] *See, e.g.*, *Olsen, et al. v. Singer, et al.*, No. 3:19-cv-01351 (N.D. Cal. Mar. 13, 2019) (dismissed without prejudice on March 15, 2019 in light of *Bendis* matter); *Bendis, et al. v. Singer, et al.*, No. 5:19-cv-01405 (N.D. Cal. Mar. 15, 2019) (dismissed as to USC, Georgetown, and Wake Forest on July 5, 2019 in light of *Tamboura* matter); *Tamboura, et al. v. Singer, et al.*, No. 5:19-cv-03411 (N.D. Cal. June 14, 2019) (pending as to Georgetown, USC, and other affected schools as of Sept. 4, 2019).

[18] *E.g.*, Letter from Georgetown University (Aug. 2, 2019).

[19] E-Poll Market Research, *How Do Brands Survive a Crisis?* (May 13, 2019), *available at* https://blog.epollresearch.com/2019/05/13/how-do-brands-survive-a-crisis/.

[20] *See* Rooney, P., and Smith, J., *The Impact of Highly Publicized Campus Scandals on College Outcomes*, CONTEMPORARY ECONOMIC POLICY, Mar. 18, 2019, *available at* https://onlinelibrary.wiley.com/doi/full/10.1111/coep.12427 (concluding that "scandals with significant media coverage substantially reduce applications" and that scandals covered in long-form news articles lead to a 10 percent drop in applications, with greater media coverage precipitating more substantial declines).

For USC, which received approximately 64,000 applications for admission in 2018, with an associated fee of $85 per application, a 10 percent decline in applications would translate to a loss of more than $540,000 in application revenues per year. Likewise, for Georgetown, a 10 percent decline in applications would cause a loss of more than $170,000 per year.[21] *See* U.S.S.G. § 2B1.1 cmt. n.3(C)(v) (in estimating loss, courts must consider the "reduction that resulted from the offense in the value of . . . other corporate assets"). Indeed, even if the study's results overstate the decline dramatically, the point is clear: it is reasonably foreseeable that the universities will suffer a cognizable loss from the fraud.

While pecuniary harm for Guidelines purposes does not include "harm to reputation" *per se*, U.S.S.G. § 2B1.1 cmt. n.3(A)(iii), the Guidelines provide that "reasonably foreseeable pecuniary harm" *does* include pecuniary harm "that the defendant knew or, under the circumstances, reasonably should have known, was a *potential* result of the offense." *Id.* cmt. 3(A)(iv) (emphasis added). Moreover, probable loss is cognizable for sentencing purposes. *See United States v. Vrdolyak*, 593 F.3d 676, 681 (7th Cir. 2010); *United States v. Corrigan*, 273 F. App'x 15, 16 (2d Cir. 2008) ("We have described 'intended loss' as 'the probable loss from a particular misstatement because one is presumed to intend the natural and 'probable' consequences of one's acts.'") (quoting *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000)). Here, the loss

---

[21] Mackovich, Ron, *USC sees record number of applicants for fall 2018 admission*, USC News (March 23, 2018), *available at* https://news.usc.edu/139338/usc-acceptance-rate-fall-2018-admission/ (USC received 64,000 applications in 2018); USC Dornsife College of Letters, Arts and Sciences, Freshman Application Process, *available at* https://dornsife.usc.edu/undergraduate-application-process/ (last accessed Sept. 4, 2019) ($85 application fee for USC); Kahn-Perry, Taylor, *Admissions Rate Falls to 14 Percent, Lowest in University History*, The Hoya (April 5, 2019), *available at* https://www.thehoya.com/admit-rate-falls-14-percent-lowest-university-history/ (Georgetown received 22,788 applicants in 2018); Georgetown University Office of Undergraduate Admissions, First Year Application, *available at* https://uadmissions.georgetown.edu/applying/first-year-application/ (last accessed Sep. 4, 2019) ($75 application fee for Georgetown).

of application-related revenue is a foreseeable result of the defendants' conduct, and the Court need not wait for that harm to actually occur to take it into account at sentencing.

## II.     THE TESTING AGENCIES SUFFERED PECUNIARY HARM

Like the universities, the College Board, Educational Testing Service ("ETS") and the ACT, Inc. have suffered pecuniary harm from the lost wages they paid to their corrupt proctors, the cost of their internal investigations, the cost of strengthening their security practices in direct response to the defendants' conduct, the lost revenue resulting from a decline in the number of students taking those exams, and the decline in the value of their intellectual property.  The agencies acknowledge these losses in individual victim impact statements they have submitted to the Court.

Moreover, in the weeks and months after the fraud was publicly disclosed, numerous universities announced they will no longer require applicants to submit standardized test scores as part of their applications, resulting in decreased revenue for the testing agencies.  For example:

| College/University | "Test Optional" Announcement | Last Year Applicant Pool |
|---|---|---|
| University of Minnesota - Crookston | March 18, 2019 | 1,297 |
| University of Denver | March 19, 2019 | 20,475 |
| University of San Francisco | March 27, 2019 | 18,411 |
| Springfield College | March 28, 2019 | 3,367 |
| Southwestern University | April 1, 2019 | 4,551 |
| Alma College | April 17, 2019 | 4,765 |
| Simpson College | April 18, 2019 | 1,401 |
| University of Southern Maine | May 22, 2019 | 4,254 |
| Marquette University | June 10, 2019 | 15,574 |
| University of Rochester | June 12, 2019 | 21,255 |
| Dominican University of California | July 15, 2019 | 1,909 |
| University of New Haven | August 5, 2019 | 10,426 |
| Spring Hill College | August 8, 2019 | 8,587 |
| Carroll College | August 12, 2019 | 2,709 |
| Queens University of Charlotte | August 18, 2019 | 2,419 |
| College of Our Lady of the Elms | August 20, 2019 | 1,085 |

| (except School of Nursing) | | |
| Xavier University | August 23, 2019 | 15,100 |
| Colorado College | August 28, 2019 | 8,552 |
| **TOTAL** | | **146,137** |

While it is difficult to attribute any one of these decisions directly to the fraud scheme,

California state officials did just that in introducing legislation to eliminate the use of standardized

tests by the state's two public university systems.  In introducing the legislation, its author noted:

> [R]ecently, it was uncovered that wealthy parents are buying their children's
> way into elite colleges and universities including two universities that are part
> of the University of California system.  We all watched in complete disgust as
> the fraud committed in this recent college admissions scandal unfolded.
> California seems to be the epicenter of the national scandal as 25 of the 33
> families in the initial indictment are from California, and 10 of the 17 corrupt
> coaches and university officials were based at California colleges and
> universities.

> This scandal not only undermines the public's trust in the college admissions
> process, but it further perpetuates the opportunity gap in our college system.
> Equally disturbing is the fact that qualified California students were
> undoubtedly squeezed out and denied admission.  For every student admitted
> through bribery and fraud, there was an honest and talented student that was
> rejected.

> The scandal also shed light on the many legal ways that wealth and social
> connections skew the college admissions process.  This scandal, "Operation
> Varsity Blues," and the subsequent investigation resulted in dozens of bribery
> and fraud charges against wealthy parents willing to break the law to get their
> children into an elite university, including fraudulent testing practices with the
> SAT and ACT tests.

Calif. Bill No. ACR-64, Comments at p. 2-3.  As of September 4, 2019, the bill had passed the

California State Assembly and was pending in the California State Senate.

In 2018, more than 800,000 students applied to the California State University and University of California systems alone.[22]  As a result, the College Board, ETS and the ACT can expect a significant decline in the number of applicants taking the SAT and ACT tests, and the loss of associated registration fees.  In 2019, those fees were $52.00 and $49.50 per exam,[23] respectively, for the ACT and the SAT, in addition to fees the agencies charge for sending test scores to schools, expediting scores, late registration, changing test centers, and selling test preparation materials.[24]

These lost revenues are precisely the type of "reduction in the value of [proprietary] information" resulting from the offense that the Guidelines provide should be included in the calculation of pecuniary harm.  *See* U.S.S.G. § 2B1.1 cmt. n.3(C)(ii); *see also id.* n.3(C)(v) (in estimating loss, courts must consider the "reduction that resulted from the offense in the value of . . . other corporate assets").

---

[22] Specifically, the California State University system had 637,350 "First Time Freshman" applications, *see* Press Release, Cal. State System, CSU New Students Applications and Admissions By Campus and Student Level (Dec. 14, 2018), *available at* https://www.calstate.edu/as/stat_reports/2018-2019/apps_f2018_all.htm, while the University of California system had 181,918 applications, *see* Press Release, UC System, Freshman Applications by Campus and Residency, *available at* https://www.ucop.edu/institutional-research-academic-planning/_files/factsheets/2019/fall-2019-applications-table-1-1.pdf.

[23] These figures reflect the lowest possible fee associated with taking the exams. *See, e.g.*, ACT, Inc., Current ACT Fees and Services, *available at* https://www.act.org/content/act/en/products-and-services/the-act/registration/fees.html (last accessed Sep. 4, 2019); College Board, Fees, *available at* https://collegereadiness.collegeboard.org/sat/register/fees (last accessed Sep. 4, 2019).

[24] *See, e.g.*, Jack Meserve, *The SAT May Have Been Changed To Help The College Board Maximize Revenue*, THE MOTLEY FOOL, Mar. 7, 2014, *available at* https://www.businessinsider.com/the-sat-may-have-been-changed-to-help-college-board-maximize-revenue-2014-3 ("The details of the College Board's revenue stream aren't publicly available, but SAT administration and all of its related paraphernalia—The Official SAT Study Guide with DVD ($31.99), the SAT Score Verification Services ($18), the SAT Online Course (just $69.95 a year!)—surely make up a sizable portion. Chadwick Matlin of Slate.com conservatively estimated this combined revenue at around $115 million back in 2006.").

## III.     **THE STIPULATED GAIN/LOSS IS APPROPRIATE AND REASONABLE**

All of the defendants have stipulated that their offense levels should be enhanced, pursuant

to the table in Section 2B1.1(b) of the Sentencing Guidelines, based on the sums they paid to

participate in the fraud scheme.  Such an approach is appropriate where the precise amount of

pecuniary harm caused by the scheme is difficult or impossible to calculate (not least because, as

noted above, that harm is still occurring), and it is also consistent with the way in which various

provisions of the Sentencing Guidelines treat bribe payments generally.

Indeed, while the plea agreements in this case stipulate that the Guidelines should be

calculated based on Section 2B1.1, the First Circuit and at least *four* other circuits have in similar

circumstances applied Section 2B4.1, the commercial bribery guideline, to private sector honest

services fraud cases, regardless whether those cases were charged pursuant to 18 U.S.C. § 1346.

*See, e.g.*, *United States v. Josleyn*, 99 F.3d 1182, 1198 (1st Cir. 1996) (applying § 2B4.1 where

defendant convicted of conspiracy and mail fraud for conspiring to defraud his former employer

by accepting bribes from prospective Honda dealers in exchange for dealership rights).[25]  Notably,

Section 2B4.1—which has a slightly higher base offense level—instructs courts to refer back to

_____

[25] *See also, e.g., United States v. Rybicki*, 38 F. App'x 626, 633 (2d Cir. 2002) (affirming sentence under § 2B4.1 where defendant convicted of honest services fraud); *United States v. Montani*, 204 F.3d 761 (7th Cir. 2000) (same); *United States v. Winters*, 62 F.3d 1418, 1995 WL 462415 (6th Cir. Aug. 3, 1995) (unpublished) (same); *United States v. Kelly*, No. 17-cr-547001-RWS, 2018 WL 2411593, at *4 (S.D.N.Y. May 29, 2018) (unpublished) (same); *United States v. Hendershot*, 150 F. Supp. 2d 965, 968 (N.D. Ill. 2001) (applying § 2B4.1 where defendant convicted of mail fraud arising out of an illegal kickback scheme and noting that "[t]he government prosecuted this case as a bribery case"); *see also United States v. Poirer*, 321 F.3d 1024, 1035 (11th Cir. 2003) (applying § 2B4.1 where defendants convicted of wire fraud and conspiracy and noting, "[i]t is certainly true that accepting or providing bribes is inconsistent with the delivery of honest services, but that is not to say that the commercial bribery guideline cannot also be applied to a § 1343 money and property wire fraud case. The defendants' conduct in giving and receiving money in exchange for the misappropriation of documents is 'more aptly' covered by the commercial bribery guideline than by the fraud guideline.").

Section 2B1.1, and to apply an enhancement pursuant to the table set forth in that Guideline based on the greater of the amount of the bribe paid or the improper benefit conferred.

In *United States v. Tanner*, for example, the district court applied Section 2B4.1 in a private sector honest services fraud case in which the defendant, a pharmaceutical executive, received a kickback of nearly $10 million in exchange for giving secret guidance to senior executives at a mail-order pharmacy the defendant's employer was negotiating to purchase. *See* Transcript of Proceedings, No. 17-cr-00061-LAP (S.D.N.Y. Oct. 30, 2018) (Dkt. 214). In that case, the Probation Department agreed that Section 2B4.1 was the appropriate Guideline and the court enhanced the base offense level pursuant to the table in Section 2B1.1 based on the $10 million bribe the defendant received. *See id.*

More recently, in a case directly analogous to this one, former University of Pennsylvania basketball coach Jerome Allen was sentenced in July in the Southern District of Florida after pleading guilty to one count of money laundering under 18 U.S.C. § 1957, in connection with a scheme to accept bribes from co-conspirator Phillip Esformes in exchange for recruiting Esformes's son to the University of Pennsylvania basketball team. *See* Judgment, *United States v. Allen*, No. 18-cr-20773-KMW (S.D. Fla. July 8, 2019) (Dkt. 34). In that case, the parties' stipulated that the Guidelines should be calculated based on an underlying base offense level derived from Section 2B4.1(a), and that the offense level should be enhanced pursuant to Section 2B1.1 based on bribe payments of between $15,000 and $40,000. *See* Plea Agreement, *United States v. Allen*, No. 18-cr-20773-KMW (S.D. Fla. Oct. 3, 2018) (Dkt. 10). At Allen's sentencing, the district court applied Section 2B4.1 and sentenced him under that Guideline, but found that the

bribe amount was higher—between $150,000 and $250,000—and enhanced the offense level accordingly.[26]

Like Section 2B4.1, Section 2C1.1, which applies to public-sector honest services fraud, provides for an enhancement pursuant to the table in Section 2B1.1 based on the greater of the value of the bribe or the improper benefit conferred in exchange. *Compare* U.S.S.G § 2C1.1(b)(2) ("if the value of the payment, the benefit received or to be received in return for the payment . . . whichever is greatest, exceeded $6,500, increase by the number of levels from the table in § 2B1.1") *with* U.S.S.G. § 2B4.1(b)(1)(B) ("If the greater of the value of the bribe or the improper benefit to be conferred . . . exceeded $6,500, increase by the number of levels from the table in § 2B1.1.").[27] Although Section 2C1.1 typically applies to bribery involving public officials, it also applies to convictions under 18 U.S.C. § 666(a)(2), which criminalizes fraud and bribery schemes at organizations or agencies that receive more than $10,000 per year in federal benefits.[28] As an example, in the Jerome Allen case referenced above, Allen's co-conspirator, Phillip Esformes, was convicted after trial of conspiracy to violate Section 666(a)(2) arising out of his payment of bribes to Allen, an employee of the University of Pennsylvania. *See* Jury Verdict, *United States v. Esformes*, No. 16-cr-20549-RNS (S.D. Fla. April 5, 2019) (Dkt. 1245). Although Esformes's sentencing has not yet occurred—the hearing is scheduled for September 11 and 12—the U.S.

---

[26] The court sentenced Allen to probation based on his cooperation with the government at Esformes's trial.

[27] Section 2C1.1 carries a higher base offense level than either Section 2B1.1 or 2B4.1. S*ee Josleyn*, 99 F.3d at 1199 n.15 ("One reasonable explanation for the two-level difference between the BOL for private bribery, *see* U.S.S.G. § 2B4.1 (level 8), and public bribery, *see* U.S.S.G. § 2C1.1 (level 10), may lie in the fact that the Sentencing Commission factored the abuse-of-trust element into the BOL for public bribery only.").

[28] Although the defendants here were not charged pursuant to Section 666, the victim universities receive more than $10,000 per year in federal assistance.

Probation office in the Southern District of Florida has calculated his offense level pursuant to Section 2C1.1, with a base offense level of 12 and an enhancement based on the amount of the bribe paid.

Accordingly, enhancing the defendants' base offense level based on the value of the bribe and related payments is consistent with the way in which the Guidelines treat bribe payments generally, and would align the defendants' Guidelines ranges in this case with those of similarly situated defendants nationwide. Measuring harm based on the value of the bribes or the improper benefits conferred is also consistent with the purpose of the Guidelines generally to appropriately reflect the defendants' absolute and relative culpability and to achieve a just result. By contrast, the PSR's conclusion that the bribe amount has no impact on the calculation of the Guidelines means that a defendant who pays a $10 million bribe will have the *same* offense level as a defendant who pays a $10,000 bribe, and that a defendant who commits a fraud that causes pecuniary harm of $6,501 will have a *higher* offense level than a defendant who pays a $65 million bribe. The government respectfully submits that such an approach is neither logical nor just.

## <u>CONCLUSION</u>

For the reasons set forth above, the government respectfully submits that the Court should find that the victim universities and testing agencies have suffered pecuniary harm from the defendants' fraud, and that the applicable Guidelines levels should be enhanced pursuant to Section 2B1.1 based on the amounts the defendants agreed to pay to facilitate the scheme, as stipulated in the plea agreements.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney


By:     */s/ Eric S. Rosen*
ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Assistant United States Attorneys

Date: September 5, 2019